**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC,[1] *et al.*,<br><br>     Debtors. | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |
| GARLOCK SEALING TECHNOLOGIES LLC, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>SIMON GREENSTONE PANATIER BARTLETT, APLC, *et al*.,<br><br>     Defendants. | Case No. 3:14-cv-00116-MOC<br><br>Adversary Proceeding No. 14-AP-03037 |

**APPENDIX TO SUBMISSION OF RECENT CLAIMANT COMMITTEE'S ARGUMENT AT ODDS WITH SIMON GREENSTONE DEFENDANTS' MOTION TO WITHDRAW THE REFERENCE**

| Exhibit Number | Description |
|---|---|
| Exhibit A | Transcript from May 8, 2014 hearing in *In re Garlock Sealing Technologies LLC*, Case No. 10-31607 (Bankr. W.D.N.C.) (excerpts) |
| Exhibit B | Complaint filed January 9, 2014 in *Garlock Sealing Technologies LLC v. Simon Greenstone Panatier Bartlett, APLC*, Case No. 14-AP-03037 (Bankr. W.D.N.C.) |

---

[1] The three debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division**

| | |
|---|---|
| IN RE:<br><br>GARLOCK SEALING TECHNOLOGIES LLC,[1] et al.<br><br>            Debtors. | Case No. 10-BK-31607<br><br>Chapter 11<br><br>Jointly Administered |
| GARLOCK SEALING TECHNOLOGIES LLC and GARRISON LITIGATION MANAGEMENT GROUP, LTD.,<br><br>            Plaintiffs,<br><br>    v.<br><br>SIMON GREENSTONE PANATIER BARTLETT, A PROFESSIONAL CORPORATION; JEFFERY B. SIMON; DAVID C. GREENSTONE; ESTATE OF RONALD C. EDDINS; AND JENNIFER L. BARTLETT,<br><br>            Defendants. | Adversary Proceeding No. 14-AP-3037 |

**COMPLAINT**

Garlock Sealing Technologies LLC and Garrison Litigation Management Group, Ltd.

(collectively, "Garlock"), debtors and debtors-in-possession in bankruptcy cases pending in the

United States Bankruptcy Court for the Western District of North Carolina, hereby submit their

Complaint and allege:

---

[1]  The three debtors in these jointly administered cases are Garlock Sealing Technologies LLC; Garrison Litigation Management Group, Ltd.; and The Anchor Packing Company.

# I.
## NATURE OF THE ACTION

1.      Garlock brings this action against Jeffrey B. Simon ("Simon"), David C. Greenstone ("Greenstone"), the Estate of Ronald C. Eddins ("Eddins Estate") and Jennifer L. Bartlett ("Bartlett") (together, the "Lawyer Defendants") and Simon Greenstone Panatier Bartlett, a Professional Corporation (together with its predecessor firm, the "Firm") (collectively "Defendants") because they committed fraud and violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").

2.      The Lawyer Defendants are well-organized and fully resourced asbestos personal injury lawyers who have, since forming the Firm in 2006, engaged in a deliberate and ongoing scheme to defraud solvent manufacturers and distributors of asbestos-containing equipment and components.  In particular, through the various acts of mail and/or wire fraud described below, Defendants have conspired over a period of years to conceal evidence and misrepresent facts in order to maximize settlement offers by, and verdicts entered against, solvent asbestos defendants (the "Scheme").  The Scheme has allowed Defendants to maximize settlements and jury verdicts from solvent defendants in the tort system, while—sometimes simultaneously—taking full advantage of recovery available against insolvent asbestos manufacturers and distributors in the bankruptcy system.  Garlock and its codefendants have been targets of this Scheme, which is ongoing.

### *How the Scheme Works*

3.      The Scheme consists of Defendants knowingly and willfully concealing material evidence of their clients' exposures to asbestos that Defendants are obligated to disclose in discovery. Defendants conceal evidence of their clients' exposures to the dangerous asbestos products of reorganized companies—for which asbestos trusts are now responsible—to increase

the strength of their clients' cases against Garlock and other tort defendants and accordingly the amount of their contingency fees. Defendants or their co-counsel then use the concealed exposure evidence to obtain payments from trusts, upon which they also receive substantial contingency fees.

4.      By concealing exposure evidence and telling different stories about what caused their clients' injuries to Garlock on the one hand and trusts on the other, Defendants obtained inflated settlements and verdicts from Garlock and committed fraud against Garlock.

5.      Defendants' representation of Charles White ("White") provides a prime example of how the Scheme operates. White was diagnosed with mesothelioma on February 26, 2006. After his diagnosis, he told his wife that he knew at least one cause of his asbestos disease— during his employment ████████, he had worked with and around pipefitters and insulators ██████████ while they were installing and tearing out asbestos pipe insulation. White would later swear that he was also exposed to asbestos pipe insulation when he █████████████ ██. Asbestos pipe insulation was one of the most notoriously dangerous, highly friable asbestos products ever used in American workplaces, so dangerous that the federal government banned it from the marketplace in the 1970s. Pipe insulation was manufactured by companies like Armstrong World Industries, Owens Corning, Fibreboard, and Keene. These companies could not be sued in the tort system because that had previously filed for bankruptcy protection, reorganized under Chapter 11, and funded trusts to compensate workers for disease caused by their products.

6.      When he engaged the Lawyer Defendants, they convinced White to tell a different story for his lawsuit against Garlock. In this rendition, Defendants claimed that exposure to Garlock's products and the products of a handful of other non-bankrupt companies had caused

3

his mesothelioma.  White testified in his tort suit that he never ████████████████████ ██████████████, so could not have been exposed to pipe insulation ████. He also testified that, ████████████, he did not believe he was exposed to any asbestos-containing products at all, and that he never saw anyone remove pipe insulation.

7.     Garlock knew that its non-friable gaskets could not have caused White's disease and that the likely cause was friable amphibole pipe and other insulation.  Garlock, however, had no practical and economical way of disproving the story that Defendants manufactured for White.  Garlock thus settled White's claims for an inflated amount, paying the settlement on June 13, 2007.

8.     But unknown to Garlock, Defendants' double dipping already had begun. Beginning on May 8, 2007, the law firm that referred White to Defendants—Early Lucarelli Sweeney & Meisenkothen—began filing trust claims for White against bankrupt companies, including the companies that manufactured or were responsible for friable amphibole pipe insulation—Armstrong World Industries, Owens Corning, Fibreboard, and Keene.  White's attorneys submitted sworn statements in support of fifteen of the trust claims.  These sworn statements told a completely different story from Defendants' tort system story.  In contrast to White's testimony against Garlock that, ████████████████████, he never worked ██ ██ and that, ███████████████████, he never was exposed to asbestos, White's wife and White himself swore that he was exposed to asbestos-containing pipe insulation and numerous other highly friable asbestos products in these very settings. White's lawyers eventually would file twenty-four bankruptcy trust claims on behalf of White for asbestos exposures he either denied or never disclosed in his suit against Garlock.

4

9.     The beauty of the Scheme for Defendants was (and remains) that the two stories permitted multiple recoveries for one injury, translating into higher contingency fees for Defendants.  The reason this double dipping could occur is that the rules governing the filing of bankruptcy trust claims keep such claims secret.  The people who wrote those rules were people like Defendants—plaintiffs' asbestos lawyers.  Because of trust secrecy provisions, Defendants had good reason to believe that perjury they had suborned in state court to inflate White's claims against Garlock would never be discovered.

10.     Defendants followed the same pattern in other cases.  In two more cases filed during 2006 through 2008 (specifically identified in paragraph 12 below, with *White*, as *Ornstein* and *Reed*), Defendants sued Garlock in state court in California claiming that their clients' mesothelioma had been caused primarily by exposure to Garlock's asbestos-containing products and the products of several other non-bankrupt defendants.  But at the same time that they were suing Garlock, Defendants, without the required disclosure to Garlock and its codefendants and acting in concert with the firms that referred *White* and *Reed* to them, also were pursuing claims for the same clients in bankruptcy cases against manufacturers of products that were far more likely causes of their clients' diseases based on testimony that was starkly inconsistent with testimony offered in their cases against Garlock.  Defendants' pursuit of trust claims intensified after they resolved their state court cases, with Defendants pursuing multiple claims for their clients based on tales of exposures they did not disclose in tort system discovery.

11.     During the relevant time period, standard asbestos interrogatories in *White*, *Ornstein*, and *Reed* as well as in other lawsuits against Garlock and its solvent codefendants (identified in paragraph 14 below as the "Limited Discovery Cases") legally obligated Defendants to disclose all of their clients' asbestos exposures, including the exposures that were

5

the bases of bankruptcy trust claims for these same clients. Defendants were aware, however, that making the required disclosures would have greatly reduced the value of the *White*, *Ornstein*, and *Reed* actions and the Limited Discovery Cases against Garlock and its codefendants. The bankrupt companies' asbestos-containing products are known for their potential to cause mesothelioma, while Garlock's products and products of many of its codefendants are demonstrably safe in their foreseeable use.

12. Thus, Defendants knew that if they made the required disclosures thereby giving a complete and accurate picture of their clients' exposure profiles, reasonable fact finders would conclude that most, if not all, liability in *White*, *Ornstein*, *Reed* and in the Limited Discovery Cases properly rested with the bankrupt companies. Accordingly, Defendants repeatedly signed and served, using the mails and/or wires, discovery responses concealing the exposures that were the foundation of the claims they and their referral firms would submit against bankruptcy trusts. Defendants conceived and perpetrated this fraud to increase the amount of the contingency fees they would realize from their tort cases, including the *White*, *Ornstein*, and *Reed* actions and the Limited Discovery Cases. Defendants' fraud did not come to light until January 2013, when Garlock obtained discovery in the bankruptcy case to which this adversary proceeding is related.

13. Defendants' fraud has been highly effective, inducing Garlock to incur unnecessary defense costs and to settle cases, including at least the following cases, for amounts that were artificially inflated by Defendants' fraud: *White v. Buffalo Pumps, Inc., et al.*, Case No. 2006-41943 (Harris County, TX 2006) ("*White*"); *Ornstein v. Alfa Laval, Inc., et al.*, Case No. BC388810 (Los Angeles County, CA 2008) ("*Ornstein*"); and *Reed v. American Standard, Inc., et al*, Case No. BC360536 (Los Angeles County, CA 2006) ("*Reed*").

14.     Further, as more fully described below, this pattern of misconduct occurred in at least ten other cases that the Firm pursued against Garlock and other solvent defendants, cases that were litigated contemporaneously with and after *White*, *Ornstein*, and *Reed* (collectively, the "Limited Discovery Cases," each of which is specifically identified at paragraphs 161 – 207 below).  The inflated settlements in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases, the fraudulent means by which they were obtained, and their effect on the defense and settlement of other Garlock cases are the subjects of this lawsuit.

15.     More broadly, the concealment and suppression of exposure evidence used to sustain trust claims and bankruptcy filings from solvent asbestos defendants has been widely recognized as a fraudulent and deceptive practice in the growing number of cases where such conduct has been discovered before trial.  Judge Peggy Ableman, who until 2012 presided over all asbestos litigation in the state of Delaware, described the conduct in one such case as "dishonesty at its highest level. . . . This is trying to defraud. . . . [I]t happens a lot [in asbestos litigation].  She later testified before the Judiciary Committee of the U.S. House of Representatives about the same incident, stating that "the very foundation and integrity of the judicial process is compromised by the withholding of information that is critical to the ultimate goal of all litigation—a search for, and discovery of, the truth."  The U.S. House of Representatives passed legislation on November 14, 2013 that is designed to prevent fraud such as this in the future.

16.     Because of confidentiality provisions applicable to trust claims and bankruptcy filings that have been procured by asbestos plaintiffs' firms, Garlock was unable to discover the conduct described in this Complaint before it settled the cases and suffered the damages

described in this Complaint. In fact, Garlock was unable to discover the suppression of evidence until it obtained court-ordered discovery in its bankruptcy case.

17.     Defendants' conduct described below gives rise to claims for violation of RICO, 18 U.S.C. § 1961, et seq., common law fraud, and civil conspiracy.

## II.
## PARTIES, JURISDICTION, AND VENUE

18.     Plaintiff Garlock Sealing Technologies LLC is a North Carolina limited liability company whose sole member is Coltec Industries Inc, which is a Pennsylvania corporation with its principal place of business in Charlotte, North Carolina.

19.     Plaintiff Garrison Litigation Management Group, Ltd. is a North Carolina corporation with its principal place of business in Rochester, New York.

20.     Defendant Simon Greenstone Panatier Bartlett, a Professional Corporation, is a professional corporation organized under the laws of the State of Texas whose partners, upon information and belief, are citizens and residents of Texas and California. Simon Greenstone Panatier Bartlett is the successor to Simon Eddins & Greenstone, LLP.

21.     Defendant Jeffrey B. Simon has been a partner or shareholder in the Firm during the events relevant to this Complaint. Upon information and belief, he is a citizen and resident of Texas.

22.     Defendant David C. Greenstone has been a partner or shareholder in the Firm during the events relevant to this Complaint. Upon information and belief, he is a citizen and resident of Texas.

23.     Defendant Eddins Estate is the estate of a deceased lawyer, Ronald C. Eddins (collectively with the Eddins Estate, "Eddins"), who was a partner or shareholder in the Firm from 2006 to 2011. Ronald Eddins died on January 4, 2012. Upon information and belief, he

was a citizen and resident of Texas. Upon information and belief, the Eddins Estate is being administered in the State of Texas.

24.     Defendant Jennifer L. Bartlett has been a partner or shareholder in the Firm during the events relevant to this Complaint. Upon information and belief, she is a citizen and resident of California.

25.     Upon information and belief, the Firm derives income from the fees that it charges for legal services provided by its lawyers, generally upon a contingency fee basis.

26.     The Firm acts through the lawyers it employs. The Lawyer Defendants conduct or participate in, directly or indirectly, the Firm's affairs. The Lawyer Defendants also act for themselves and their own personal benefit, including by receipt of their respective shares of the Firm's profits as partners or shareholders.

27.     The district court has subject matter jurisdiction over the claims herein for relief under 28 U.S.C. §§ 1331 (federal question), 1332 (diversity of citizenship), and 1334 (bankruptcy). The causes of action alleged herein relate to a case under the Bankruptcy Code. This is a non-core proceeding under 28 U.S.C. § 157 in which Garlock requests a trial by jury before the district court.

28.     Venue is predicated upon 28 U.S.C. § 1409(a), which provides for venue for a proceeding related to a case under the Bankruptcy Code in the district court where such case is pending.

29.     This Court has personal jurisdiction over Defendants under the nationwide service provisions of Federal Rule of Bankruptcy Procedure 7004(d) because Defendants reside within the United States.

# FACTUAL BACKGROUND

30.     Defendants individually and collectively represent asbestos plaintiffs in state and federal courts (the "tort system"), including against Garlock and other solvent defendants, as well as in the bankruptcy system and asbestos trusts.  This representation is ongoing.

31.     Defendants represented the tort plaintiffs in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases.  Early Law, L.L.C., Early Lucarelli Sweeney & Meisenkothen, and Early & Strauss, L.L.C. (collectively, the "Early Firm") referred *White* and *Reed* to Defendants and continued to represent White and Reed in connection with thirty-five bankruptcy trust claims.  The Mandelbrot Law Firm d/b/a Asbestos Legal Center (the "Mandelbrot Firm") filed claims for White and Reed with three trusts and the Law Office of John F. Venable, P.A. (the "Venable Firm") filed trust claims for White and Reed with one trust.

32.     White, Reed, Ornstein, and the plaintiffs in the Limited Discovery Cases each had mesothelioma.  Mesothelioma cases can be extremely lucrative for plaintiffs' lawyers, who are virtually always compensated by receiving a percentage of the amount the tort plaintiff recovers through settlement, trust payment, or verdict.

33.     The leading cause of mesothelioma among American workers is occupational exposure to asbestos fibers released from friable insulation containing amphibole fibers (a fiber type that is a proven cause of mesothelioma), including pipe covering and other insulating products.  Many of the companies responsible for these products, however, have filed for bankruptcy protection because of their liability for asbestos claims.  These bankruptcy filings were especially prevalent in the early 2000s.  This bankruptcy wave substantially reduced the available funds to pay damages, and therefore, plaintiffs' lawyer fees.  Thus, after the bankruptcy

wave, plaintiffs' lawyers needed to find non-bankrupt defendants to sue for their clients' injuries in order to maximize their contingency fee recoveries in the tort system.

34.    Documents filed by Defendants under penalty of perjury on behalf of Ornstein and Reed, by the Early and Mandelbrot Firms on behalf of White and Reed, and by Defendants in the Limited Discovery Cases establish that Defendants had knowledge that each of these clients had claims against such bankrupt companies responsible for friable amphibole insulation and other asbestos-containing products based on exposures to such companies' products. Further, Defendants knew during the pendency of *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases that these friable amphibole insulation-containing products were a cause of their respective clients' mesothelioma.

35.    The bankrupt friable amphibole insulation manufacturers have established trusts stocked with billions of dollars.  But Defendants wanted more money than could be recovered by pursuing claims solely against these companies and other companies that produced highly friable asbestos-containing products in their bankruptcies.  They intended to get whatever money they could out of the bankruptcy trusts, but they also searched for solvent non-insulation manufacturers and suppliers to sue in the tort system to obtain additional recoveries for their clients and themselves.

36.    Garlock is now informed and believes that when Defendants planned their lawsuits in the 2000s, they targeted another asbestos product category historically used in applications closely proximate to insulation and pipe covering:  gaskets.

37.    Asbestos gaskets are "non-friable," meaning that the asbestos fibers within the gaskets are not released in response to hand pressure.  Asbestos fibers in Garock's gaskets could not become airborne in more than trace amounts during normal use.  Accordingly, although

leading researchers warned of the dangers of asbestos insulation and other friable asbestos products that released large numbers of fibers, the same researchers explained that gaskets and packing posed "no health hazard." Indeed, unlike friable insulation products, which have been banned in the United States for almost forty years, asbestos gaskets and packing are still sold lawfully today by other companies. Moreover, Garlock's gaskets and packing principally contained chrysotile asbestos which, also in contrast to amphibole asbestos insulation, is not a proven cause of mesothelioma, especially at low doses. Garlock used these facts to formulate a "low dose" defense. Asbestos gaskets therefore do not begin to compare with insulation in notoriety, danger, fiber release, or carcinogenicity, which in the 1990s translated into favorable trial results for Garlock and other solvent gasket manufacturers. As a result, when plaintiffs admitted exposures to asbestos insulation, Garlock and other solvent defendants with similar defenses faced very little trial risk, which meant plaintiffs and their lawyers obtained less money from Garlock and other solvent defendants through settlement or trial.

38. Defendants, however, formulated the Scheme in order to turn the tables and mislead juries into returning higher awards against Garlock and other solvent defendants. Defendants accomplished this feat by taking advantage of their ability to control product identification.

39. Identification of the products that caused the tort plaintiff's disease is at the crux of every mesothelioma case. Attorneys for mesothelioma plaintiffs are in a unique position to control this product identification evidence because the tort plaintiff is often the principal witness capable of identifying facts relevant to exposure. Indeed, a plaintiff's testimony often provides the *only* evidence regarding the plaintiff's exposures.

40.     The Superior Court of Middlesex County New Jersey, in a decision imposing sanctions for a plaintiff's fraud on the court for failing to disclose the true circumstances of his asbestos exposure explained: "Knowledge of Plaintiff's work and asbestos exposure history is in Plaintiff's hands. Only what he chooses to reveal can be investigated." *Gaskill v. Abex Corp.*, No. L-1772-08, 2010 WL 1484813 (N.J. Super. Apr. 1, 2010).  Further, "[i]t is only by investigation of a Plaintiff's work history the Defendants can learn about all of Plaintiff's asbestos exposures, an issue that is central to all asbestos cases."  *Id.* Accordingly, a plaintiff's misrepresentation of his work history of asbestos exposure has "a substantial detrimental impact on Defendants' ability to conduct discovery and ultimately prepare expert reports which are dependent upon asbestos exposure history."  *Id.*

41.     Mesothelioma plaintiffs' attorneys, by virtue of their position, have exclusive access to the plaintiff before any lawsuit is filed and thus can take control of this evidence.

42.     In addition, given the passage of time, it is very difficult for tort defendants to develop evidence using sources other than the tort plaintiff.  Mesothelioma plaintiffs' attorneys often possess substantial experience and historical information to identify products to which a plaintiff was exposed, as well as relationships with co-workers, unions, and others who may provide additional information, but who are uncooperative with tort defendants.  This dynamic increases the plaintiffs bar's ability to control the product identification evidence.

43.     Yet Defendants still faced a problem if they were to get money from both solvent defendants (like Garlock) and the bankruptcy trusts.  To recover in the bankruptcy system for their clients, Defendants are required to provide meaningful and credible evidence of exposure to the bankrupts' insulation (and other) highly friable products.  But if their clients' claims against bankrupt companies were discovered in the tort system, their clients' claims against Garlock and

13

its codefendants would have far less value. Defendants thus would receive far less money in legal fees.

44. Defendants solved this problem by telling one story in the bankruptcy system and another story in the tort system, including in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases. Even as they represented their clients in bankruptcy cases—and asserted that those clients were exposed to the debtors' products—Defendants signed and served discovery responses about their clients' claims and/or allowed their clients to testify untruthfully against Garlock and its codefendants in the tort system, including in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases, by concealing their clients' exposures to the bankrupts' products. Defendants worked together with the Early and Mandelbrot Firms to accomplish their Scheme.

45. To ensure that their fraud would succeed, Defendants helped create—and continue even today to protect and promote—a system in which their client's bankruptcy ballots would not be readily available to the public and their bankruptcy trust claims, when made, would be kept confidential. In furtherance of Defendants' Scheme, Defendants, along with other members of the asbestos plaintiffs' bar, have made extraordinary—and until now successful— efforts to maintain the confidentiality of these ballots and claims, both within bankruptcy cases and when claims are asserted against trusts. These efforts include Defendants' service on the claimants' committee in Garlock's bankruptcy that opposed both discovery into the above-described issues and Garlock's and Legal Newsline's motions for an open and public estimation trial.

46. The result of this designed secrecy is a two-track system rife with potential for abuse.

14

47.     Garlock has learned during the course of its bankruptcy case that Defendants have exploited this two-track system, beginning at least seven years ago.  Through their deceptive concealment of asbestos exposures during discovery in the tort actions, Defendants were able to obtain substantial settlements from Garlock for their tort plaintiff clients.  Then, after settling with Garlock, Defendants routinely submitted ballots and/or asserted bankruptcy trust claims based upon these same clients' exposures to asbestos-containing products of bankrupt companies.  Defendants failed to disclose these exposures to Garlock and its codefendants in the tort actions, and Garlock was unable to uncover them on its own.  Defendants followed this identical pattern of misconduct in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases.

48.     Because Defendants concealed evidence they were duty-bound to disclose in the discovery responses that they themselves prepared and served, Garlock incurred substantial defense costs it would not have otherwise incurred.  Further, Garlock eventually paid in settlement of *White*, *Ornstein*, and *Reed* an amount far in excess of the settlement value of each case had Defendants revealed the information about claims against friable amphibole insulation companies and other manufacturers of friable asbestos-containing products.  Garlock is informed and believes that Defendants followed a similar pattern of misconduct in each of the twelve Limited Discovery Cases, similarly resulting in excessive settlement payments.

49.     Defendants had a duty under prevailing law and the applicable rules of civil procedure to make truthful and complete responses to the standard interrogatories as well as those served by the tort defendants, including Garlock, based upon all information reasonably available to them at the time their answers and reports were provided.  This duty extended to all information known by or reasonably available to Defendants, even if such information was not known to their clients.

15

50.     In addition, under the Texas Rules of Civil Procedure, Defendants' signatures on their interrogatory responses constituted a certification and a representation that to the best of their knowledge, information, and belief, formed after a reasonable inquiry, the interrogatory answers had a good faith factual basis.  Defendants in *White* therefore certified and represented that to the best of their knowledge, the answers had good faith factual bases in light of all information reasonably available to them and their clients.

51.     As described more fully below, Garlock has subsequently discovered that Defendants misrepresented and failed to disclose information when answering interrogatories and negotiating settlements in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases.  In the alternative, when Defendants took these actions, they acted recklessly without any knowledge of or regard for the truth of the representations and as a positive assertion.  The Early and Mandelbrot Firms acted in concert with Defendants with respect to Defendants' representation of White and Reed.

52.     Evidence of Defendants' clients' exposures to other asbestos-containing products, especially exposures to pipe covering and other insulation, was material to Garlock and its codefendants in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases for at least two reasons under California and Texas law.  First, that evidence necessarily would have improved Garlock's and its codefendants' defenses to liability.  To recover under California and Texas law against Garlock, the tort plaintiffs in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases each had to prove that exposure to Garlock's products was a substantial factor in causing their mesothelioma.  Exposures from other sources, especially exposure to high dose, friable amphibole insulation products, decreased the chance that any purported Garlock exposure would

be deemed a substantial cause of their clients' mesothelioma. The same would have held true for Garlock's codefendants.

53. The plaintiffs' exposures to insulation products were especially relevant to Garlock's defense in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases because other products such as asbestos insulation and pipe covering released huge amounts of amphibole asbestos fibers during routine operations such as cutting, that dwarfed the potential trace amounts of asbestos from Garlock's products (to the extent that any release occurred). In the absence of complete and truthful evidence about the tort plaintiffs' other exposures, it became much more difficult for Garlock to explain to a jury how any alleged release from Garlock products (even to the extent any such release occurred) was at trivial, scientifically insignificant levels and not the cause of the tort plaintiffs' diseases.

54. Second, the tort plaintiffs' exposures to other products were important for allocating fault among defendants that ultimately might be held liable in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases. In California, there is not joint and several liability for non-economic damages. In Texas, unless a plaintiff can show that a particular defendant's percentage of responsibility is greater than 50%, the defendant is liable only for the percentage of damages found by the jury equal to that defendant's percentage of responsibility with respect to the harm for which damages are allowed.

55. Moreover, both California and Texas law permitted defendants to place other companies, including bankrupt companies, on the verdict form as potentially responsible third parties, and required courts to instruct juries to allocate percentages of responsibility to such parties based on evidence regarding the extent to which exposure to such products contributed to plaintiffs' diseases. Thus, the tort plaintiffs' exposure to non-Garlock products—if disclosed—

would have substantially decreased Garlock's risk of significant adverse verdicts. The same would have held true for Garlock's codefendants.

56.     Complete and meaningful evidence of friable amphibole insulation exposure and other friable products would have been powerful evidence in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases. Truthful evidence of each tort plaintiff's exposures to friable amphibole insulation products and other friable products would have materially decreased Garlock's and its codefendants' potential liability in each action, and thereby decreased the settlement value of these plaintiffs' claims.

57.     At no point, however, did Defendants' discovery responses or witness testimony in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases completely and meaningfully identify their clients' exposure to insulation products or other friable asbestos-containing products of bankrupt companies. Defendants knew that discovery responses and/or testimony provided by their clients regarding their asbestos exposures were not complete and accurate. Indeed, Garlock is informed and believes that Defendants encouraged their clients not to reveal their true exposure histories during pre-trial discovery in order to inflate the values of their claims against companies like Garlock that had not filed for bankruptcy protection and thus could still be sued in civil courts.

58.     Accordingly, because of Defendants' concealment of material evidence, Garlock incurred unnecessary defense costs and paid hundreds of thousands of dollars to settle the claims against Garlock asserted in and arising out of *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases. Upon information and belief, as a result of the Garlock's payments, the Firm received and reinvested substantial contingency fees in the Firm and the Lawyer Defendants enhanced their positions within the Firm and the plaintiffs' bar. Further, as partners or shareholders in the

Firm, the Lawyer Defendants received their respective shares of the Firm's profits, which were increased due to Garlock's payments.

59.      Upon information and belief, Defendants have directly or indirectly reinvested or otherwise used the moneys they obtain through their Scheme in the operation of the Firm and, in furtherance of the Scheme, the association among the Defendants and the Early and Mandelbrot Firms.

60.      The principal reason that Garlock incurred unnecessary defense costs and paid substantial settlement amounts was because Defendants failed to disclose the specific exposures of each tort plaintiff to all of the friable amphibole insulation-containing products and other friable products of bankrupt companies, exposures that each of these same tort plaintiffs alleged in the bankruptcy system.  In fact, in some instances Defendants allowed their clients falsely to deny exposures to specific products of entities against which they filed trust claims.  The concealment of this evidence prevented Garlock and the solvent defendants from showing a jury evidence of the true cause of each tort plaintiff's mesothelioma, caused Garlock to incur substantial defense costs in an ultimately unsuccessful effort to identify all relevant exposures, and exposed Garlock to a substantial risk that it would be required to bear more of any damages because Garlock had been denied available (but concealed) evidence to allocate liability to others.  All of this greatly increased the value of the tort plaintiffs' claims in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases and directly resulted in Garlock paying hundreds of thousands of dollars in settlement, which resulted in the payment of substantial contingency fees to Defendants.

61.      These excessive settlements, in turn, increased the value of Defendants' other cases against Garlock and other solvent defendants—both in cases settled contemporaneously

and in future cases—resulting in Garlock making much higher settlement payments in many other cases. Garlock is informed and believes that the same misconduct has occurred in the Limited Discovery Cases.

62. On information and belief, Defendants' standard method of operation is through the Scheme, which is ongoing. Defendants (with the exception of Eddins) continue to represent asbestos plaintiffs in the tort system and bankruptcy system, including against Garlock. In furtherance of the Scheme, Defendants oppose both changes to the two-track system that would curtail the Scheme, and the disclosure of information regarding their practices, which would jeopardize their ability to continue obtaining settlements and verdicts against tort defendants by concealing evidence of insolvent companies' exposures, as seen in Defendants' opposition to an open and public estimation trial in Garlock's underlying bankruptcy case.

63. As alleged below, Defendants employed the Scheme in specific asbestos personal injury and wrongful death claims to obtain fraudulently inflated settlements from Garlock for specific individuals. Defendants employed the Scheme more broadly, however, to create a high cost/high risk litigation environment for Garlock. By concealing many of their individual clients' exposures to numerous, highly friable asbestos products for which trusts have assumed responsibility—exposures that dwarfed any exposures that their clients could have experienced to asbestos fibers released form Garlock's products—Defendants created the prospect of enormous aggregate defense costs for Garlock as it was forced to search for exposure evidence that Defendants possessed but fraudulently concealed. Through the Scheme, Defendants also created the illusion of liability risk across multiple claims that would not have existed in the absence of Defendants' concealment of exposure evidence. Defendants used leverage gained through the Scheme to compel Garlock to enter into group settlements in which Garlock paid

higher amounts to large numbers of the Defendants' clients than Garlock would have paid in the absence of the Scheme.

## IV.
## PARTICULAR INSTANCES OF RACKETEERING AND FRAUDULENT ACTIVITY

### A. The White Case

64.     Defendants represented Charles White, who had been diagnosed with mesothelioma.  Defendants Simon and Greenstone were partners in the Firm responsible for the handling of *White*.

65.     Defendants filed a complaint on behalf of White in Dallas County, Texas in May 2006.  White alleged that his primary exposure occurred when he was ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. Garlock agreed to settle *White* on March 22, 2007 and paid the settlement amount on June 13, 2007.

66.     Although White and Defendants had actual knowledge that White was in fact exposed to amphibole insulating products (including pipe insulation) and other highly friable asbestos-containing products, White and Defendants failed to describe or identify exposures to those products in discovery in the *White* tort action.

67.     Interrogatory 6 of the Texas standard asbestos interrogatories required Defendants, on behalf of White, "using extreme diligence," to list each asbestos product to which White was exposed, including the name of the "manufacturer, supplier or distributor and brand name," of the asbestos product, and "a specific description of each alleged exposure." Interrogatory 6 therefore required identification of all asbestos products to which White had been exposed.

68.     On July 31, 2006, Defendants served, through the mails and/or wires, their response to Interrogatory 6 on at least twenty tort defendants, including Garlock. Defendants responded to this interrogatory on White's behalf by attaching a Work History Sheet and identifying Garlock, Cranite, John Crane, and Sterling gaskets, along with Cranite packing and assorted other solvent equipment and product makers and one bankrupt entity's product—Worthington (Halliburton) pumps—as the sources of White's exposures. Defendants mentioned "the external insulation on those products" but provided no names of specific products or manufacturers.

69.     Interrogatory 10 of the Texas standard asbestos interrogatories required Defendants and White to identify "any claim or settlement made or anticipated to be made with any entity or trust (including but not limited to claims made in conjunction with a bankruptcy proceeding…)."

70.     In Defendants' and White's response to Interrogatory 10, they objected to providing evidence of "confidential offers of settlement," but not claims. They stated that "no such claim has been made" but did not identify any claims they anticipated to be made.

71.     Interrogatory 23 of the Texas standard asbestos interrogatories required Defendants and White to identify (from a lengthy list of names) the bankrupt asbestos defendants whose products White "ever worked with or around," and Interrogatory 24 of the standard interrogatories called for Defendants and White to supply information related to the companies named in Interrogatory 23.

72.     In response to Interrogatories 23 and 24, White only identified Kentile Floors and referred to White's Work History.

73.     The answers to Interrogatories 23 and 24 were not true or complete.

74.     Defendants knew when the answers to Interrogatories 23 and 24 were made that they were not true or complete.

75.     As required by Texas law, Defendants and White supplemented White's interrogatory responses, in this case no less than eight times.  The responses, the last of which were served (using the mails and/or wires) on January 25, 2007, never varied with respect to the exposures disclosed.  The original and amended interrogatory answers are attached as **Exhibit 1** and incorporated by reference.

76.     Despite diligent inquiries by the tort defendants' counsel, no witness in any deposition in *White* provided the brand name or manufacturer of any friable amphibole insulation products to which White was exposed.  White claimed under oath that he did not work ████ ███████████████████, that he never went ████████, and that he never worked with or around insulators.

77.     As described more fully below, Garlock subsequently discovered through discovery in its bankruptcy case that Defendants made material misrepresentations and omissions during discovery in the *White* action, including in the responses and information described above, and thereby confirmed that Defendants' representation of White was a calculated fraud.

78.     As discussed more specifically herein, White had exposure to the specific asbestos insulation products and other friable asbestos-containing products of the debtors identified in the trust claims set forth in the attached **Exhibit 2**.  Further, Defendants knew White had such exposures and, in furtherance of the Scheme, failed to disclose such exposures to Garlock and its codefendants in *White*.

79.     In the alternative, when Defendants made representations to Garlock in *White*, they acted recklessly without knowledge of or any regard for the truth of such representations and as a positive assertion.

### *The White Trust Claims*

80.     Through discovery granted in its underlying bankruptcy case, Garlock learned that the Early and Mandelbrot Firms, in furtherance of the Scheme, filed multiple bankruptcy trust claims on behalf of White (the "White Trust Claims"). All these claims were filed using the mails and/or wires.

81.     The first of the White Trust Claims was submitted on May 8, 2007, approximately two months after Garlock agreed to settle *White* in March 2007 and more than a month before Garlock paid the *White* settlement.

82.     Garlock is informed and believes that Defendants had a business relationship with the Early and Mandelbrot Firms and were aware of, and had a duty to be aware of, the exposures underlying the White Trust Claims while *White* was pending. Garlock also is informed and believes that the Early and Mandelbrot Firms were aware of the exposures underlying the White Trust Claims while *White* was pending and worked together with Defendants to conceal such exposures from Garlock in *White*. In fact, the Early Firm referred the *White* tort case to Defendants. The Early Firm filed twenty-one of the White Trust Claims and the Mandelbrot Firm filed two. (A third firm, the Venable Firm, filed one.) A schedule of the White Trust Claims is attached as **Exhibit 2** and incorporated by reference.

83.     To prove the exposures underlying fifteen of the White Trust Claims, White, his wife, his son, and his attorney (Michael J. Mandelbrot of the Mandelbrot Firm) submitted sworn statements (the "White Statements") in which the affiants swore under oath that White was

exposed to asbestos products at ███████████████████████, and during home renovations.

84.     Further, and contrary to Defendants' answers to interrogatories and the deposition testimony in *White*, the affiants stated that White worked on ███████████████████ ████████████, as more particularly described below. The White Statements are attached as **Exhibit 3** and incorporated by reference.

85.     The White Trust Claims are evidence of exposure to the products for which the applicable trusts are responsible, including friable amphibole insulation products.

86.     The White Trust Claims include at least fifteen claims against manufacturers or suppliers of friable amphibole insulation that are responsible for products supplied during White's time working in the shipyard.

87.     For all but two of the White Trust Claims, White and Defendants failed to disclose the underlying exposures during pre-trial discovery in *White*.

88.     In particular, the White Trust Claims demonstrate that Defendants failed to disclose in *White* that White:

a)  Was exposed to asbestos from Armstrong Accopac Asbestos Paper, Heavy Duty FRJ, and Ring Facing Material ████████████████████████ ███████████████;

b)  Was exposed to asbestos ███████████████████ █████████████████████, despite deposition testimony in which White stated he knew of no exposure ████████████████;

c)  Was exposed to asbestos from fireproofing, boilers, pipe covering, block, cement, insulation, and refractory products while working with and in the vicinity of insulators, repairmen, and other tradesmen when he worked █████████████████ ████;

d)  Was exposed to asbestos from Kelly Moore Joint Compound ████████████ ████████████████████;

25

e) Was exposed to asbestos from Durabond Joint Compound, Hi-Lite Acoustical Plaster, Perf-A-Tape Joint System, Imperial Plaster, and Glatex Asbestos Cement Siding during home renovations that he completed in the early to mid-1960s at his home in Chesapeake, Virginia;

f) Worked ████████████████, including at least 90 days in boiler rooms and around individuals who worked on boilers and always wore dirty and dusty work clothes;

g) Mixed, installed, and chipped refractory products; handled and cleaned other asbestos-containing boiler materials while ██████████████;

h) Worked ███████████████████████████ with and around insulation materials, including but not limited to pipe insulation, in a variety of ███████████;

i) Worked with and around other tradesmen ██████████, including insulators, pipefitters, ship fitters, boilermakers, and other outside personnel, which other tradesmen were installing and tearing out asbestos-containing products, including but not limited to pipe insulation;

j) Believed, soon after his diagnosis, that his exposure to pipe insulation while ████ ████████████ contributed to his mesothelioma; and

k) Used Gold Bond Asbestos Permaboard, Gold Bond Asbestos Panels, Gold Bond Plaster, Gold Bond Texture Paint, and Gold Bond Joint Compounds during household renovations that he completed in the early to mid-1960s at his home.

89.     Garlock is informed and believes that at the time Defendants served the *White* discovery responses on Garlock and its codefendants (or failed to supplement their responses as required by law), Defendants knew and should have known that White had been exposed in the settings and to the products providing the bases for the White Trust Claims.

90.     Moreover, Defendants had an obligation to discover (and an interest in discovering) such exposure evidence in 2006 and 2007 because the Firm was representing its clients' interests with respect to the various bankruptcy cases and trusts pending at that time.

91.     Garlock also is informed and believes that Defendants failed to disclose such exposures to Garlock and its codefendants because Defendants knew disclosure would decrease the value of the claims against Garlock and its codefendants in *White*.  Defendants thus

deliberately withheld this exposure evidence to increase White's recovery, which in turn increased Defendants' contingency fee.

92.     White's exposure to the products associated with the White Trust Claims was known to Defendants and a material fact that Defendants had a duty to disclose under applicable law, but failed to disclose.

93.     The materiality of this evidence to Garlock's and its codefendants' defenses to White's claims was, upon information and belief, the motivation for Defendants to conceal it.

94.     Garlock relied on Defendants' representations and the absence of identification of these exposures (both in discovery and as forecast for trial) in incurring unnecessary defense costs and in agreeing to settle the *White* case. If Defendants had identified White's exposure to the products associated with the White Trust Claims, the value of White's claims against Garlock and its codefendants would have decreased materially for numerous reasons. First, Garlock's low-dose defense would have improved due to the greater magnitude of White's exposure to non-Garlock products. In addition, Garlock's expected share of any damages would have decreased due to Garlock's added ability to allocate liability to responsible third parties. Furthermore, the identification of alternative exposures would have assisted Garlock in cross-examining White's witnesses, probing their credibility, and impacting the jury's assessment of the evidence. Moreover, Garlock would have obtained admissible evidence of the tort plaintiff's friable amphibole insulation exposures from the source most persuasive to the jury, the tort plaintiff himself, which would have improved Garlock's fiber-type defense. The same would have held true for Garlock's codefendants.

95.     In short, if Defendants had identified the exposures associated with the White Trust Claims in the *White* action, Garlock would not have incurred unnecessary defense costs or settled White's claims for the fraudulently inflated value it did.

96.     Garlock reasonably relied on Defendants' omission of the alternative exposures reflected in the White Trust Claims (both in discovery and as forecast for trial), as well as the representations by Defendants that their answers had a good faith factual basis.  Garlock reasonably believed that Defendants would identify exposures known to them, including those reflected in the White Trust Claims, in response to the interrogatories, document requests and/or deposition questions asking for such exposures and anticipated trust claims, as required by law, and reasonably relied on this fact.  In addition, Garlock reasonably relied on its reasonable belief that a rational jury would conclude that Defendants would truthfully identify all exposures known to them, including those reflected in the White Trust Claims, during discovery and at trial.  Garlock also reasonably relied on Defendants' omissions and representations because it was unable to identify White's non-Garlock exposures through independent means, despite incurring substantial defense costs in that effort.

97.     Garlock is informed and believes that Defendants intended for Garlock and its codefendants to rely on their omission of the exposures associated with the White Trust Claims, and intended for Garlock to settle the *White* claims at an inflated value or lose the *White* trial as a result of the omissions, resulting in a larger contingency fee for Defendants.

98.     Garlock had no factual basis or ability to discover the fraudulent concealment of the White Trust Claim exposures until it obtained the relevant trust claim information during discovery in this bankruptcy case.

99.     Garlock suffered damages from Defendants' fraudulent omission of the exposures underlying the White Trust Claims because Garlock incurred unnecessary defense costs and settled the *White* claims for a fraudulently inflated value rather than winning at trial or settling the case for far less money, which it would have done had Defendants' fraud not occurred. The Early and Mandelbrot Firms participated in and conspired to carry out Defendants' fraud. The result in *White* also inflated the value of Defendants' other cases against Garlock.

### *B. The Ornstein Case*

100.    Defendants represented Howard Ornstein, who had been diagnosed with mesothelioma. Defendant Eddins was the partner in the Firm responsible for the handling of *Ornstein*.

101.    Ornstein sued Garlock in Los Angeles County, California in April 2008. He alleged that his primary exposure occurred ███████████████████████████████ ██████████████████████████████████████████████████████████. Garlock agreed to settle *Ornstein* on August 4, 2008 and paid the settlement amount on October 9, 2008.

102.    Although Ornstein and Defendants had actual knowledge that Ornstein was exposed to amphibole insulating products (including pipe insulation) and other highly friable asbestos-containing products, Ornstein and Defendants failed to describe or identify exposures to those products in discovery in the *Ornstein* tort action. Ornstein testified in that case that he never saw anyone installing or removing pipe insulation ██████████████████████ and that he never saw ████████████████████████.

103.    Los Angeles County General Standard Interrogatory 26 required Defendants, on behalf of Ornstein, to identify and describe each asbestos-containing product which "you claim to have been exposed to at any time." Among other things, Defendants were obligated to

"[d]escribe each product as specifically as possible," and provide the "date(s)," "places," and "circumstances surrounding each exposure."

104.    On May 23, 2008, Defendants served, through the mails, Ornstein's response to Interrogatory 26 in *Ornstein* on at least thirty tort defendants, including Garlock.  Defendants and Ornstein responded to this interrogatory by attaching a Work History Sheet and by incorporating by reference their response to Interrogatory 59 in *Ornstein* concerning workplace exposures.  The response identified Garlock gaskets, along with assorted other solvent equipment and product makers.  Defendants and Ornstein identified only one insulation product, Mundet block insulation (for which *Ornstein* tort defendant Crown Cork & Seal Co, Inc. was responsible), as well as Ornstein's exposure to several insulation suppliers and contractors.

105.    Los Angeles General Standard Interrogatory 27 required Defendants and Ornstein, if Ornstein was exposed to asbestos of any entity "not named as a defendant," to identify such entity.

106.    The May 28, 2008 response to Interrogatory 27 in *Ornstein* was "[u]pon information and belief, no."

107.    Defendants did not amend their responses to Interrogatories 26 and 27.  Defendants' interrogatory answers in *Ornstein* are attached as **Exhibit 4** and incorporated by reference.

108.    Similarly, Ornstein refused to admit at his deposition in *Ornstein* that he was exposed to asbestos in the engine room, in the boiler room, or around boilers:

| | |
|---|---|
| Q. | When you ████████████████████████████ ████ ? |
| A. | Yes. |
| Q. | Did you ever see that boiler? |
| A. | No. |

<p style="text-align:center">* * * * *</p>

Q.     During your time ███████████████████████████████████
       ███████████████████████████
A.     No, I didn't work in any of that area.
Q.     Do you have any reason to believe you may have been exposed to any asbestos in
       ████████████████████████████████████████████?
A.     No.
                                    * * * * *
Q.     I believe you told us yesterday that you never went into ████████████████████
       ████████?
A.     Correct.
Q.     You never went into ██████████████?
A.     Correct.
                                    * * * * *
Q.     Okay. You mentioned previously that when you were ████████████████████████
       ███████████████████████████████ I understand that,
       and my question may seem silly, but I have to ask it anyway. To the best of your
       knowledge, did you ever work with or around any type of boilers when you were
       ████████████?
A.     No.
                                    * * * * *
Q.     And if I understand correctly, you've never been around the boilers; right?
A.     Right.

       109.    As described more fully below, Garlock subsequently discovered through

discovery in its bankruptcy case that Defendants made material misrepresentations and

omissions during discovery in the *Ornstein* action, including in the responses and information

described above, and thereby confirmed that Defendants' representation of Ornstein was a

calculated fraud.

       110.    As discussed more specifically herein, Ornstein had exposure to the specific

asbestos insulation products and other friable asbestos-containing products of the debtors

identified in the trust claims set forth in the attached **Exhibit 5**. Further, Defendants knew

Ornstein had such exposures and, in furtherance of the Scheme, failed to disclose such exposures

to Garlock and its codefendants in *Ornstein*.

111.    In the alternative, when Defendants made representations to Garlock in *Ornstein*, they acted recklessly without any regard for the truth of such representations and as a positive assertion.

### *The Ornstein Trust Claims*

112.    Through discovery ordered by the Court in its underlying bankruptcy case, Garlock learned that Defendants filed multiple bankruptcy trust claims on behalf of Ornstein ("the Ornstein Trust Claims").  Eleven of these trust claims were based on exposures Defendants never identified in the *Ornstein* tort case.  All these claims were filed using the mails and/or wires.  A schedule of the Ornstein Trust Claims is attached as **Exhibit 5** and incorporated by reference.

113.    To prove the exposures underlying six of the Ornstein Trust Claims, Defendants submitted declarations signed by Ornstein in connection with their submission of the Ornstein Trust Claims.  Ornstein's declarations attested to his personal knowledge of exposures arising from when he "would remove and replace insulation" such as Armstrong 85% Magnesia Pipe Covering and Block, Eagle Picher 85% Magnesia Pipe Covering, Keene Pipe Covering, Pabco 85% Magnesia Pipe Covering, and Kaylo Pipe Covering.  Defendants submitted other declarations from Ornstein that attested, specifically, to Ornstein's ███████ exposure, namely exposure to "Combustion Engineering Boilers" and while ████████████████████ ████████████████████    Each declaration squarely contradicts the pre-trial discovery responses that Defendants and Ornstein made and Ornstein's deposition testimony in the *Ornstein* tort action in which Defendants and Ornstein repeatedly denied that he was ever exposed to pipe insulation and asbestos boiler insulation.  In his trust affidavits, Ornstein repeatedly swore under oath based on personal knowledge that he was in fact exposed to the

insulation, pipe covering, and boiler insulation for which the applicable trusts are responsible. The Ornstein Declarations are attached as **Exhibit 6** and incorporated by reference.

114.    The Ornstein Trust Claims and supporting materials, including the affidavits, are evidence of exposure to the products for which the applicable trusts are responsible, including friable amphibole insulation products.

115.    The Ornstein Trust Claims include at least nine claims against trusts set up by manufacturers or suppliers of friable amphibole insulation that are responsible for products supplied during Ornstein's time working on the *Estes* and the *Duval County*.

116.    Defendants and Ornstein concealed all eleven of the underlying exposures reflected in the Ornstein Trust Claims during discovery in *Ornstein*.

117.    In particular, the Ornstein Trust Claims demonstrate that Defendants failed to disclose in *Ornstein* that Ornstein ███████████████ was exposed to asbestos from:

a) Armstrong 85% Magnesia Pipe Covering and Block and Armstrong Hi-Temp Pipe Covering;

b) Combustion Engineering boilers;

c) Worthington Pumps (contrary to Ornstein's testimony that he did not recall the Worthington name) and Moore Turbines;

d) Eagle Picher 85% Magnesia Pipe Covering;

e) H.K. Porter asbestos cloth;

f) Keene pipe covering and insulation;

g) Pabco 85% Magnesia pipe covering and block and Kaylo pipe covering and block;

h) Boilers, evidenced by Ornstein's personal knowledge (contrary to Ornstein's testimony that he never saw a boiler ███████); and

i) Installation and removal of pipe insulation, evidenced by Ornstein's personal knowledge that ██████ he "would remove and replace insulation," including pipe

insulation (contrary to Ornstein's testimony that he never saw anyone installing or removing pipe insulation ███████████████████).

118. Garlock is informed and believes that, at the time Defendants served the *Ornstein* discovery responses on Garlock and its codefendants, Defendants knew and should have known that Ornstein had been exposed to the products providing the bases for the Ornstein Trust Claims. Defendants submitted the first of the Ornstein trust claims little more than three months after Garlock paid the *Ornstein* settlement.

119. Moreover, Defendants had an obligation to discover (and an interest in discovering) such exposure evidence in 2008 because the Firm was representing its clients' interests with respect to the various bankruptcy cases and trusts pending at that time.

120. Garlock also is informed and believes that Defendants failed to disclose such exposures to Garlock and its codefendants because Defendants knew disclosure would decrease the value of the claims against Garlock and its codefendants in *Ornstein*. Defendants thus deliberately withheld this exposure evidence to increase Ornstein's recovery, which in turn increased Defendants' contingency fee.

121. Ornstein's exposure to the products associated with the Ornstein Trust Claims was known to Defendants and a material fact that Defendants had a duty to disclose under applicable law, but failed to disclose.

122. The materiality of this evidence to Garlock's and its codefendants' defenses to Ornstein's claims was, upon information and belief, the motivation for Defendants to conceal it.

123. Garlock relied on Defendants' representations and the absence of identification of these exposures (both in discovery and as forecast for trial) in incurring unnecessary defense costs and in agreeing to settle the *Ornstein* case. If Defendants had identified Ornstein's exposure to the products associated with the Ornstein Trust Claims, the value of Ornstein's

claims against Garlock and its codefendants would have decreased materially for numerous reasons. First, Garlock's low-dose defense would have improved due to the greater magnitude of Ornstein's exposure to non-Garlock products. In addition, Garlock's expected share of any damages would have decreased due to Garlock's added ability to allocate liability to responsible third parties. Furthermore, the identification of alternative exposures would have assisted Garlock in cross-examining Ornstein's witnesses, probing their credibility, and impacting the jury's assessment of the evidence. Moreover, Garlock would have obtained admissible evidence of the tort plaintiff's friable amphibole insulation exposures from the source most persuasive to the jury, the tort plaintiff himself, which would have improved Garlock's fiber-type defense. The same would have held true for Garlock's codefendants.

124.    In short, if Defendants had identified the exposures associated with the Ornstein Trust Claims in the *Ornstein* action, Garlock would not have incurred unnecessary defense costs or settled Ornstein's claims at the fraudulently inflated value it did.

125.    Garlock reasonably relied on Defendants' omission of the exposures reflected in the Ornstein Trust Claims (both in discovery and as forecast for trial), as well as the representations by Defendants that their answers had a good faith factual basis. Garlock reasonably believed that Defendants would identify exposures known to them, including those reflected in the Ornstein Trust Claims, in response to the interrogatories, document requests and/or deposition questions asking for such exposures and anticipated trust claims, as required by law, and reasonably relied on this fact. In addition, Garlock reasonably relied on its reasonable belief that a rational jury would conclude that Defendants would truthfully identify all exposures known to them, including those reflected in the Ornstein Trust Claims, during discovery and at trial. Garlock also reasonably relied on Defendants' omissions and representations because it

was unable to identify Ornstein's non-Garlock exposures through independent means, despite incurring substantial defense costs in that effort.

126.    Garlock is informed and believes that Defendants intended for Garlock and its codefendants to rely on their omission of the exposures associated with the Ornstein Trust Claims, and intended for Garlock to settle *Ornstein* at an inflated value or lose the *Ornstein* trial as a result of the omissions, resulting in a larger contingency fee for Defendants.

127.    Garlock had no factual basis or ability to discover the fraudulent concealment of the alternative exposures associated with the Ornstein Trust Claim exposures until it obtained the relevant trust claim information during discovery in this bankruptcy case.

128.    Garlock suffered damages from Defendants' fraudulent omission of the exposures underlying the Ornstein Trust Claims because Garlock incurred unnecessary defense costs and settled the *Ornstein* claims for a fraudulently inflated value rather than winning at trial or settling the case for far less money, which it would have done had Defendants' fraud not occurred. The result in *Ornstein* also inflated the value of Defendants' other cases against Garlock.

### C. The Reed Case

129.    Defendants represented Robert G. Reed, who had been diagnosed with mesothelioma. Defendant Eddins was the partner in the Firm responsible for the handling of *Reed*.

130.    Defendants sued Garlock in Los Angeles County, California in October 2006. The case became a wrongful death action in July 2007. Reed alleged asbestos exposure resulting from his work █████████████████████████████████████████████████ █████████ Garlock agreed to settle *Reed* on February 1, 2008 and made the settlement payment on April 11, 2008.

36

131.     Although Reed and Defendants had actual knowledge that Reed was exposed to amphibole insulating products (including pipe insulation) and other highly friable asbestos-containing products, Reed and Defendants failed to describe or identify exposures to those products in discovery in the *Reed* tort action.

132.     Los Angeles County General Standard Interrogatory 32 (Wrongful Death) required Defendants, on behalf of Reed, to identify and describe each asbestos-containing product which "you claim decedent was exposed to at any time."  Among other things, Defendants were obligated to "[d]escribe each product as specifically as possible," and provide the "date(s)," "places," and "circumstances surrounding such exposure."

133.     On February 5, 2008, Defendants served, through the mails, Reed's response to Interrogatory 32 on at least nineteen tort defendants, including Garlock.  Defendants responded to the interrogatory for Reed by attaching a Work History Sheet.  The response identified Garlock gaskets, along with assorted other equipment and product makers.  Defendants identified only one insulation product, Mundet block insulation (for which *Reed* tort defendant Crown Cork & Seal Co, Inc. was responsible), and one insulation supplier, Thorpe Insulation Company ("Thorpe").

134.     Los Angeles General Standard Interrogatory 33 (Wrongful Death) required Defendants, if exposed to asbestos of any entity "not named as a defendant," to identify such entity.

135.     Defendants' February 5, 2008 response to Interrogatory 33 in *Reed* was "[u]pon information and belief, no."

136.     Los Angeles General Standard Interrogatory 69 (Wrongful Death) required Reed and Defendants, for each employer where Reed claimed asbestos exposure, to state "[t]he

manner of exposure, the duration and time period of exposure and the type of products (*e.g.*, insulation, cement, etc.) to which decedent was exposed."

137. Defendants' February 5, 2008 response to Interrogatory 69 in *Reed* was to provide a two-page narrative that essentially repeated the response to Interrogatory 32, including naming only Mundet and Thorpe with respect to insulation exposures.

138. Despite not identifying Reed's exposures to insulation products and suppliers other than Mundet and Thorpe, Defendants were able to identify Reed's exposures to three asbestos *fiber* suppliers:  Harcross Chemicals, Inc., T H Agriculture & Nutrition, LLC, and Union Carbide Corporation.

139. Defendants did not amend their responses to Interrogatories 32, 33, and 69, which responses are materially similar to responses dated in January and February 2007.  Defendants' interrogatory answers are attached as **Exhibit 7** and incorporated by reference.

140. As described more fully below, Garlock subsequently learned through discovery in its bankruptcy case that Defendants made material misrepresentations and omissions during discovery in the *Reed* action, including in the responses and information described above, and thereby confirmed that Defendants' representation of Reed was a calculated fraud.

141. As discussed more specifically herein, Reed had exposure to the specific asbestos insulation products and other friable asbestos-containing products of the debtors identified in the trust claims set forth in the attached **Exhibit 8**.  Further, Defendants knew Reed had such exposures and, in furtherance of the Scheme, failed to disclose such exposures to Garlock and its codefendants in *Reed*.

142.    In the alternative, when Defendants made representations to Garlock in *Reed*, they acted recklessly without any regard for the truth of such representations and as a positive assertion.

### *The Reed Trust Claims*

143.    Through discovery ordered by the Court in its underlying bankruptcy case, Garlock learned that the Early and Mandelbrot Firms, in furtherance of Defendants' Scheme, filed multiple bankruptcy trust claims on behalf of Reed (the "Reed Trust Claims"). These claims were filed using the mails and/or wires.

144.    Garlock is informed and believes that Defendants had a business relationship with the Early and Mandelbrot Firms and were aware of, and had a duty to be aware of, the exposures underlying the Reed Trust Claims while *Reed* was pending. Garlock also is informed and believes that the Early and Mandelbrot Firms were aware of the exposures underlying the Reed Trust Claims while *Reed* was pending and worked together with Defendants to conceal such exposures from Garlock and its codefendants in *Reed*. In fact, the Early Firm referred the *Reed* tort case to Defendants. The Early Firm filed fourteen of the Reed Trust Claims; the Mandelbrot Firm filed one. A schedule of the Reed Trust Claims is attached as **Exhibit 8** and incorporated by reference.

145.    To prove the exposures underlying several of the Reed Trust Claims, Reed's wife, his son, and his attorney (Michael J. Mandelbrot of the Mandelbrot Firm) submitted sworn statements in which the makers of the statements swore under oath that Reed was exposed to the asbestos-containing products identified in the statements (the "Reed Statements"). The Reed Statements are attached as **Exhibit 9** and incorporated by reference

146.    The Reed Trust Claims are evidence of exposure to the products for which the applicable trusts are responsible, including friable amphibole insulation products.

147.    The Reed Trust Claims include at least five claims against trusts set up by manufacturers or suppliers of friable amphibole insulation products.

148.    For fourteen of the fifteen Reed Trust Claims, Defendants concealed the underlying exposures during discovery in *Reed*.  Further, although Defendants were able to identify three asbestos fiber suppliers in discovery, they purportedly could not identify any of the significant insulation manufacturers who are the subject of several of the Reed Trust Claims.

149.    In particular, the Reed Trust Claims demonstrate that Defendants failed to disclose in *Reed* that Reed was exposed to asbestos from:

a) Synkoloid SYNKO Flexi-Patch when repairing his home in 1971;

b) Congoleum Vinyl Asbestos Floor Tiles when he repaired and renovated his home in Reno, Nevada in 1971;

c) Ruberoid and GAF vinyl asbestos floor tiles ███████████████████████ ███████████████ ;

d) U.S. Gypsum Imperial Plaster during home remodeling from 1967 to 1968;

e) Philip Carey pipe covering while working at ███████████████████ ; and

f) Eagle Picher cement while working at ████████████████████████████ ██████████ .

150.    Garlock is informed and believes that, at the time Defendants served the *Reed* discovery responses on Garlock and its codefendants, Defendants knew and should have known that Reed had been exposed to the products providing the bases for the Reed Trust Claims.  The Early Firm began filing the Reed Trust Claims at least as early as June 18, 2008, which was a little more than two months after Garlock paid the *Reed* settlement on April 11, 2008.

151.    Moreover, Defendants had an obligation to discover (and an interest in discovering) such exposure evidence from 2006 through 2008 because the Firm was representing

their clients' interests with respect to the various bankruptcy cases and trusts pending at that time.

152.    Garlock also is informed and believes that Defendants failed to disclose such exposures to Garlock and its codefendants because Defendants knew disclosure would decrease the value of the claims against Garlock and its codefendants in *Reed*.  Defendants thus deliberately withheld this exposure evidence to increase Reed's recovery, which in turn increased Defendants' contingency fee.

153.    Reed's exposure to the products associated with the Reed Trust Claims was known to Defendants and a material fact that Defendants had a duty to disclose under applicable law, but failed to disclose.

154.    The materiality of this evidence to Garlock's and its codefendants' defenses to Reed's claims was, upon information and belief, the motivation for Defendants to conceal it.

155.    Garlock relied on Defendants' representations and the absence of identification of these exposures (both in discovery and as forecast for trial) in incurring unnecessary defense costs and in agreeing to settle the *Reed* case.  If Defendants had identified Reed's exposure to the products associated with the Reed Trust Claims, the value of Reed's claims against Garlock and its codefendants would have decreased materially for numerous reasons.  First, Garlock's low-dose defense would have improved due to the greater magnitude of Reed's exposure to non-Garlock products.  In addition, Garlock's expected share of any damages would have decreased due to Garlock's added ability to allocate liability to responsible third parties.  Furthermore, the identification of alternative exposures would have assisted Garlock in cross-examining Reed's witnesses, probing their credibility, and impacting the jury's assessment of the evidence.  Moreover, Garlock would have obtained admissible evidence of the tort plaintiff's friable

41

amphibole insulation exposures from the source most persuasive to the jury, the tort plaintiff himself, which would have improved Garlock's fiber-type defense. The same would have held true for Garlock's codefendants.

156.    In short, if Defendants had identified the exposures associated with the Reed Trust Claims in the *Reed* action, Garlock would not have incurred unnecessary defense costs or settled Reed's claims at the fraudulently inflated value it did.

157.    Garlock reasonably relied on Defendants' omission of the exposures reflected in the Reed Trust Claims (both in discovery and as forecast for trial), as well as the representations by Defendants that their answers had a good faith factual basis. Garlock reasonably believed that Defendants would identify exposures known to them, including those reflected in the Reed Trust Claims, in response to the interrogatories, document requests and/or deposition questions asking for such exposures and anticipated trust claims, as required by law, and reasonably relied on this fact. In addition, Garlock reasonably relied on its reasonable belief that a rational jury would conclude that Defendants would truthfully identify all exposures known to them, including those reflected in the Reed Trust Claims, during discovery and at trial. Garlock also reasonably relied on Defendants' omissions and representations because it was unable to identify Reed's non-Garlock exposures through independent means, despite incurring substantial defense costs in that effort.

158.    Garlock is informed and believes that Defendants intended for Garlock and its codefendants to rely on their omission of the exposures associated with the Reed Trust Claims, and intended for Garlock to settle the *Reed* claims at an inflated value or lose the *Reed* trial as a result of the omissions, resulting in a larger contingency fee for Defendants.

159.    Garlock had no factual basis or ability to discover the fraudulent concealment of the alternative exposures associated with the Reed Trust Claims until it obtained the relevant trust claim information during discovery in this bankruptcy case.

160.    Garlock suffered damages from Defendants' fraudulent omission of the exposures underlying the Reed Trust Claims because Garlock incurred unnecessary defense costs and settled the *Reed* claims for a fraudulently inflated value rather than winning at trial or settling the case for far less money, which it would have done had Defendants' fraud not occurred.  The Early and Mandelbrot Firms participated in and conspired to carry out Defendants' fraud.  The result in *Reed* also inflated the value of Defendants' other cases against Garlock.

### D.  Further Acts in the Pattern of Racketeering Activity Since 2006

161.    The *White*, *Ornstein* and *Reed* cases described above are three examples of the Scheme and its consequences for which Garlock has obtained discovery sufficient to uncover detailed evidence of Defendants' wrongdoing.  Garlock attempted to obtain similar discovery in a number of other cases for which Garlock is informed and believes Defendants have continued their Scheme, *e.g.*, the Limited Discovery Cases, but Defendants and their allies thus far have been successful in preventing further discovery.

162.    Nonetheless, based on the information it does have, Garlock is informed and believes that Defendants' Scheme to pursue claims for their clients against solvent defendants in the tort system while concealing evidence of their clients' exposures to bankrupt defendants' products constitutes Defendants' regular business practice, pervaded Defendants' practice from at least 2006 until it was discovered in 2013, and continues even today.

163.    Based on the information it has obtained, Garlock believes that in at least ten additional cases dating back to 2006, Defendants represented their clients pursuant to and in

furtherance of the Scheme through multiple acts of mail and wire fraud. Defendants' misconduct in the Limited Discovery Cases is described more particularly below.

164. Upon information and belief, Defendants pursued and furthered—and continue to pursue and further—the Scheme through similar acts of mail and wire fraud in other cases, which conduct is Defendants' regular way of doing business.

165. Defendants represented Albert Bercher in a lawsuit against Garlock entitled *Bercher v. Alfa Laval, Inc., et al.*, No. BC 347 728, filed in the Superior Court of Los Angeles County, California ("*Bercher*"). Defendants caused their discovery responses in *Bercher* to be served through the mails on twenty-eight tort defendants, including Garlock, on April 7, 2006.

166. Based upon its review of discovery in the *Bercher* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Bercher's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

167. In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Bercher was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Bercher* or otherwise, Bercher's exposure to products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Bercher* in 2006.

168. Defendants represented Richard Merrill in a lawsuit against Garlock entitled *Merrill v. Alfa Laval, Inc., et al.*, No. BC 352 170, filed in the Superior Court of Los Angeles County, California ("*Merrill*"). Defendants, including specifically defendants Eddins and

Bartlett, caused their discovery responses in *Merrill* to be served through the mails and by facsimile on thirty-one tort defendants, including Garlock, on June 26, 2006.

169.     Based upon its review of discovery in the *Merrill* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Merrill's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

170.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Merrill was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Merrill* or otherwise, Merrill's exposure to products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Merrill* in 2007.

171.     Defendants represented Jack Pounds in a lawsuit against Garlock entitled *Pounds v. Alfa Laval, Inc., et al.*, No. BC 353 068, filed in the Superior Court of Los Angeles County, California ("*Pounds*").  Defendants, including specifically defendants Eddins and Bartlett, caused their discovery responses in *Pounds* to be served through the mails on twenty-four tort defendants, including Garlock, on September 6, 2006.

172.     Based upon its review of discovery in the *Pounds* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Pounds' exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

173.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Pounds was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Pounds* or otherwise, Pounds' exposure to products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Pounds* in 2007.

174.     Defendants represented James Howell in a lawsuit against Garlock entitled *Howell v. Alfa Laval, Inc., et al.*, No. BC 353761, filed in the Superior Court of Los Angeles County, California ("*Howell*").  Defendants caused their discovery responses in *Howell* to be served by facsimile on twenty-four tort defendants, including Garlock, on September 25, 2006.

175.     Based upon its review of discovery in the *Howell* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Howell's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

176.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Howell was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Howell* or otherwise, Howell's exposure to products, other than Flexitallic gaskets and Babcock & Wilcox boilers, for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Howell* in 2007.

177.     Defendants represented Richard Belt in a lawsuit against Garlock entitled *Belt v. A.W. Chesterton Co., et al.*, No. BC360535, filed in the Superior Court of Los Angeles County,

California ("*Belt*").  Defendants caused their discovery responses in *Belt* to be served through the mails on twenty-eight tort defendants, including Garlock, on December 13, 2006.

178.     Based upon its review of discovery in the *Belt* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Belt's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

179.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Belt was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Belt* or otherwise, Belt's exposure to products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Belt* in 2007.

180.     Defendants represented Jack Steidel in a lawsuit against Garlock entitled *Steidel v. AGCO Corp., et al.*, No. BC 369 661, filed in the Superior Court of Los Angeles County, California ("*Steidel*").  Defendants, including specifically defendants Eddins and Bartlett, caused their discovery responses in *Steidel* to be served through the mails on twenty-nine tort defendants, including Garlock, on July 2, 2007.

181.     Based upon its review of discovery in the *Steidel* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Steidel's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

182.    In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Steidel was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Steidel* or otherwise, Steidel's exposure to products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Steidel* in 2008.

183.    In furtherance of their Scheme, Defendants worked with the Coady Law Firm, including specifically Edward Coady and David Fanikos, to represent James Creek in lawsuits against Garlock entitled *Creek v. Alfa-Laval, Inc., et al.*, No. BC 348521, filed in the Superior Court of Los Angeles County, California, and *Creek v. American Standard, et al.*, No. 07-CA-011285, filed in the Circuit Court of the Thirteenth Judicial Circuit, Florida (collectively, "*Creek*").  Defendants caused their discovery responses in *Creek* to be served through the mails and/or wires on Garlock and its codefendants on, *inter alia*, May 12, 2006, November 13, 2008, and January 9, 2009.

184.    Through discovery in its underlying bankruptcy case, Garlock has learned that Defendants, pursuant to their Scheme, caused a ballot to be submitted (through the mails and/or wires) on behalf of Creek in the bankruptcy case of United States Gypsum, which constitutes a certification of Creek's exposure to products for which United States Gypsum was responsible.[2]

185.    Based upon its review of discovery in the *Creek* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and

---

[2] Through discovery ordered by the Court in its underlying bankruptcy case, Garlock obtained copies of the ballots cast on plans of reorganization (pursuant to 11 U.S.C. § 1126) in certain bankruptcy cases of other former producers of asbestos-containing products.  Ballots in asbestos bankruptcy cases are filed by claimants' counsel on behalf of their clients who have claims against the debtors.  The ballots constitute that claimant's vote to either accept or reject proposed plans of reorganization.  As such, the ballots require a certification that the identified individuals were exposed to asbestos for which the respective debtors are responsible and are entitled to vote such claims.  The ballots are customarily not filed on the public docket, but are submitted to the custody of court-appointed balloting agents.

believes that Defendants concealed Creek 's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

186.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Creek was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Creek* or otherwise, Creek's exposure to the products of United States Gypsum and other products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Creek* in 2009.

187.     Defendants represented Larry Lindquist in a lawsuit against Garlock entitled *Lindquist v. Alfa Laval, Inc., et al.*, No. BC 382 729, filed in the Superior Court of Los Angeles County, California ("*Lindquist*").  Defendants, including specifically defendants Eddins and Bartlett, caused their discovery responses in *Lindquist* to be served through the mails on fifty-three tort defendants, including Garlock, on February 22, 2008.

188.     Based upon its review of discovery in the *Lindquist* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Lindquist's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

189.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Lindquist was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Lindquist* or otherwise, Lindquist's exposure to products, other than National Gypsum Gold Bond joint compound, for

which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Lindquist* in 2008.

190.     In furtherance of the Scheme, Defendants worked with the Law Offices of Roger G. Worthington, P.C., including specifically Roger Worthington and John Caron, to represent Robert Thacker in a lawsuit against Garlock entitled *Thacker v. 3M Company, et al.*, No. BC 384 159, filed in the Superior Court of Los Angeles County, California ("*Thacker*"). Defendants, including defendants Eddins and Bartlett, caused their discovery responses in *Thacker* to be served through the mails on forty-two tort defendants, including Garlock, on March 7, 2008.

191.     Based upon its review of discovery in the *Thacker* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Thacker's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

192.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Thacker was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Thacker* or otherwise, Thacker's exposure to products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Thacker* in 2009.

193.     Defendants represented Erik Lange in a lawsuit against Garlock entitled *Lange v. Alfa Laval, Inc., et al.*, No. BC 396 922, filed in the Superior Court of Los Angeles County, California ("*Lange*"). Defendants, including specifically defendants Eddins and Bartlett, caused their discovery responses in *Lange* to be served through the mails on thirty-one tort defendants, including Garlock, on December 15, 2008.

194.     Based upon its review of discovery in the *Lange* case, Defendant Simon's testimony about the Simon Firm's practices, and the information Garlock obtained regarding Defendants' employment of the Scheme in *White*, *Ornstein*, and *Reed*, Garlock is informed and believes that Defendants concealed Lange's exposures to asbestos products for which bankrupt companies were responsible, including friable amphibole insulation.

195.     In furtherance of their Scheme and in derogation of their legal obligation to disclose the asbestos products to which Lange was exposed, Garlock is informed and believes that Defendants failed to identify, through their discovery responses in *Lange* or otherwise, Lange's exposure to products for which bankrupt companies were responsible, including friable amphibole insulation, at any time prior to Garlock's resolution of *Lange* in 2009.

196.     Defendants had a duty to answer the discovery in the Limited Discovery Cases truthfully and to make truthful disclosures as more particularly described above.

197.     Defendants' representations in the Limited Discovery Cases were material, important, and factual when made.

198.     Defendants' nondisclosures in the Limited Discovery Cases were material, important, and factual when concealed.

199.     Defendants' representations in the Limited Discovery Cases were false. Upon information and belief, and consistent with the Scheme, Defendants concealed material evidence of other product exposures not identified above that Defendants or their co-counsel have used to serve as bases for trust claims or to obtain settlements from other companies.

200.     When Defendants made the misrepresentations in the Limited Discovery Cases, Defendants knew they were false or made them recklessly without any knowledge or regard for their truth and as a positive assertion.

51

201.     Defendants intentionally failed to disclose important facts in the Limited Discovery Cases; disclosed some facts but intentionally failed to disclose important facts, making the disclosures deceptive; intentionally failed to disclose important facts that were known only to themselves and that Garlock could not have discovered; or actively concealed important facts from Garlock or prevented Garlock from discovering those facts.

202.     Garlock did not know of the concealed facts.

203.     Defendants made the misrepresentations in the Limited Discovery Cases with the intent that Garlock should rely and act upon them.

204.     Defendants concealed facts in the Limited Discovery Cases with the intent to deceive Garlock.

205.     Garlock acted in reasonable reliance upon the misrepresentations and nondisclosures in the Limited Discovery Cases.

206.     As a proximate result of Defendants' misrepresentations and nondisclosures in the Limited Discovery Cases, Garlock suffered compensatory and punitive damages.

207.     Garlock's reliance on the misrepresentations and nondisclosures in the Limited Discovery Cases was a substantial factor in causing Garlock's harm.

### E. Additional Specific Uses of the Mails and Wires in Furtherance of the Scheme

208.     Defendants made, *inter alia*, the following uses of the mails and/or wires in furtherance of the Scheme:

209.     On August 25, 2006, Defendant Simon sent a letter on the Firm's stationery through the mails and by facsimile to Garlock's lawyer Melissa Ferrell outlining settlement terms for the *Bercher* case.

210.     On January 11, 2008, and January 16, 2008, Defendant Eddins corresponded via email with Garlock's attorney David Glaspy ("Glaspy") regarding settlement of the *Reed* case.

211.	On February 1, 2008, Defendant Greenstone sent a letter on the Firm's stationery by facsimile to Garlock's lawyer Glaspy outlining settlement terms for the *Reed* case.

212.	On June 23, 2008, defendant Eddins corresponded via email with Garlock's attorney Glaspy regarding settlement of the *Lindquist* and *Ornstein* cases.

213.	On August 4, 2008, Defendant Greenstone sent a letter on the Firm's stationery by facsimile to Garlock's lawyer Glaspy outlining settlement terms for the *Lindquist* and *Ornstein* cases.

## V.
## FIRST CLAIM FOR RELIEF

*Claim Against All Defendants for Violation of 18 U.S.C. § 1962(a)*

214.	Garlock here realleges and incorporates herein by reference the allegations of paragraphs 1–213 of the Complaint.

215.	Each Defendant is each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

216.	The Firm is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce.

217.	Defendants have been using or investing, directly or indirectly, in the establishment or operation of the Firm, income received by Defendants and derived, directly or indirectly, from a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(a), namely and as described more fully above, multiple related instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

218. By reason of the violation of 18 U.S.C. § 1962(a) committed by Defendants, including their use or investment of racketeering income, Garlock was injured within the meaning of 18 U.S.C. § 1964(c) in an as yet undetermined amount to be proven at trial.

219. By reason of Defendants' violations as specified above, Garlock is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest thereon from the date of loss and reasonable attorneys' fees.

## VI.
## SECOND CLAIM FOR RELIEF

*Claim Against the Lawyer Defendants for Violation of 18 U.S.C. § 1962(c)*

220. Garlock here repeats and incorporates herein by reference the allegations of paragraphs 1–213 of the Complaint.

221. Each Lawyer Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

222. The Firm constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise has, at all relevant times, been engaged in activities which are in and affect interstate commerce.

223. The Lawyer Defendants have been employed by the Firm at all relevant times, with the exception of Defendant Eddins, who was employed by the Firm from 2006 to 2011.

224. Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the Firm through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(c), namely and as more fully described above, multiple related instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

225. In furtherance of Defendants' Scheme, the Lawyer Defendants have utilized the resources of the Firm to carry out their pattern of racketeering activity.

226.     By reason of the violation of 18 U.S.C. § 1962(c) committed by the Lawyer

Defendants, Garlock was injured within the meaning of 18 U.S.C. § 1964(c) in an as yet

undetermined amount to be proven at trial.

227.     By reason of the Lawyer Defendants' violations as specified above, Garlock is

entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest thereon

from the date of loss and reasonable attorneys' fees.

<div align="center">

**VII.**
**<u>THIRD CLAIM FOR RELIEF</u>**

</div>

<div align="center">

*Claim Against All Defendants for Common Law Fraud*

</div>

228.     Garlock here realleges and incorporates by reference the allegations of paragraphs

1–213 of the Complaint.

229.     Defendants had a duty to answer the discovery responses in *White*, *Ornstein*,

*Reed*, and the Limited Discovery Cases truthfully and to make truthful disclosures as more

particularly described above.

230.     Defendants' representations in *White*, *Ornstein*, *Reed*, and the Limited Discovery

Cases were material, important, and factual when made.

231.     Defendants' nondisclosures in *White*, *Ornstein*, *Reed*, and the Limited Discovery

Cases were material, important, and factual when concealed.

232.     Defendants' representations in *White*, *Ornstein*, *Reed*, and the Limited Discovery

Cases were false.

233.     When Defendants made the misrepresentations in *White*, *Ornstein*, *Reed*, and the

Limited Discovery Cases, Defendants knew they were false or made them recklessly without any

knowledge or regard for their truth and as a positive assertion.

234.    Defendants intentionally failed to disclose important facts in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases; disclosed some facts but intentionally failed to disclose important facts, making the disclosures deceptive; intentionally failed to disclose important facts that were known only to themselves and that Garlock could not have discovered; or actively concealed important facts from Garlock or prevented Garlock from discovering those facts.

235.    Garlock did not know of the concealed facts.

236.    Defendants made the misrepresentations in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases with the intent that Garlock should rely and act upon them.

237.    Defendants concealed facts in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases with the intent to deceive Garlock.

238.    Garlock acted in reasonable reliance upon the misrepresentations and nondisclosures in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases.

239.    As a proximate result of Defendants' misrepresentations and nondisclosures in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases, Garlock suffered compensatory and punitive damages in an as yet undetermined amount to be proven at trial, which exceeds $75,000, exclusive of interest and costs.

240.    Garlock's reliance on the misrepresentations and nondisclosures in *White*, *Ornstein*, *Reed*, and the Limited Discovery Cases was a substantial factor in causing Garlock's harm.

241.    Garlock is informed and believes that the Early Firm, which referred *White* and *Reed* to the Firm, and the Mandelbrot Firm were aware of the exposures underlying the White Trust Claims and Reed Trust Claims while *White* and *Reed* were pending and worked together with Defendants to conceal such exposures from Garlock in *White* and *Reed*.

## VIII.
## FOURTH CLAIM FOR RELIEF

*Claim Against All Defendants for Civil Conspiracy*

242. Garlock here realleges and incorporates by reference the allegations of paragraphs 1–213.

243. As more particularly described above, Defendants and the Early and Mandelbrot Firms had a meeting of the minds on a common object to be accomplished and an agreement to commit wrongful acts to that end, *i.e.*, recovery of a contingency fee artificially inflated by the fraudulently induced settlements in *White* and *Reed* and all of the other settlements that these settlements affected.

244. Defendants committed various unlawful and wrongful acts as more particularly described above in pursuit of the fraudulently induced settlement in *White* and *Reed*.

245. Defendants were aware of each other's plans to commit the wrongful acts.

246. Consistent with their agreement, Defendants intended that the wrongful acts be committed.

247. As a proximate result of Defendants' civil conspiracy, Garlock suffered compensatory and punitive damages in an as yet undetermined amount to be proven at trial, which exceeds $75,000, exclusive of interest and costs.

## IX.
## PRAYER FOR RELIEF

Wherefore Garlock prays that judgment be entered in Garlock's favor against the relevant Defendants, each of them jointly and severally:

1. In an amount to be determined at trial upon the First Claim for Relief, for violation of 18 U.S.C. § 1962(a), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

2.      In an amount to be determined at trial upon the Second Claim for Relief, for violation of 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

3.      In an amount to be determined at trial upon the Third Claim for Relief, for common law fraud, as well as punitive damages.

4.      In an amount to be determined at trial upon the Fourth Claim for Relief, for common law civil conspiracy, as well as punitive damages.

5.      For the costs of suit including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c) and under applicable law.

6.      For such other damages, relief, and pre- and post-judgment interest as the Court may deem just and proper.

7.      All issues in this action that are triable by a jury be tried before and decided by a jury in the United States District Court for the Western District of North Carolina.

This 9th day of January, 2014.

/s/ Garland S. Cassada
Garland S. Cassada
N.C. Bar No. 12352
D. Blaine Sanders
N.C. Bar No. 12541
Louis A. Bledsoe, III
N.C. Bar No. 12730
Jonathan C. Krisko
N.C. Bar No. 28625
Richard C. Worf, Jr.
N.C. Bar No. 37143

ROBINSON BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Telephone: (704) 377-2536
Facsimile:  (704) 378-4000

gcassada@rbh.com
bsanders@rbh.com
lbledsoe@rbh.com
jkrisko@rbh.com
rworf@rbh.com

*Counsel to Garlock Sealing Technologies LLC
and Garrison Litigation Management Group,
Ltd.*

# EXHIBIT 1

JEFFREY B. SIMON (TX, NY)
RON C. EDDINS (CA, TX)
DAVID C. GREENSTONE (TX, NY)

ASSOCIATES
JENNIFER L. BARTLETT (CA)
CLAY B. CARROLL (TX)



SIMON, EDDINS & GREENSTONE, LLP



ROBERT
H.W. TRE
SAAR S

CHARLES W. BRANHAM, III (CA)
JAMIE A. NEWBOLD (CA)

PLEASE RESPOND TO THE TEXAS OFFICE

July 31, 2006

**VIA LEXISNEXIS**
**TO ALL COUNSEL OF RECORD:**

Re: *Charles White, et al v. Buffalo Pumps, Inc., et al;* Cause No. 2006-41943; In the
11th Judicial District Court of Harris County, Texas
***TRANSFERRED FROM***
*Charles White, et al v. Buffalo Pumps, Inc., et al;* Cause No. 06-06970-E; In the
County Court at Law No. 5 in Dallas County, Texas.

Dear Counsel:

Attached please find Plaintiffs Charles White and Barbara Lorton's *Answers to Master Discovery Requests* to all Defendants in all Asbestos-Related Personal Injury and Death Cases Filed in Harris County and *Responses to all Defendants' Rule 194 Requests for Disclosure* in the above-referenced matter, including *Exhibits "1-7"* and *Authorizations as Exhibits "A-J"*.

The CD referenced as Exhibit "6" will be sent by separate cover via U.S. Mail.

If you have any questions, do not hesitate to call.

Sincerely,

Charles W. Branham, III

CWB/cfc
Attachments

**cc: All Counsel of Record via Lexis Nexis (See attached counsel list)**

TEXAS OFFICE:
3232 MCKINNEY AVENUE, SUITE 610
DALLAS, TEXAS 75204
TEL: 214.276.7680
FAX: 214.276.7699

ATTORNEYS & COUNSELORS AT LAW
www.seglaw.com

CALIFORNIA OFFICE:
211 E. OCEAN BLVD., SUITE 200
LONG BEACH, CALIF. 90802
TEL: 562.590.3400
FAX: 562.590.3411

Case 3:14-cv-00116-GCM-DSC Document 75-1 Filed 01/20/15 Page 63 of 181

GST-EST-0521405

# CLIENT CHECKLIST - WHITE, CHARLES MDL CN#2006-41943

| Counsel Name | Firm Name | Address | Phone | Fax | Party(s) Represented | E-mail |
|---|---|---|---|---|---|---|
| James H. Powers | Powers & Frost | 2400 One Houston Center, Houston, TX 77010 | 713-767-1555 | 713-767-1799 | Buffalo Pumps, Inc. | jpowers@powersfrost.com |
| Nathan Bosio | Dogan & Wilkinson | 734 Delmas Ave., Pascagoula, MS 39568 | 228-762-2272 | 228-762-3223 | Carver Pump Co. | nbosio@doganwilkinson.com |
| Michael J. Ramirez | Kirkpatrick & Lockhart Nicholson Graham, LLP | 2828 N. Harwood St., Ste. 1800, Dallas, TX 75201 | 214-939-4900 | 214-939-4949 | Crane Co. | mramirez@klng.com |
| Susan Ashmore | DeHay & Elliston | 901 Main St., Ste. 3500, Dallas, TX 75202 | 214-210-2400 | 214-210-2500 | Certainteed, Inc. Union Carbide Corp. | sashmore@dehay.com |
| Raymond Harris | Schachter Harris, LLP | 2300 Plaza of the Americas, 600 N. Pearl, LB 133, Dallas, TX 75201 | 214-999-5700 | 214-999-5747 | Garlock Sealing Tech. | rharris@schachterharris.com |
| John D. Carlos | Prichard Hawkins McFarland & Young | 10101 Reunion Pl., Ste. 600, San Antonio, TX 78216 | 210-477-7400 | 210-477-7450 | General Motors Corp. | jcarlos@phmv.com |
| L. Hayes Fuller, III | Naman Howell Smith & Lee | 9th & Washington, Waco, TX 76703 | 254-755-4100 | 254-754-6331 | Goulds Pumps, Inc. Goulds Pumps (NY), Inc. | fuller@namanhowell.com |
| Robert Wilkinson William Farrell | Dogan & Wilkinson | 734 Delmas Ave., Pascagoula, MS 39568 | 228-762-2272 | 228-762-3223 | Guard-Line, Inc. | rwilkinson@doganwilkinson.com |
| J. Michael Jordan | Gardere Wynne Sewell | 1000 Louisiana, Ste. 3400, Houston, TX 77002 | 713-276-5569 | 713-276-6569 | IMO Industries, Inc. | mjordan@gardere.com |
| Laura Frase | Forman Perry Watkins Krutz & Tardy | 2001 Bryan St., Ste. 1300, Dallas, TX 75201 | 214-678-5541 | 214-905-3976 | Ingersoll Rand Co. | lafrase@fpwk.com |
| Laura Kugler | Bailey Crowe & Kugler | 6550 Bank of America Plaza, 901 Main St., Ste. 4600, Dallas, TX 75202 | 214-231-0555 | 214-231-0556 | John Crane, Inc. | lkugler@bcklaw.com |
| Billy D. Anderson | Kent, Good, Anderson & Bush | Woodgate I, Ste. 200, 1121 ESE Loop 323, Tyler, TX 75701 | 903-579-7500 | 903-581-3701 | Leslie Controls, Inc. | billya@tyler.net |

GST-EST-0521406

| Counsel Name | Firm Name | Address | Phone | Fax | Party(s) Represented | E-mail |
|---|---|---|---|---|---|---|
| Ken Rhodes | Kacal, Adams & Law | One Riverway Ste. 1200, Houston, TX 77056 | 713-529-3992 | 713-621-4072 | Met Life Insurance Co. | kdrhodes@kalpc.com |
| Brian S. Clary | The Clary Firm | 408 Staiti, Humble, TX 77338 | 281-548-1100 | 281-548-1126 | Mueller, Co., Mueller Steam Specialty | bclary@claryfirm.com |
| Laurie B. Easter | McGinnis Lockridge & Kilgore, LLP | One Houston Center, Ste. 3200, 1221 McKinney St, Houston, TX 77010 | 713-651-8524 | 713-328-1824 | PCC Flow Technologies Holdings, Inc. | leaster@mcginnislaw.com |
| Ken Royer | Beason Willingham | 808 Travis St., Ste. 1608, Houston, TX 77002 | 713-333-7600 | 713-333-7601 | Peerless Pump Company, Standco Industries, Inc. | kenr@beasonwillingham.com |
| Todd Ogden | Forman Perry Watkins Krutz & Tardy | 2001 Bryan St., Ste. 1300, Dallas, TX 75201 | 214-678-5546 | 214-905-3976 | Uniroyal Holdings, Inc. | tdogden@fpwk.com |
| Robert Thackston | Hawkins Parnell & Thackston | 4514 Cole Ave., Ste. 550, Dallas, TX 75205 | 214-780-5100 | 214-780-5200 | Warren Pumps, Inc. | rthackston@hplegal.com |
| Alan Moore | Fanning Harper & Martinson | Two Energy Square, 4849 Greenville Ave., Ste. 1300, Dallas, TX 75206 | 214-369-1300 | 214-987-9649 | Yarway Corporation | amoore@fhmlaw.com |

GST-EST-0521407

| | | |
|---|---|---|
| CHARLES WHITE and spouse BARBARA LORTON, | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | HARRIS COUNTY, TEXAS |
| BUFFALO PUMPS, INC., ET AL | § | 11TH JUDICIAL DISTRICT |

---

**TRANSFERRED FROM**

---

CAUSE NO. 06-06970-E

| | | |
|---|---|---|
| CHARLES WHITE and spouse BARBARA LORTON, | § § § | IN THE COUNTY COURT |
| VS. | § § | AT LAW NO. 5 |
| BUFFALO PUMPS, INC., ET AL | § | DALLAS COUNTY, TEXAS |

---

**PLAINTIFF'S ANSWERS TO MASTER DISCOVERY REQUESTS
TO ALL DEFENDANTS IN ALL ASBESTOS-RELATED PERSONAL
INJURY AND DEATH CASES FILED IN HARRIS COUNTY AND RESPONSES
TO ALL DEFENDANTS' RULE 194 REQUESTS FOR DISCLOSURE**

TO: ALL DEFENDANTS, by and through their counsel of record.

COME NOW Plaintiffs, CHARLES WHITE and spouse BARBARA LORTON, Plaintiffs herein and by and through their counsel of record, file this their Answers to Master Discovery Requests and Responses to Rule 194 Requests for Disclosure propounded by all defendants and also in response and supplemental response to written discovery previously propounded by the defendants to the plaintiff and responses to any and all defendants' Rule 194 Requests for Disclosure pursuant to the Texas Rules of Civil Procedure.

Respectfully submitted,
SIMON, EDDINS & GREENSTONE, LLP

JEFFREY B. SIMON
State Bar No. 00788420

ANSWERS TO MASTER DISCOVERY
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Page 1

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 66 of 181

GST-EST-0521408

RON C. EDDINS
State Bar No. 24000926
DAVID C. GREENSTONE
State Bar No. 24007271
CHARLES W. BRANHAM, III
State Bar No. 24012323
CLAY B. CARROLL
State Bar No. 24029475

3232 McKinney Avenue   Suite 610
Dallas, Texas 75204
214-276-7680
214-276-7699 Fax

**ATTORNEYS FOR PLAINTIFF**


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Instrument was sent via Lexis Nexis to all counsel of record on the 31st day of July, 2006.

CHARLES W. BRANHAM, III

ANSWERS TO MASTER DISCOVERY                                                                    Page 2
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 67 of 181

GST-EST-0521409

**INTERROGATORY NO. 1:**

State the following personal information pertaining to the plaintiff/decedent who claims to have sustained an asbestos-related disease:

     (a)     full name;

     (b)     current residence address;

     (c)     social security number(s);

     (d)     date of birth;

     (e)     name of spouse;

     (f)     spouse's residence address, if different from plaintiff's;

     (g)     date of death (if applicable); and

     (h)     cause of death (if applicable).

**ANSWER:**

     (a)     Charles Conrad White;

     (b)     ███████████
             Hollywood, MD 20636;

     (c)     ████5981;

     (d)     ██████1942;

     (e)     Barbara Jane Lorton;

     (f)     Not applicable;

     (g)     Not applicable;

     (h)     Not applicable.

ANSWERS TO MASTER DISCOVERY                                         Page 3
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 68 of 181

GST-EST-0521410

**INTERROGATORY NO. 2:**

State the following injury information pertaining to the plaintiff/decedent who claims to have sustained an asbestos-related disease:

     (a)     the asbestos-related injury or injuries claimed;

     (b)     the first date of diagnosis of each of the plaintiff or decedent's asbestos-related condition(s); and

     (c)     name and address of the physician/health care provider(s) who rendered the diagnosis or diagnoses.

**ANSWER:**

     (a)     Mesothelioma;

     (b)     February 20, 2006;

     (c)     M. Blair Marshall
                   Georgetown University Hospital
                   3800 Reservoir Rd., NW
                   Pasquerilla Healthcare Center, 4th Floor
                   Washington, D,C. 20007

**INTERROGATORY NO. 3:**

Identify all doctors, hospitals, and other health care providers or facilities that have ever treated the plaintiff/decedent for any heart, lung, chest-related injury, or cancer and all doctors, hospitals, and other health care providers or facilities where the plaintiff/decedent has been treated at any time during the preceding ten (10) years, to include:

     (a)     the approximate dates of the treatment;

     (b)     the names and current addresses of the doctors, hospitals or other healthcare providers; and

     (c)     the reasons for the treatment and diagnosis.

**ANSWER:**

**INTERROGATORY NO. 4:**

State the plaintiff/decedent's tobacco use history; including quantity, product smoked, and when started and stopped.

GST-EST-0521411

**ANSWER:**

Plaintiff objects to this Interrogatory to the extent it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection, please see plaintiff's Tobacco Questionnaire, attached as Exhibit "3."

**INTERROGATORY NO. 5:**

State the plaintiff/decedent's occupation and union membership, if any, and the dates of membership. If plaintiff was or is an officer or steward in any union, state the dates that such position, if any, was held.

**ANSWER:**

Plaintiff has never been a member of any union.

**INTERROGATORY NO. 6:**

Using extreme diligence, provide detailed work and asbestos exposure history of the plaintiff/decedent (or if exposure is claimed through another person, of that other person) to include the following information (provide answers to each subpart):

(a)  the location and name of the owner/occupier of each premises, the specific unit or area of the premises where exposure to asbestos is alleged to have occurred;

(b)  the manufacturer, description, model name and number, serial number, and location at the time of plaintiff/decedent's alleged exposure, of any and all equipment, including but not limited to Heavy Equipment, pumps, vessels, boilers, turbines, furnaces, tractors, engines, mobile or affixed equipment containing or utilizing asbestos or asbestos-containing products or component part(s) to which the plaintiff/decedent claims, or has claimed, exposure;

(c)  the identity of each Contractor that the plaintiff/decedent claims, or has claimed, caused them to be exposed to asbestos and for each Contractor, each act or omission of that Contractor that caused exposure, including the premises, location and date of each such claimed exposure;

(d)  each product, to include manufacturer, supplier or distributor and brand name (regardless of whether the manufacturer is a party), that the plaintiff/decedent claims, or has claimed, to have caused his/her asbestos exposure. The plaintiff must state if the name of the manufacturer is not known by the plaintiff;

(e)  a specific description of each alleged exposure, including the specific time period, the work or task being performed, the length of time in hours, days, or months, as appropriate, and the specific nature of the exposure alleged;

(f)  the plaintiff/decedent's employer and occupation or craft at the time of each exposure identified;

(g)  if any exposure in question is the result of ship-board exposure in the navy or otherwise, the work history must identify the name of any ship on which the plaintiff claims

ANSWERS TO MASTER DISCOVERY                                                                                              Page 5
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 70 of 181

GST-EST-0521412

exposure occurred and, if known, the hull number, the owner/operator of the ship, the dates of service on the ship and any berths or yards where the ship was located when not at sea or in operation; and

(h)     whether any exposure in question is claimed to have occurred on United States government property, and if so, the complete name and location of the site, relevant dates of alleged exposure, and describe the nature of the exposure and the asbestos-containing products to which plaintiff was exposed at that time.

**ANSWER:**

(a)     

(b)     Plaintiff objects to this Interrogatory to the extent it is overly broad and unreasonably burdensome. In addition, the information requested herein is equally or moreso available to the Defendants in this action. Subject to, and without waiving this objection, please see Plaintiffs' Work History Sheet, attached as Exhibit "4." Discovery is ongoing and Plaintiff reserves the right to supplement this answer as discovery continues.

(c)     Not applicable.

(d)     Please see Plaintiff's Work History Sheet attached hereto as Exhibit "4". Mr. White was exposed to products, including but not limited to, gaskets and packing manufactured and sold by Crane; gaskets manufactured and sold by Garlock, John Crane and Standco, Industries; pumps manufactured and sold by Buffalo Pumps, Carver Pumps, Cochrane, Goulds Pumps, Ingersoll Rand, Peerless Pump Co., Warren Steam Pumps and Worthingon; valves manufactured and sold by Chapman, Crane Co., Leslie Controls, Inc., and Mueller Co; asbestos siding manufactured and sold by Certainteed; floor tile manufactured and sold by Kentile; and joint compound manufactured and sold by Georgia-Pacific. Plaintiff's counsel will make Mr. White available, if he is able, for deposition for cross-examination on the specific issues.

(e)     Mr. White worked around asbestos-containing gaskets, packing, pumps, steam winches, valves, asbestos siding, floor tile and joint compound throughout his career. From approximately 1961 to 1969, Mr. White worked in the machine shop at Norfolk Shipbuilding. Mr. White repaired equipment that was brought from the ships to the machine shop. In approximately 1967, Mr. White performed remodeling and repair work on his home. Some of his duties on this job were to cut, install and paint asbestos siding, install and remove asbestos floor tiles and repeatedly mix, sand and sweep joint compound. Mr. White often observed visible dust from his work with and around these products and he often breathed the dust created from these processes. Plaintiff does not know the exact length of time for each exposure, but he was exposed to asbestos gaskets, packing, pumps and valves, and the external insulation on those products, and siding,

ANSWERS TO MASTER DISCOVERY                                                                                    Page 6
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 71 of 181

GST-EST-0521413

floor tile and joint compound in one way or another virtually all day everyday of his career into the late 1960s. Plaintiff's counsel will make Mr. White available for deposition, if he is able, for cross-examination on the specific issues.

(f) 

(g)

(h) N/A.

## INTERROGATORY NO. 7:

State the identity of each coworker or other product identification witness who can provide product identification information, the specific site or sites at which each coworker or product identification witness worked with the plaintiff, the specific units or areas in each site at which each coworker or product identification witness worked with the plaintiff, the dates that the coworker or witness worked at each site, and the products and manufacturer, supplier and distributor of the alleged asbestos-containing products, and any other products that allegedly released asbestos in their use, that each coworker, or other product identification witness, can identify (listing the product(s) specific to each co-worker or product identification witness). [If the plaintiff/decedent alleges exposure through another person's job or occupation, please answer for that other person's job or occupation.]

## ANSWER:

Plaintiff objects to this Interrogatory to the extent it is overly broad and unreasonably burdensome. Specifically, Plaintiff at this time, cannot identify each and every coworker who worked with Plaintiff. Subject to and without waiving this objection, please see Plaintiff's Work History Sheet, attached as Exhibit "4" for a list of co-workers Plaintiff does recall. Plaintiff reserves the right to supplement this Interrogatory pursuant to the Texas Rules of Civil Procedure and the applicable Case Management Order.

## INTERROGATORY NO. 8:

Provide detailed information about the plaintiff/decedent's non-occupational history during which he or she may have been exposed to asbestos or asbestos-containing materials, including:

(a) a description of the activity engaged in;

(b) the location, including address, of such possible exposure;

(c) the dates of all possible exposure; and

(d) the identity of any persons who were present during such possible exposure.

ANSWERS TO MASTER DISCOVERY
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Page 7

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 72 of 181

GST-EST-0521414

**ANSWER:**

Plaintiff is unaware of any non-occupational history in which he may have been exposed to asbestos or asbestos-containing materials.

**INTERROGATORY NO. 9:**

With regard to any lawsuit filed or claim (including claims made through workers compensation or with the Veteran's Administration) made in any jurisdiction in which the plaintiff/decedent claimed a personal injury affecting his/her lungs (including but not limited to any asbestos-related, silica-related, mixed-dust related or welding-fume related condition), the plaintiff shall identify:

    (a)    the identity of each entity against whom any such lawsuit was filed or against whom any claim was made;

    (b)    the full style, including name, cause number and court, in which the lawsuit, if any, was filed, and identifying information such as claim number and dates of claim(s) for any claims made;

    (c)    counsel, if any, that represented plaintiff/decedent in any such lawsuit(s) or claim(s);

    (d)    the current status and result of any such lawsuit(s) or claim(s); and

    (e)    the amount, if any, received in resolution or settlement of any such lawsuit(s) or claims(s) and from whom received.

**ANSWER:**

Plaintiff objects that this interrogatory is vague, ambiguous, overly-broad and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff has never filed a claim or received disability payments from the Veterans' Administration, and has never filed a claim for workers' compensation for injuries affecting his lungs.

**INTERROGATORY NO. 10:**

With regard to any claim or settlement made or anticipated to be made with any entity or trust (including but not limited to claims made in conjunction with a bankruptcy proceeding such as those for Johns-Manville, UNARCO, and Celotex, and including any claims made to or through the Center for Claims Resolution) in which the plaintiff/decedent claimed or will claim a personal injury affecting his/her lungs (including but not limited to any asbestos-related, silica-related, mixed-dust related or welding-fume related condition), the plaintiff shall identify:

    (a)    the full identity of the entity against whom such claim was or will be made;

    (b)    the amount, if any, paid or agreed to be paid, in compensation for the claim of the plaintiff/decedent; and

    (c)    the date such claim was made and current status (e.g., claim made and pending).

ANSWERS TO MASTER DISCOVERY                                                Page 8
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 73 of 181

GST-EST-0521415

**ANSWER:**

Plaintiff objects on the basis that this Interrogatory seeks information pertaining to confidential offers of settlement. Subject to and without waiving this objection, Plaintiff responds that this request is not applicable, as no such claim has been made.

**INTERROGATORY NO. 11:**

In all wrongful death or survival actions,

    (a)    state the date and place of death;

    (b)    state whether the decedent had a Last Will and Testament and whether any administration has been had on the decedent's estate;

    (c)    if any administration of the estate or probate proceedings were initiated, state the name of the executor or administrator of the estate, the date the executor or administrator first qualified, and the title and location of each court that has granted letters, orders, or other authority to the executor or administrator;

    (d)    the name, age, and address of each child and each heir of the decedent;

    (e)    state whether an autopsy was performed on the decedent and if so, identify the person who performed the autopsy and the facility where the autopsy was performed; and

    (f)    state the cause of death.

**ANSWER:**    Not applicable.

**INTERROGATORY NO. 12:**

If the plaintiff/decedent is currently married, please state the spouse's name and address, the date of marriage and the name and address of the spouse's employer. With respect to any and all prior spouses, if any, state: as to each prior spouse:

    (a)    name and date of marriage; and

    (b)    whether that marriage was terminated by divorce, separation, annulment, or death, and the date of such termination.

**ANSWER:**    Spouse name:    Barbara Jane Lorton
                 Address:    ████████████

                                       Hollywood, MD 20636
                 Date of marriage:    August 10, 1996
                 Spouse employer:    ████████████

    (a)    Patricia Ann White, 1963;

    (b)    Death, 1973.

ANSWERS TO MASTER DISCOVERY                                       Page 9
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 74 of 181

GST-EST-0521416

(a)    Staron White, 1985;

(b)    Divorce, 1995.

## INTERROGATORY NO. 13:

State the present name, age, date of birth, and current address of each of the plaintiff/decedent's children, and of any person who in any way is financially dependent upon the plaintiff/decedent for support, including, but not limited to, parents, in-laws, relatives, or other people; for each such person, including children, state the extent to which such person is dependent upon the plaintiff/decedent for financial support or maintenance.

**ANSWER:**    Plaintiff objects to this Interrogatory to the extent it is duplicative of Interrogatory No. 11(d). Subject to, and without waiving this objection, please see Interrogatory No. 11. Additionally, plaintiff will provide the following additional information:

| NAME | AGE | DATE OF BIRTH | ADDRESS | RELATION | SUPPORT |
|------|-----|---------------|---------|----------|---------|
| Justin C. White | 34 | 1972 | Pinehurst, NC 28374 | Son | 0% |
| Kerrick King | 36 | 70 | Springfield, TN 37172 | Daughter | 0% |

## INTERROGATORY NO. 14:

State the names and addresses of all schools that the plaintiff/decedent has attended, the dates the plaintiff/decedent attended those schools, whether they were public, private, military, trade schools, and/or special training institutions, and with respect to each describe the type of training received, the highest grade reached, and the degree or certificate obtained, if any.

**ANSWER:**    Plaintiff objects to this Interrogatory to the extent it is overly broad. Subject to, and without waiving this objection, plaintiff attended the following schools:

| SCHOOL NAME | ADDRESS | DATE | TYPE | TRAINING/DEGREE |
|-------------|---------|------|------|-----------------|
| Woodrow Wilson High School | Portsmouth, VA | 1961 | High School | |
| Jefferson Professional Institute | Virginia Beach, VA | 1963 | College | |
| Coast Guard-Electronics School | Benbridge, MD | 1964-1965 | Trade School | SFNT |

## INTERROGATORY NO. 15:

If the plaintiff/decedent has ever been arrested, charged, or convicted of a felony or crime involving moral turpitude, state the date, location and nature of each criminal charge or conviction, including the case number and jurisdiction, and the result of each such arrest, charge, or conviction; and specifically identify any time period and location of incarceration.

**ANSWER:**    Plaintiff objects to this Interrogatory to the extent that it is overly broad, it is not limited in scope, is not reasonably calculated to lead to the discovery of admissible evidence, and

ANSWERS TO MASTER DISCOVERY    Page 10
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 75 of 181

GST-EST-0521417

is vague to the extent it does not define a crime involving moral turpitude. Subject to, and without waiving this objection, plaintiff has never been convicted of a crime.

## INTERROGATORY NO. 16:

If the plaintiff/decedent has ever served in any capacity in the military service, state the dates, rank, service number, and branch of service; MOS (Military Occupational Specialty) or equivalent; each location where the plaintiff/decedent was stationed; the plaintiff/decedent's duties at each location; the injuries, if any, received during service; the exposure, if any, to any chemicals, solvents, silica, asbestos, radioactive materials or biological or chemical weapons; date and type of discharge from each tour of duty or enlistment; and type of disability and pension the plaintiff/decedent has received or are receiving, if any. If military service included service upon vessels, provide ship names and dates of service on each vessel.

**ANSWER:** 

Plaintiffs have attached an authorization to permit the Defendants to acquire the Plaintiff's Military Records. That authorization is attached hereto as Exhibit "F."

## INTERROGATORY NO. 17:

State the plaintiff/decedent's income and the source(s) of the plaintiff/decedent's income for each year of the last five years. If the plaintiff/decedent's spouse is employed or has been employed, state his or her income for each year of the last five years.

**ANSWER:**    Plaintiff objects to this request to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence in that plaintiff is not making a claim for lost wages. Subject to and without waiving this objection, plaintiffs have ordered these records and will supplement them as soon as the returns are received, in accordance with the Texas Rules of Civil Procedure and the Case Management Order entered by this Court. Additionally, please see the attached authorization to allow defendants to order these returns. Subject to and without waiving objections, Plaintiff's income for the past five years has come from owning and operating a sign business, Admiral Signs. ████████ ████████████████████████████████████████████████ In addition, Plaintiffs have ordered these records and will supplement them as soon as the returns are received, in accordance with the Texas Rules of Civil Procedure and the Case Management Order entered by this Court. Additionally, please see the attached authorization to allow defendants to order these returns.

## INTERROGATORY NO. 18:

*Excluding any information already provided in response to Interrogatory No. 6,* describe in detail the plaintiff/decedent's employment history, including:

(a)    the name and address of each employer for whom the plaintiff/decedent worked;

(b)     the dates when the plaintiff/decedent worked for each employer;

(c)     the location, including each unit or area of each job site, and description of each job site where the plaintiff/decedent was employed and the dates when they worked at each such jobsite;

(d)     the plaintiff/decedent's job duties, craft and titles for each job site where they were employed;  and

(e)     whether the plaintiff/decedent was exposed to any dusts, fumes or gases and if so, what dusts, fumes or gases the plaintiff/decedent was exposed to and at which job.

[If the plaintiff/decedent alleges exposure through another person's job or occupation, please answer for that other person's job or occupation.]

**ANSWER:**

Please see objections and responses to Interrogatory No. 6 which are incorporated by reference herein as if fully set forth.  Plaintiff is not aware or in possession of additional information responsive to this request.

**INTERROGATORY NO. 19:**

For each position that the plaintiff/decedent held or job that the plaintiff/decedent performed at the job sites listed in response to Interrogatory No. 6, provide the following information for every product, part, or equipment, that allegedly was a producing cause of any of the injuries or damages made the basis of this lawsuit.  [If the plaintiff/decedent alleges exposure through another person's job or occupation, please answer for that other person's job or occupation.]

(a)     every location, unit or area in which the plaintiff/decedent worked with or around such product, and the inclusive dates during which the plaintiff/decedent worked in each location, unit or area;

(b)     the beginning and ending dates of each job during which the plaintiff/decedent contends the exposure occurred, the name and address of the plaintiff/decedent or the other person's employer on each job, and the plaintiff/decedent's or the other person's job title(s), classification(s), duties, and responsibilities on each job;

(c)     whether the product, part, or equipment was accompanied by a warning concerning dust or asbestos fibers, and, if so, the substance of the warning;

(d)     describe all training or information provided to the plaintiff/decedent (or the other person) by the plaintiff/decedent's (or the other person's) employer regarding the risks and hazards of working around asbestos, respiratory protection, or proper handling of hazardous substances;

(e)     whether the plaintiff/decedent was required to follow any safety procedures when working with and/or around the product, part, or equipment. If so, please identify these procedures and whether they followed these safety procedures;

ANSWERS TO MASTER DISCOVERY                                   Page 12
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 77 of 181

GST-EST-0521419

(f)     the respiratory or protective equipment the plaintiff/decedent (or the other person) used, identifying each manufacturer and model number, who provided it to the plaintiff/decedent (or the other person) and whether use of the respiratory or protective equipment was mandatory;

(g)     if the premises were owned or occupied by a premises defendant, state all facts that support the plaintiff/decedent's contention that the premises defendant had actual knowledge of the danger posed by asbestos exposure, posed by the condition or activity on its premises that allegedly caused their injury;

(h)     a description of the ventilation system of each building, shop, or confined space in which the plaintiff/decedent worked with and/or around the product, part, or equipment; and

(i)     the percentage that the plaintiff/decedent contends should be allocated to each asbestos-containing product, part, or equipment for comparative fault.

**ANSWER:**     Please see objections and responses to Interrogatory No. 6 which are incorporated by reference herein as if fully set forth. In addition, Plaintiff objects to subpart (i) on the basis that it seeks core attorney work product and is not reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 20:

For each co-worker or product identification witness identified in response in Interrogatory No. 7, fully identify any claim or lawsuit where such co-worker or product identification witness asserted or claimed his/her own asbestos-related illness or condition, and list all prior depositions of the co-worker or product identification witness, whether as a plaintiff or witness, in any case alleging asbestos exposure.

**ANSWER:**     Plaintiff objects to this Interrogatory to the extent it is overly broad and unreasonably burdensome. Subject to, and without waiving this objection, Plaintiff is not aware of any information responsive to this discovery request. Discovery is ongoing and Plaintiff reserves the right to supplement this answer as discovery continues.

## INTERROGATORY NO. 21:

Has the plaintiff/decedent, or has anyone on the plaintiff/decedent's behalf, performed an investigation or research or reviewed data to identify asbestos-containing products or manufacturers which the plaintiff/decedent contends caused their asbestos related disease? If so, please provide the following:

(a)     an explanation of the specific research performed (i.e. internet, etc.);

(b)     a list of every document, photograph or other material retrieved as a result of the research;

(c)     a list of literature, trade publications or journals, medical literature or treatises, union publications and similar literature reviewed;

(d)     a list of photographs, slide-shows, videotapes, product lists, manufacturer lists and lists of suppliers or distributors reviewed; and

(e)     all other information reviewed or consulted in order to identify asbestos-containing products, part, or equipment, or manufacturers, suppliers and distributors of asbestos-containing products, or equipment.

**ANSWER:**     Plaintiff objects to the extent that this Interrogatory seeks core work product, to the extent that it seeks discovery of Plaintiff's testifying experts, and in that respect is expressly prohibited under the Rules, and to the extent that responsive information may be obtained from documents which are hereby being made available to the Defendants with the same or similar burden as that which would be imposed upon the Plaintiff to create the lists requested by this Interrogatory. In addition, please see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by Plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented. These lists will reflect any and all documents, photographs, films, movies or video recordings that Plaintiff intends to use at trial and/or said materials will be made available to Defendants and/or supplemented. These lists may be amended or supplemented later. Plaintiff attempted to set forth a list of products, brands, premises, and vendors incorporated herein as part of the Work History sheet attached as Exhibit "4".

## INTERROGATORY NO. 22:

During the time for which the plaintiff/decedent alleges exposure, if the plaintiff/decedent was ever warned or given any information about hazards or potential hazards relating to asbestos by either a defendant, an employer for whom the plaintiff/decedent worked, a union of which the plaintiff/decedent were a member, or any other person or entity, please state the following:

(a)     each date that the plaintiff/decedent was provided with a warning or other information;

(b)     identify each person (name, position, and name of employer, union, or other entity with which the person was affiliated) who provided the plaintiff/decedent with the warning or other information;

(c)     whether the warning or other information was in writing;

(d)     the content of the warning or other information; and

(e)     what action the plaintiff/decedent took or refrained from taking as a result of the warning or other information.

**ANSWER:**     None

## INTERROGATORY NO. 23:

Has the plaintiff/decedent (or the person through whom the plaintiff/decedent alleges exposure) ever worked with or around asbestos-containing materials that were manufactured, sold, produced, prepared, or distributed by any of the following entities?

ANSWERS TO MASTER DISCOVERY                Page 14
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 79 of 181

GST-EST-0521421

| | | |
|---|---|---|
| Johns-Manville Corporation %%% | Raybestos-Manhattan | Carey Canadian |
| Quebec Asbestos Corporation | Asbestospray | Chicago Firebrick Co. |
| National Gypsum Company | Turner & Newell | Cassiar Mining |
| AP Green Industries | AP Green Services | Kaiser Aluminum |
| Armstrong World Industries | Ferodo America, Inc. | GAF Corporation |
| Rutland Fire and Clay | Owens-Corning Fiberglas | W.R. Grace |
| A-Best Products | Fibreboard Corp | Flexitallic Gasket |
| Asbestos Claims Management | Gardner Asphalt | Nicolet |
| Plibrico Company | TAF International | Eagle Picher |
| TBA Industrial Products | United States Gypsum Co. | Celotex |
| Shook & Fletcher Insulation Co. | Pabco | H.K. Porter |
| Combustion Engineering | Pittsburgh Corning | Babcock & Wilcox |
| Unarco | Forty-Eight Insulations | Keene/BEH |
| North American Asbestos | Synkoloid; Burns & Roe | J.T.Thorpe |
| E.J. Bartells | Baldwin Ehret Hill | Keene Corporation |
| Kentile Floors | Philip Carey Company | M.H. Detrick |
| Hillsborough Holding | Brunswick Fabricators, Inc. | Pacor |
| Crown Cork & Seal Co., Inc. | Amatex | Proko Industries |
| Rock Wool Manufacturing | Standard Insulation | UNR Industries |
| United States Mineral Products Co. | Porter-Hayden Co. | AC&S |
| Gasket Holdings, Inc., f/k/a Flexitallic | | |
| NARCO/North American Refractory Co. | | |
| Dresser Industries/Harbison-Walker Refractories | | |

**ANSWER:**   Plaintiff objects to this Interrogatory to the extent that it is overly broad, unduly burdensome, does not specifically identify which asbestos-containing materials to which defendants refer and is compound. Subject to, and without waiving this objection, Plaintiff provides the following information regarding the entities listed in this Interrogatory. If defendants provide and identify the various products produced and made by these entities, plaintiff will attempt to more fully and accurately respond to this Interrogatory.

## INTERROGATORY NO. 24:

If the plaintiff/decedent's answer to the preceding interrogatory is affirmative, provide the following information for each asbestos-containing product the plaintiff/decedent worked with or around that was manufactured, sold, produced, prepared, or distributed by any of the entities identified in the immediately preceding interrogatory:

(a)   the brand or trade name of the product and a detailed description of the product including its color, shape, size, texture and use;

(b)   the manufacturer, supplier, and/or distributor of the product;

(c)   a detailed description of the packaging for the product including the color, size, shape, and material used for the packaging, the substance of all statements on the packaging, and a description of the container for the product;

(d)   the date of each alleged exposure to each product;

ANSWERS TO MASTER DISCOVERY                                                                              Page 15
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 80 of 181

GST-EST-0521422

(e)     the location of each alleged exposure;

(f)     a description of the circumstances of each alleged exposure(s);

(g)     the identities of all co-workers or witnesses present during each alleged exposure;

(h)     the identity of the plaintiff/decedent's supervisor(s) and all co-workers during each period the plaintiff/decedent was allegedly exposed to each asbestos- containing product;

(i)     the exact nature of the work the plaintiff/decedent was performing at the time of each alleged exposure;

(j)     the frequency with which the plaintiff/decedent worked with or handled each asbestos-containing product; and

(k)     the plaintiff/decedent's job title or description at the time of each alleged exposure.

**ANSWER:**     Please see objections and responses to Interrogatory No. 6 above for the identification of asbestos containing products to which the Plaintiff may have been exposed.

(a)     Kentile Floors –floor tile;

(b)     Kentile Floors, Inc.;

(c)     Some tiles were blue and some were white.

(d)     In approximately 1967;

(e)     See Work History Sheet attached as Exhibit "4";

(f)     See Work History Sheet attached as Exhibit "4";

(g)     See Work History Sheet attached as Exhibit "4";

(h)     See Work History Sheet attached as Exhibit "4";

(i)     See Work History Sheet attached as Exhibit "4";

(j)     See Work History Sheet attached as Exhibit "4";

(k)     See Work History Sheet attached as Exhibit "4."

## INTERROGATORY NO. 25:

Did the plaintiff/decedent ever participate in any safety meetings or conferences among co-workers, union representatives, union members, physicians, medical technicians, attorneys or other individuals regarding the potential exposure to asbestos or other occupational dust in the work place? If so, please provide the following:

(a)     the date, location, and purpose of the meeting;

(b)     the identity (name, address and phone number) of all individuals who conducted or were present at the meeting, including but not limited to attorneys, co-workers, physicians, x-ray technicians or other individuals performing health screening tests;

(c)     the substance of all conversations, representations or claims asserted during the meeting;

(d)     all data, documents, product lists, manufacturer lists and all other information provided unto participants and/or reviewed by participants;

(e)     all medical testing performed as a result of the meeting and the results thereof; and

(f)     whether or not the plaintiff/decedent believed they had been exposed to asbestos, prior to the discussions at this meeting, and if so, state the basis of their belief.

**ANSWER:**     Not applicable.

**INTERROGATORY NO. 26:**

(a)     When, if ever, did the plaintiff/decedent first experience any problems with their respiratory health, lungs, or breathing?

(b)     Describe in layman's language what the plaintiff/decedent's physical complaints were at the time they first experienced such problems.

(c)     If the physical complaints and symptoms of which the plaintiff/decedent now complains are different than those they first experienced, as described above, describe their present physical complaints and symptoms and state when they first had these complaints.

(d)     Please place a check mark by any of the illnesses, diseases, or injuries which the plaintiff/decedent has or had and, for each one checked, identify who advised them of the illness, disease, or injury, and the date they were so advised:

| Mesothelioma: Dr. Blair Marshall | X |
|---|---|

(e)     Identify each physician or medical provider who has attended the plaintiff/decedent for lung or breathing problems, and with respect to each physician, state:

     (1)     the date(s) the physician was seen by the plaintiff/decedent;

ANSWERS TO MASTER DISCOVERY                                                                Page 17
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 82 of 181

GST-EST-0521424

<div style="margin-left: 2em;">

(2)    the complaints made to the physician;

(3)    the type of examination and/or treatment received by the plaintiff/decedent from the physician;

(4)    whether any chest x-ray, MRI, CT scan, HRCT scan, biopsy, lung resection, spirometry and/or pulmonary function test was taken or performed; and

(5)    the final diagnosis made by the physician.

(f)    If the plaintiff/decedent has ever been examined through a company or union screening program for lung or respiratory disease, give the dates, place, and details of such examination, and the name of the company, law firm, or union sponsoring the program.

(g)    State the date on which the plaintiff/decedent was first diagnosed with an asbestos-related disease or injury, and identify who made such diagnosis.

</div>

**ANSWER:**

(a)    █████████

(b)    ████████████████

(c)    ██████████████████████

(d)    Mesothelioma (see checked box above);

(e)    See Plaintiff's List of Physicians, attached hereto as Exhibit "1" and Plaintiff's List of Hospitals, attached hereto as Exhibit "2".

(f)    Not applicable;

(g)    Plaintiff objects to this Interrogatory to the extent that it is duplicative. Subject to, and without waiving this objection, plaintiff answered this question in Interrogatory No. 2(c).

**INTERROGATORY NO. 27:**

With regard to any employment referenced in answers to Interrogatories Nos. 6 or 18, state whether the plaintiff/decedent (or the exposed person) was warned in any way about hazards or health risks regarding exposure to asbestos, specifically, the name and address of employer, the date or dates on which such warning was given, the general nature of the warning given, and if any documents or materials were given to the employee by the employer, identify such documents.

**ANSWER:**    Plaintiff objects to this Interrogatory to the extent that it is duplicative. Subject to, and without waiving this objection, plaintiff did not receive any warnings from any employers listed in Interrogatory Nos. 6 or 18.

**INTERROGATORY NO. 28:**

If the plaintiff/decedent have any family history of cancer, state the name of the family member(s) diagnosed as having cancer, the family member's age when diagnosed, the family member's

ANSWERS TO MASTER DISCOVERY           Page 18
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 83 of 181

GST-EST-0521425

relation to the plaintiff/decedent, the type(s) of cancer diagnosed, and if the family member is now deceased, the date, location, and cause of the family member's death.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent that it is overly broad, and that it does not properly identify family history or is not specific as to what family members it is referring to. ████████

## INTERROGATORY NO. 29:

Please state whether the plaintiff/decedent was a recipient of the polio vaccine administered in the late 1950's and 1960's. If the answer is in the affirmative, please state:

(a)    the approximate date(s) of the vaccination;

(b)    the geographic location where the vaccine was administered; and

(c)    the identity of the healthcare provider or facility administering the vaccine(s).

**ANSWER:** Plaintiff objects on the basis that this Interrogatory seeks information that is not relevant nor reasonably calculated to lead to the discovery of admissible evidence.

## INTERROGATORY NO. 30:

If the plaintiff/decedent has been treated for alcohol or drug use or abuse, state the type of treatment received, the inclusive dates during which they received this treatment, and the name and address of each medical practitioner who provided this treatment.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence. ████████

## INTERROGATORY NO. 31:

(a)    How and under what circumstances did the plaintiff/decedent first learn that asbestos could be harmful to his/her health?

(b)    When did the plaintiff/decedent first believe that the lung problems or breathing problems of which he/she complains might have been related to asbestos-containing products, parts, or equipment?

(c)    When was the plaintiff/decedent first told, and by whom, that any lung problems or breathing problems of which he/she complains might have been related to asbestos-containing products, parts, or equipment?

**ANSWER:**

(a)    Media;

(b)    February 2006;

ANSWERS TO MASTER DISCOVERY                                                                                 Page 19
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 84 of 181

GST-EST-0521426

(c)     February 2006 by Dr. Blair Marshall.

**INTERROGATORY NO. 32:**

If the plaintiff/decedent has entered into any settlement agreement, or if a named defendant or any third party has agreed to make payment to the plaintiff/decedent for his/her asbestos-related condition, please state:

(a)     the full name of the party or person with whom the plaintiff/decedent entered into an agreement;

(b)     the date of the agreement; and

(c)     the amount of money each person or party has paid or agreed to pay.

**ANSWER:**     Plaintiff objects to this Interrogatory to the extent it requests confidential information that is not relevant to the pending litigation and not reasonably calculated to lead to the discovery of admissible evidence. *See i.e., Ford Motor Co. v. Leggat,* 904 S.W.2d 643 (Tex.1995). Subject to this objection, settlement discussions are in progress.

**INTERROGATORY NO. 33:**

Please list all medical expenses, if any, incurred as a result of the plaintiff/decedent alleged exposure to asbestos-containing products and the approximate date such expenses were incurred. "Medical expenses" includes, but is not limited to, all charges for care, treatment or diagnosis by a physician, nurse, or other health care specialist; all hospital costs, charges, and expenses; and all medication expenses

**ANSWER:**

Plaintiff continues to undergo and incur medical expenses as a result of his asbestos-related disease. Plaintiff reserves the right to supplement this Interrogatory pursuant to Texas Rules of Civil Procedure.

**INTERROGATORY NO. 34:**

If the plaintiff/decedent is making a claim for lost wages or lost earning capacity, either past or future, as a result of their alleged exposure to asbestos-containing products, please identify the factual basis for such a claim and the monetary amount claimed by the plaintiff/decedent to have been lost in the past or which they estimate will be lost in the future.

**ANSWER:**     Plaintiff is currently self-employed with Admiral Signs as a sign maker. However, due to his illness and pain, he has had to refuse most jobs he would have otherwise taken. Plaintiff has suffered economic loss as a result of his injuries and seeks compensation for same. Discovery is ongoing and Plaintiffs reserve the right to supplement this response. Additionally, Plaintiffs have provided Social Security authorizations and Employment authorizations.

**INTERROGATORY NO. 35:**

State when (including the month, date and year) the plaintiff/decedent first contacted an attorney for the purpose of obtaining professional legal services regarding their alleged asbestos exposure, and the

date of any agreement with a lawyer to provide the plaintiff/decedent with professional legal services regarding the same.

**ANSWER:**     Plaintiff objects to this Interrogatory to the extent that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to, and without waiving this objection, plaintiff contacted counsel in April 2006 after learning of his diagnosis of malignant mesothelioma.

## INTERROGATORY NO. 36:

Please identify each consulting expert whose mental impressions and opinions have been reviewed by a testifying expert. Tex. R. Civ. P. 192.3(e).

**ANSWER:**     Plaintiff objects to this Interrogatory to the extent that it is an improper Interrogatory under the Texas Rules of Civil Procedure and is more appropriately addressed through a Request for Disclosure. Subject to, and without waiving this objection, none at this time.

## INTERROGATORY NO. 37:

If the plaintiff/decedent are making a claim of punitive damages against any defendant, please state:

(a)     the basis upon which the plaintiff/decedent contends they are entitled to punitive damages against each defendant against whom they assert such a claim;

(b)     each and every fact, opinion or other evidence upon which the plaintiff/decedent intends to rely at trial in support of their claim, as against each such defendant;

(c)     each and every document upon which the plaintiff/decedent intends to rely to prove that they are entitled to punitive damages against each such defendant;

(d)     each person upon whose testimony the plaintiff/decedent intend to rely to prove that they are entitled to punitive damages against each such defendant;

(e)     each deposition or transcribed piece of testimony, by case name, number, date and page number, upon which the plaintiff/decedent will rely in support of their allegation of punitive damages against each such defendant; and

(f)     each and every medical or technical treatise, report, article, journal, book or other such publication or document upon which the plaintiff/decedent will rely in support of their claim for punitive damages against each such defendant.

**ANSWER:**     Plaintiff objects to this Interrogatory to the extent that it is overly broad, unduly burdensome. Without waiving objections, please see plaintiff's petition(s) in this case. However, plaintiff maintains that amended petitions, if any, supersede prior ones.

## INTERROGATORY NO. 38:

For each dust mask, respirator and other respiratory protection product the plaintiff/decedent used when exposed to asbestos, state:

ANSWERS TO MASTER DISCOVERY                                                                                     Page 21
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 86 of 181

GST-EST-0521428

(a)      the name of the manufacturer and the name and model number of the product;

(b)      the basis for the plaintiff/decedent belief that the manufacturer they named actually manufactured the product;

(c)      the most complete description of the product that the plaintiff/decedent can give;

(d)      the quantity of time the plaintiff/decedent used such product in areas where they contend asbestos dust was in the air (being as specific and complete as they can);

(e)      the tasks the plaintiff/decedent performed while using such product in areas where they contend asbestos dust was in the air;

(f)      the reasons the plaintiff/decedent contends asbestos dust was in the air in areas where they performed the tasks identified above; and

(g)      the names, addresses and telephone numbers of all individuals who worked with or around the plaintiff/decedent at each job site during the time period they used such product when exposed to asbestos.

**ANSWER:**      Not applicable.

**INTERROGATORY NO. 39:**

For each dust mask, respirator and other respiratory protection product the plaintiff/decedent used to attempt to reduce exposure to any substance other than asbestos, state:

(a)      the name of the manufacturer and the name and model number of the product;

(b)      the basis for the plaintiff/decedent's belief that the manufacturer they named actually manufactured the product;

(c)      the most complete description of the product that the plaintiff/decedent can give;

(d)      the substances to which the plaintiff/decedent attempted to reduce exposure;

(e)      the name and address of each job site where the plaintiff/decedent used the product during such exposure and the dates of such use at each job site;

(f)      the quantity of time the plaintiff/decedent used the product in areas where they believe such substances were present (being as specific and complete as they can, and answering separately for each substance); and

(g)      the tasks the plaintiff/decedent performed while using the product in areas where they believe such substances were present (answer separately for each substance).

**ANSWER:**      Not applicable.

ANSWERS TO MASTER DISCOVERY
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc      Page 22

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 87 of 181

GST-EST-0521429

**INTERROGATORY NO. 40:**

Identify all documents and tangible things (including but not limited to sales literature, promotional materials, training materials, posters, instructions, warnings, warranties, limitations of liability, written representations, advertisements, and printed packaging) ever seen by the plaintiff/decedent that reference or concern any dust mask, respirator or other respiratory protection product used by them.

**ANSWER:**     Not applicable.

**INTERROGATORY NO. 41:**

Describe in as much detail as the plaintiff/decedent can, the substance of all training, information and representations they received concerning the use or limitations of any dust mask, respirator or other respiratory protection product used by them, and state the name, address and telephone number of each person who provided any of such training, information or representations to them.

**ANSWER:**     Not applicable.

**INTERROGATORY NO. 42:**

Identify all documents and tangible things the plaintiff/decedent has seen to refresh their memory regarding the description or identification of any dust mask, respirator or other respiratory protection product ever used by them, or regarding the description or identification of the packaging for any such product.

**ANSWER:**     Not applicable.

**INTERROGATORY NO. 43:**

Please provide the following information for each Retailer product that the plaintiff/decedent claims caused or contributed to cause their injuries.

(a)     Identify the type of product, including manufacturer and brand name.

(b)     Identify who purchased the product and when and the location where was it purchased.

(c)     State specifically how the plaintiff/decedent was exposed to dust created by the product. If the plaintiff/decedent worked with the product, provide a detailed description of what work they did; where and when they did the work; how long it took; how this work created dust; and what tools they used to manipulate, install or remove the product, if any. If the plaintiff/decedent is making a bystander claim, please describe in detail when and where they were around the product; identify who was working with the product; their proximity to the product; how the product was being used; how long they were around the product; how this work created dust; and, what tools were used to manipulate, install or remove the product, if any.

(d)     Identify the plaintiff/decedent's employer and supervisor at the time they performed or were around the work described in subsection (c) above.

(e)     Identify the plaintiff/decedent's supervisors and co-workers at the time they performed or were around the work described in subsection (c) or (d), above.

(f)     State whether the plaintiff/decedent believes the product contained asbestos, then give all reasons for such belief.

## ANSWER:

(a)     See Work History Sheet attached as Exhibit "4."

(b)     Plaintiff, in certain instances purchased the various asbestos-containing products around which he worked and with which he worked. Additionally, members of his family or unidentified third parties may have purchased certain asbestos-containing products around which he worked and with which he worked. See also Exhibit "4."

(c)     Breathing asbestos dust from close proximity to the cutting of asbestos siding, from the installation and removal of asbestos floor tiles and from the mixing of asbestos joint compound which he used in the renovation work he performed on his house.

(d)     Plaintiff performed this work himself.

(e)     See response to (d) above.

(f)     Yes. Sworn interrogatory responses of defendant companies, coupled with general inaction by defendant companies to vigorously substitute asbestos until likelihood of Consumer Products Ban was announced in the late 1970's.

## INTERROGATORY NO. 44:

Please provide the name, address, and telephone number of any person that the plaintiff/decedent expects to call to testify at trial that:

(a)     a product sold by Retailer proximately caused their injuries;

(b)     Retailer's conduct with regard to the plaintiff/decedent violated any standard of care (i.e., that Retailer was negligent or grossly negligent, as alleged in the petition);

(c)     Retailer knew or should have known that the specific products identified in answer to Interrogatory No. 43 were unreasonably dangerous;

(d)     Retailer engaged in a conspiracy to harm the plaintiff/decedent;

(e)     Retailer failed to develop or utilize substitutes for asbestos; and

(f)     Retailer failed to properly test its products before releasing them for consumer use.

ANSWERS TO MASTER DISCOVERY     Page 24
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 89 of 181

GST-EST-052143

**ANSWER:** Discovery is ongoing at this time. Plaintiff will supplement with a list of testifying expert witnesses. Fact witnesses at this time include:

Charles C. White

Hollywood, MD 20636

Barbara J. Lorton –Spouse

Hollywood, MD 20636

## INTERROGATORY NO. 45:

If the plaintiff/decedent was exposed to asbestos-containing products or equipment allegedly as a result of a Contractor engaging in the supply, engineering, distribution, application, installation, removal, manipulation or other construction-related activity involving asbestos-containing products:

    (a)    identify the full name of the contractor(s) that were engaging in this type of work;

    (b)    describe the type of work the contractor(s) were engaged in (*e.g.*, new construction, renovation or maintenance);

    (c)    the location and name of the premise or plant where the exposure occurred;

    (d)    the specific date and time period that such exposure occurred;

    (e)    state the type of products and equipment that the plaintiff/decedent claims the contractor(s) were using, including:

        (1)    the brand or trade name of the product or equipment;

        (2)    the manufacturer, designer, fabricator; and/or seller of the product or equipment;

        (3)    a general description of the product and equipment; and

        (4)    how the plaintiff/decedent claims that they were exposed to asbestos in or on the product or equipment; and

        (5)    the frequency with which the plaintiff/decedent alleges the contractor(s) exposed them to the asbestos containing products or equipment.

    (f)    list the names, addresses and phone numbers of any employees of the contractor(s) listed in subpart (a) that the plaintiff/decedent worked with or around; and

    (g)    list the names, addresses and phone numbers of persons with knowledge of the plaintiff/decedent's exposure to asbestos as a result of the work any contractor listed in subpart (a) to this interrogatory.

GST-EST-0521432

**ANSWER:**    Not applicable

## INTERROGATORY NO. 46:

If the plaintiff/decedent alleges direct, bystander or household exposure to asbestos or asbestos-containing products, or component parts as a result of contact with or use of any equipment including but not limited to, pumps, vessels, turbines, boilers, furnaces, heat exchangers, tractors, Heavy Equipment, engines or any other mobile or affixed equipment, for each piece of equipment, state the following:

    (a)    the name of the owner of the equipment;

    (b)    the name of the operator of the equipment;

    (c)    the manufacturer of the equipment;

    (d)    the model name, model number, year, serial number, and description of the equipment;

    (e)    when the equipment was installed or placed in service, if known;

    (f)    the specific location of the equipment when the alleged exposure(s) occurred (e.g., contractor's shop, basement, field, employer's shop, etc.);

    (g)    the specific work or task causing your alleged exposure to asbestos fibers from the equipment, the dates of exposure(s) and the frequency and duration of the exposure(s), in terms of hours, days, months, as appropriate;

    (h)    the component part(s) of the equipment to which plaintiff/decedent is alleging exposure to asbestos fibers, and specifically whether the part(s) were original or replacements, or if that is unknown, so state;

    (i)    the manufacturer and supplier of the asbestos-containing component part(s) of the equipment to which plaintiff/decedent is alleging exposure to asbestos fibers;

    (j)    the job title and responsibilities of plaintiff/decedent, or the person through whom they are alleging exposure, at the time plaintiff/decedent alleges exposure to asbestos fibers from the equipment; and

    (k)    the manner or application in which the equipment was being used at the time of plaintiff/decedent's alleged exposure.

**ANSWER:**    Not applicable.

## INTERROGATORY NO. 47:

Please state the name and address of each person who participated in the preparation of these answers to interrogatories or who furnished any information used in the preparation of these answers to interrogatories.

ANSWERS TO MASTER DISCOVERY                                                                                          Page 26
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC    Document 75-1    Filed 01/20/15    Page 91 of 181

GST-EST-0521433

**ANSWER:**    Charles C. White provided information.
Barbara J. Lorton provided information.
Assistance was provided by the law office of Simon Eddins & Greenstone.

ANSWERS TO MASTER DISCOVERY                                              **Page 27**
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp – White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 92 of 181

GST-EST-0521434

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**A.** **"FAST-TRACK" REQUESTS FOR PRODUCTION TO BE ANSWERED AT LEAST SEVEN (7) DAYS BEFORE EXIGENT PLAINTIFF DEPOSITIONS (Pursuant to Section III.A.1.(c) of the Case Management Order)**

**REQUEST NO. 1:**

To the extent available, using extreme diligence, detailed Social Security earnings records, as supplied by the Social Security Administration, with any annotations concerning exposure the plaintiff or plaintiff's counsel chooses to make on the report.

**RESPONSE:** Please see Plaintiff's Social Security Records attached hereto as Exhibit "5." Additionally, please find the attached authorization allowing defendants to order these records.

**REQUEST NO. 2:**

To the extent available, using extreme diligence, all medical records and diagnosing letters or reports, relating to the claimed asbestos-related condition regardless of when received, and medical records relating to any prior medical treatment received by the plaintiff during the past five years.

**RESPONSE:** Plaintiff objects to this Request to the extent that it calls for documents provided by purely consulting experts who will not testify, and on whose opinions a testifying expert will not rely and is, thus, protected by the consulting expert privilege. Subject to and without waiving this objection, please see the medical records currently in plaintiff's possession attached as Exhibit "6". Additionally, please find the attached medical authorization executed by plaintiff to allow defendants to obtain these materials. Additionally, plaintiff agrees to supplement this Request in accordance with the Texas Rules of Civil Procedure and the Case Management Order.

**REQUEST NO. 3:**

To the extent available, using extreme diligence, any original biological samples, tissue, paraffin blocks, slides, electron micrographs, and chest x-rays from examining and/or treating physicians, hospitals, clinics or other health care providers, to the extent they are relevant to the claims asserted.

**RESPONSE:** Plaintiffs object to this request to the extent it is unduly burdensome. Subject to and without waiving this objection, plaintiffs have ordered these items, and currently have some pathology slides in their possession. Plaintiff's will forward the pathology in it's possession to Defense Liaison Counsel for review in accordance with the Case Management Order. To the extent the Defendants have not designated Defense Liaison Counsel in this case, Plaintiffs request that the Defendants do designate. Additionally, please find the attached medical authorization executed by Plaintiff to allow defendants to obtain these materials. Plaintiffs agree to supplement this request with requested items as soon as they are received, in accordance with the Texas Rules of Civil Procedure and the Case Management Order.

ANSWERS TO MASTER DISCOVERY                                                                 Page 28
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 93 of 181

GST-EST-0521435

**REQUEST NO. 4:**

With respect to any plaintiff/decedent asserting a claim of cancer or other malignancy, if no pathological materials are readily available from medical providers, (as referenced in Request 3 above), an agreement stating that any pathological materials may be obtained for independent evaluation at the election of the defendants. The plaintiff must notify the defendants of any procedure that may result in the collection of pathology or other diagnostic materials and any testing done by the plaintiff or plaintiff's experts. Nothing in this order precludes multiple defendants from obtaining and testing the plaintiff's pathology or obtaining the plaintiff's other medical evidence or materials.

**RESPONSE:** Plaintiff objects to this Request to the extent that it is vague, not within the scope of discovery, and is an improper request under the Texas Rules of Civil Procedure in that it calls for Plaintiffs to create a document not currently in existence in the form of an agreement. Additionally, plaintiffs object to this request to the extent it requests the plaintiffs notify defendants of any testing or procedure that may have been performed by purely consulting experts who will not testify, and on whose opinions a testifying expert will not rely. Subject to and without waiving this objection, plaintiffs agree to provide defendants pathological materials as soon as those materials are received in accordance with the Texas Rules of Civil Procedure and the Case Management Order entered by this Court.

**REQUEST NO. 5:**

Payroll and employment records relating to employment identified in the plaintiff's work history to present time; including military service records.

**RESPONSE:** Plaintiffs object to this request to the extent it is overly broad and unduly burdensome in that it does not limit the scope of those records requested. Subject to and without waiving this objection, plaintiffs have ordered these records and will supplement them as soon as they are received in accordance with the Texas Rules of Civil Procedure and the Case Management Order entered by this court. Additionally, please see the attached authorizations to allow defendants to order these records.

**REQUEST NO. 6:**

Income tax returns for the preceding five (5) years.

**RESPONSE:** Plaintiffs have ordered these records and will supplement them as soon as the returns are received, in accordance with the Texas Rules of Civil Procedure and the Case Management Order entered by this Court. Additionally, please see the attached authorization to allow defendants to order these returns.

**REQUEST NO. 7:**

Veteran's Administration records and all military and ship service records.

**RESPONSE:** Plaintiff is not in possession of any documents responsive to this discovery request. Discovery is ongoing and Plaintiffs reserves the right to supplement this answer as discovery continues.

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 94 of 181

GST-EST-0521436

**REQUEST NO. 8:**

Any reports or letters from any physician, medical provider, or any expert concerning the plaintiff or his medical condition.

**RESPONSE:** Plaintiff objects to this request to the extent it calls for documents provided by purely consulting experts who will not testify, and on whose opinions a testifying expert will not rely and is overly broad. Subject to and without waiving these objections, plaintiff has ordered all responsive documents, and have attached those documents currently in plaintiff's possession as Exhibit "6". Additionally, please find the attached medical authorization executed by plaintiff to allow defendants to obtain these documents. Finally, Plaintiff agrees to supplement this request with additional documents as soon as those documents are received, in accordance with the Texas Rules of Civil Procedure and the Case Management Order.

**REQUEST NO. 9:**

Signed authorizations, including authorizations in compliance with the Health Insurance Portability and Accountability Act ("HIPAA"), to enable the defendants to reasonably obtain other discoverable records. (A complete set to be attached to these requests).

**RESPONSE:** Plaintiff objects to this request to the extent it that it is overly broad in that all documents obtained pursuant to this Request may not be otherwise discoverable or reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving this objection, please see attached authorizations. Plaintiff reserves the right to object to any documents obtained through the execution of these authorizations.

**REQUEST NO. 10:**

All documents, including but not limited to, sales receipts, product lists, contracts, naval records, specifications, product labels, invoices, purchase orders, work orders, receipts, catalogues, photographs, videotapes, product packaging and brochures that evidence the plaintiff/decedent's exposure to asbestos or relate to the products, work, or work sites described in their answers to interrogatories.

Plaintiff objects to this Request to the extent it is overly broad and unduly burdensome. Subject to and without waiving this objection, please see photos attached as Exhibit "7." The photos were not provided to plaintiff by counsel, but rather, are photos given to counsel by plaintiff. The photos and the products they depict, if any, are merely examples of, rather than an exhaustive list of, some of the types of products and brands of construction products that may have contained asbestos to which plaintiff may have in the past been exposed. To the extent that such photos are not relevant to the above request, they are provided in an attempt to provide the most complete response possible. Additionally, Plaintiffs reserve the right to supplement in accordance with the Texas Rules of Civil Procedure and the applicable Case Management Order.

ANSWERS TO MASTER DISCOVERY
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc                    Page 30

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 95 of 181

GST-EST-0521437

**B.     ADDITIONAL REQUESTS FOR PRODUCTION FOR ALL CASES**
        (<u>Answer Requests For Production Numbers 1-10, Plus The Following</u>)

<u>REQUEST NO. 11</u>:

With respect to death claims, provide:

(a)      the death certificate(s);

(b)      the report of autopsy (including private autopsy), if any, and autopsy photos;

(c)      letters testamentary; and

(d)      application and court orders from each jurisdiction where a representative has requested appointment, and documents showing the appointment of a representative of the estate.

<u>RESPONSE</u>:     Not applicable.

<u>REQUEST NO. 12</u>:

A copy of the current resume and bibliography of each expert retained on the plaintiff/decedent's behalf in this lawsuit.

<u>RESPONSE</u>:     Plaintiff objects on the basis that the Texas Rules of Civil Procedure expressly prohibits the discovery of plaintiff's testifying experts via Requests for Production. Subject to and without waiver of the foregoing objection, current curriculum vitae will be made available at the depositions of plaintiff's testifying expert witnesses. Plaintiff has no discoverable consulting expert witnesses.

<u>REQUEST NO. 13</u>:

All documents that have been provided to, reviewed by, or prepared by or for a consulting expert in anticipation of the testimony of an expert retained on the plaintiff/decedent's behalf in this lawsuit.

<u>RESPONSE</u>:     Plaintiff objects to this Request on the grounds that such information is protected from disclosure under the Texas Rules of Civil Procedure, Rule 192.3(e). Without waiving this objection, plaintiff will provide documents relied upon or prepared by consulting experts, if any, if said materials or the opinions of such consulting experts are reviewed or relied upon or form a basis in whole or in part of the opinions of a testifying expert witness.

<u>REQUEST NO. 14</u>:

All statements, invoices and other billing records that evidence or relate to any fees and expenses charged by any expert retained on the plaintiff/decedent's behalf for time spent, or services rendered, in this lawsuit.

<u>RESPONSE</u>:     Plaintiff objects on the basis that the Texas Rules of Civil Procedure expressly prohibit the discovery of plaintiff's testifying experts via Requests for Production. Subject to and without waiver of the foregoing objection, current curriculum vitae will be made

ANSWERS TO MASTER DISCOVERY                                                                                    Page 31
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC     Document 75-1     Filed 01/20/15     Page 96 of 181

GST-EST-0521438

available at the depositions of plaintiff's testifying expert witnesses. Plaintiff has no discoverable consulting expert witnesses.

**REQUEST NO. 15:**

The complete file of each consulting expert whose mental impressions or opinions have been reviewed by a testifying expert.

**RESPONSE:** Not applicable.

**REQUEST NO. 16:**

A copy of any written report and resume or curriculum vitae for each expert witness whom the plaintiff/decedent intends to call at the trial of this matter, as against each defendant.

**RESPONSE:** Plaintiff objects on the basis that the Texas Rules of Civil Procedure expressly prohibit the discovery of plaintiff's testifying experts via Requests for Production, and do not require that experts create a report for purposes of responding to a request for production. Subject to and without waiver of the foregoing objection, current curriculum vitae and reports to the extent that they are created will be made available at or prior to the depositions of plaintiff's testifying expert witnesses.

**REQUEST NO. 17:**

All photographs, films, movies, or video recordings that depict or purport to depict anything relevant to any of the matters at issue in this case, including any of the matters alleged in the plaintiff/decedent's complaint or petition.

**RESPONSE:** Plaintiff objects to this Request as vague, overly broad, and unduly burdensome. Without waiving these objections, see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by Plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented. These lists may be amended or supplemented later. These lists will reflect any and all photographs, films, movies or video recordings that plaintiff intends to use at trial and/or said materials will be made available to defendants and/or supplemented.

**REQUEST NO. 18:**

A verbatim copy of every statement in the plaintiff/decedent's possession, custody or control made by the plaintiff/decedent and/or any individual identified in their answer to Request for Disclosure 194.2(e) or 194.2(l). This request includes written statements and recorded statements (both audio and video), and all witness statements (as described in Rule 192.3(h) of the Texas Rules of Civil Procedure) and affidavits given or made by the plaintiff/decedent in any lawsuit involving any allegations of asbestos exposure or asbestos-related injury or disease, regardless of whether they were a party or were giving or making the statements or affidavits as a nonparty witness.

**RESPONSE:** Plaintiff objects on the basis that this Request is duplicative of Request for Disclosures, and is therefore unduly burdensome and harassing. To the extent that this Request

exceeds the scope of witness statements as contemplated by Requests for Disclosures, then it exceeds the scope of the Texas Rules of Civil Procedure. Subject to and without waiver of the foregoing objection, plaintiff will supplement Requests for Disclosures with any discoverable witness statements as necessary and in accordance with the Texas Rules of Civil Procedure.

**REQUEST NO. 19:**

All documents evidencing or supporting the plaintiff/decedent's contention that the plaintiff/decedent, or, if they are making a household-exposure claim, the person through whom they contend they were exposed to asbestos, was exposed to each asbestos-containing product to which the plaintiff/decedent alleges exposure.

**RESPONSE:** Plaintiff objects to this Request as vague, overly broad and unduly burdensome. Without waiving this objection, see the Work History Sheet attached as Exhibit "4."

**REQUEST NO. 20:**

Full, complete and legible color copies, (if available) of any and all photographs, advertisements or other depictions in the possession, custody or control of the plaintiff/decedent or their attorney, depicting either the packaging of any alleged asbestos-containing product to which they claim exposure, and any other product that allegedly caused plaintiff/decedent's exposure to asbestos, or the actual product itself.

**RESPONSE:** Plaintiff objects to this Request as vague, overly broad, and unduly burdensome. Without waiving these objections, see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by Plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented. Plaintiff is not sending them at this time without express request from defendants because just the exhibit lists comprise thousands and thousands of pages of documents. All of these lists and the exhibits on them are available upon request. These lists will reflect any and all photographs, films, movies or video recordings that plaintiff intends to use at trial and/or said materials will be made available to defendants and/or supplemented. Pursuant to Texas Rules of Civil Procedure, Rules 194.4 and 196.3(a), plaintiff will permit the defendants to inspect, sample, test, photograph and/or copy any such exhibits upon specific defendant's written request at a mutually agreeable time.

**REQUEST NO. 21:**

Copies of any photographs, videotapes or films depicting any of the sites at which the plaintiff/decedent was allegedly exposed to asbestos-containing products or otherwise supporting the plaintiff/decedent's claimed exposure to asbestos-containing products and any other products that allegedly caused plaintiff/decedents' exposure to asbestos.

**RESPONSE:** Plaintiff objects to this Request as vague, overly broad, and unduly burdensome. Without waiving these objections, see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas,

ANSWERS TO MASTER DISCOVERY                                                                 Page 33
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 98 of 181

GST-EST-0521440

including all supplements and amendments thereto, which are adopted by Plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented. These lists will reflect any and all photographs, films, movies or video recordings that plaintiff intends to use at trial and/or said materials will be made available to defendants and/or supplemented.

**REQUEST NO. 22:**

All documents (including, but not limited to, log books, notes, calendars, diaries, or like materials) prepared or kept by the plaintiff/decedent and all documents in the nature of memoranda, notes, or recordings of statements made by the plaintiff/decedent in connection with (a) any work history or list of job sites; (b) any exposure to asbestos or to asbestos-containing materials; (c) any conduct of the defendants with respect to asbestos or asbestos-containing products; (d) any asbestos-related injury, disease, or treatment (including mesothelioma); or (e) any elements of actual damages resulting from the plaintiff/decedent's claimed asbestos-related injury.

**RESPONSE:** Plaintiff objects to this Request as vague, overly broad and unduly burdensome. Plaintiff objects to this Request on the grounds that the choice of documents which plaintiff may seek to introduce into evidence at trial is the privileged work product of plaintiff's attorney. Without waiving these objections, plaintiff will supplement with any such materials created by plaintiff, and not his lawyers, if any, as necessary and in accordance with the Texas Rules of Civil Procedure.

**REQUEST NO. 23:**

All documents that the plaintiff/decedent may seek to introduce into evidence at trial.

**RESPONSE:** Plaintiff objects on the basis that this Request is overbroad and unduly burdensome. The Texas Rules of Civil Procedure authorizes no such request. Subject to and without waiver of the foregoing objections, please see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented

**REQUEST NO. 24:**

All documents that support the contention that the plaintiff/decedent lost wages or incurred lost earning capacity as a result of the matters alleged in the petition in this case.

**RESPONSE:** Discovery is ongoing. Plaintiff anticipates that she will testify regarding these matters.

**REQUEST NO. 25:**

All documents containing, depicting, describing, evidencing, or relating to any warnings, cautions, protections, instructions, rules, procedures, or guidelines relating to asbestos or dust and provided to the plaintiff/decedent during their working career by any employer, union, general contractor, premises owner or occupier, or other person or entity.

**RESPONSE:** None.

**REQUEST NO. 26:**

Copies of all Petitions, Complaints, and other pleadings (including all amended and supplemental petitions, complaints, and pleadings) and all interrogatory and other discovery responses (including all amended and supplemented responses) served or filed, or authorized to be served or filed, by the plaintiff/decedent or on their behalf in any court or administrative agency, in any lawsuit or proceeding in which he/she alleges that he/she suffered from any exposure to asbestos, or any other occupational dust, gases, or chemicals. [If the plaintiff/decedent alleges exposure through another person's job or occupation, please answer for that other person's job or occupation.]

**RESPONSE:** Plaintiff objects on the basis that this Request seeks documents that are not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Dust other than asbestos does not cause mesothelioma. Subject to and without waiver of the foregoing objection, there are no pleadings or other discovery responses pertaining to asbestos by his plaintiff other than those served in the present case.

**REQUEST NO. 27:**

All transcripts and videotapes of any prior deposition, trial, or other sworn testimony in any lawsuit, proceeding, or claim involving or relating to asbestos, given by the plaintiff/decedent or by any person identified by them in this lawsuit as being a person with knowledge of relevant facts.

**RESPONSE:** None.

**REQUEST NO. 28:**

Copies of all documents, photographs, videotapes, slide-show presentations, data compilation, product lists, manufacturer lists, or any other information reviewed, shown to or used to refresh the plaintiff/decedent's recollection for the purpose of identifying products to which they were allegedly exposed or they allegedly used or to identify companies to name as defendants in this lawsuit.

**RESPONSE:** Plaintiff objects to this Interrogatory to the extent that it is protected by the attorney-client privilege.

**REQUEST NO. 29:**

All documents that describe, depict or reference any dust mask, respirator, or other respiratory protection product ever used by the plaintiff/decedent, including any dust mask, respirator, or other respiratory protection in their possession from the time they allege exposure to asbestos.

**RESPONSE:** Plaintiff has no responsive documents.

**REQUEST NO. 30:**

All sales literature, promotional materials, training materials, posters, instructions, warnings, warranties, limitations of liability, written representations, advertisements, printed packaging and other documents and tangible things ever seen by the plaintiff/decedent that reference or concern any dust mask, respirator or other respiratory protection product used by them.

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 100 of 181

GST-EST-0521442

**RESPONSE:**   Plaintiff has no responsive documents.

**REQUEST NO. 31:**

All documents used or referenced in connection with any training, information or representation the plaintiff/decedent received concerning the use or limitations of any dust mask, respirator or other respiratory protection product used by them.

**RESPONSE:**   Plaintiff has no responsive documents.

**REQUEST NO. 32:**

All documents that describe, depict, reference or contain any respiratory protection program (or any portion of a respiratory protection program) established or used by any employers or job site owners while the plaintiff/decedent worked at any job site.

**RESPONSE:**   Plaintiff has no responsive documents.

**REQUEST NO. 33:**

All documents that describe, depict, reference or contain any training or experience the plaintiff/decedent had regarding checking and testing the fit of any dust mask, respirator or other respiratory protection product.

**RESPONSE:**   Plaintiff has no responsive documents.

**REQUEST NO. 34:**

All documents evidencing or supporting the plaintiff/decedent's contention that the plaintiff/decedent was, or if they are making a household-exposure claim, the person through whom they contend they were exposed to asbestos, was exposed to asbestos by any Contractor or Contractor defendant or on any premises or job site.

**RESPONSE:**   Not applicable.

**REQUEST NO. 35:**

All documents depicting, describing, evidencing, or reflecting the identity of each asbestos-containing product or material to which the plaintiff/decedent contends they were, or, if they are making a household-exposure claim, the person through whom they contend they were, exposed to asbestos by any contractor or contractor defendant or on any premises or job site.

**RESPONSE:**   Plaintiff objects on the basis that this Request is overbroad and unduly burdensome. Subject to and without waiver of the foregoing objections, please see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented.

ANSWERS TO MASTER DISCOVERY                                                                 Page 36
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 101 of 181

GST-EST-0521443

**REQUEST NO. 36:**

All documents evidencing, confirming, or reflecting the plaintiff/decedent's presence, or, if making a household-exposure claim, the presence of the person through whom they contend they were exposed, on the premises of any premises defendant or their employment by any contractor or contractor defendant that they contend they worked for on the premises of any premises defendant.

**RESPONSE:** Plaintiff objects on the basis that this Request is overbroad and unduly burdensome. Subject to and without waiver of the foregoing objections, please see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented

**REQUEST NO. 37:**

All documents evidencing, reflecting, showing results of, or otherwise relating to any air monitoring, sampling, or testing for the presence or level of asbestos fibers or dust in general on any premises on which the plaintiff/decedent contends they were, or if they are making a household-exposure claim, the person through whom they contend they were, exposed to asbestos. This request necessarily includes any documents evidencing any violations of any standards or regulations related to permissible levels of asbestos.

**RESPONSE:** Plaintiff has no documents that reflect dust measurement specifically taken at plaintiff's work sites or plaintiff's home as no such measurements were performed. However, plaintiff suffered exposure to asbestos at levels substantially above background from operations that have been quantified in medical, scientific, and industrial hygiene literature. The studies are designated on plaintiff's lists of exhibits in this case.

**REQUEST NO. 38:**

All documents showing or indicating each location and use of asbestos or asbestos-containing products or materials that the plaintiff/decedent contends they were exposed to, or, if they are making a household-exposure claim, the person through whom they contend they were exposed to asbestos and each location and use of asbestos or asbestos-containing that they were exposed to through them.

**RESPONSE:** Plaintiff objects to this request because it is vague and overbroad. With regard to documents pertaining to the particular sites where plaintiff worked, none. However, please see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented. These lists will reflect any and all documents, photographs, films, movies or video recordings that plaintiff intends to use at trial and/or said materials will be made available to defendants and/or supplemented. Please see the Work History Sheet attached as Exhibit "4."

**REQUEST NO. 39:**

Please produce all documents that any witness identified in the plaintiff/decedent's answer to Interrogatory No. 7 reviewed or relied upon in forming his/her opinion that: a product sold by Retailer proximately caused the plaintiff/decedent's injuries; Retailer's conduct with regard to the plaintiff/decedent violated any standard of care (i.e., that Retailer was negligent or grossly negligent, as alleged in the plaintiff/decedent's petition); and/or Retailer failed to properly test its products before releasing them for consumer use.

**RESPONSE:**    Plaintiff objects to this request because it is vague and overbroad. With regard to documents pertaining to the particular sites where plaintiff worked, none. However, please see Plaintiff's Exhibit List and List of Deposition Testimony filed in this case; see the Exhibit Lists and List of Deposition Testimony filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, including all supplements and amendments thereto, which are adopted by plaintiff and incorporated herein by reference, and all Waters & Kraus exhibit lists. The Waters & Kraus exhibit lists are continuously supplemented. These lists will reflect any and all documents, photographs, films, movies or video recordings that plaintiff intends to use at trial and/or said materials will be made available to defendants and/or supplemented. Please see the Work History Sheet attached as Exhibit "4."

**REQUEST NO. 40:**

Any and all construction contracts for any work performed by any contractor defendant at any facility, premises or plant where the plaintiff/decedent worked with or around any contractor defendant.

**RESPONSE:**    Not applicable.

**REQUEST NO. 41:**

Any and all documents that pertain to a contractor defendant using, disturbing, installing or removing asbestos-containing products or equipment or asbestos on any job site where the plaintiff/decedent claims exposure to asbestos.

**RESPONSE:**    Not applicable.

**REQUEST NO. 42:**

All documents that the plaintiff/decedent contends show or tend to show that any premises defendant or any contractor defendant knew, or in the exercise of reasonable care should have known, at or prior to the time that the plaintiff/decedent, or, if they are making a household-exposure claim, the person through whom they contend they were exposed, were on any premises defendant's premises or in the presence of any contractor defendants, that any condition or activity on the premises involving asbestos or asbestos-containing products or materials presented an unreasonable risk of harm to the plaintiff/decedent, or , if they are making a household-exposure claim, to the person through whom they contend they were, exposed to asbestos or to persons similarly situated.

**RESPONSE:**    Not applicable.

ANSWERS TO MASTER DISCOVERY                                                                 Page 38
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 103 of 181

GST-EST-0521445

**REQUEST NO. 43:**

All documents relating to asbestos or dust, or to protections or precautions against asbestos or dust, that the plaintiff/decedent has every received from any source, including but not limited to newspaper articles, magazine or other periodical articles, union records or publications, correspondence, newsletters, pamphlets, instructions, advertisements, screening announcements, and notices.

**RESPONSE:**  Plaintiff has no responsive documents.

**REQUEST NO. 44:**

All union cards or other membership documents showing that the plaintiff/decedent is or was a member of any union.

**RESPONSE:**  Plaintiff has no responsive documents.

**REQUEST NO. 45:**

All documents constituting, reflecting, memorializing, evidencing, or relating to settlement agreements, contracts, deals, or any other type of agreement or understanding (whether or not reduced to final form and whether or not fully performed, paid, or satisfied) which the plaintiff/decedent has entered into, or agreed to enter into, with any person or company or other entity, to compromise, settle, release, or otherwise resolve any claim or potential claim (including any lawsuit, other legal proceeding, worker's compensation claim, or other claim) relating to any injury or disease that the plaintiff/decedent has suffered, claimed to suffer, or might suffer in the future.

**RESPONSE:**  Plaintiff objects on the basis that this Request is duplicative of Request for Disclosures, and to the extent that it exceeds the scope of the Texas Rules of Civil Procedure pertaining to settlement agreements.  Plaintiff also objects to this Request to the extent it requests confidential information that is not relevant to the pending litigation and not reasonably calculated to lead to the discovery of admissible evidence.  *See i.e., Ford Motor Co. v. Leggat,* 904 S.W.2d 643 (Tex.1995).  Subject to and without waiving this objection, at the present time, plaintiff is not in possession of any documents responsive to this request.  Plaintiff reserves the right to object to production of the non-relevant portions of these documents if and when they become available.  In the alternative, plaintiff reserves the right to request an in-camera inspection of any such documents by the Court to preserve covenants of confidentiality.

**REQUEST NO. 46:**

With respect to any lawsuit, claim, or settlement made or anticipated (including but not limited to a claim made to a settlement trust in conjunction with a bankruptcy proceeding such as those for Johns Manville, UNARCO, and Celotex) regarding the plaintiff/decedent's alleged asbestos related disease,

    (a)     copies of the plaintiff/decedent's responses to written discovery;

    (b)     reports of the diagnosing physician (including test results and other documents on which the diagnosis identified in the report is based), and independent medical examination reports (including test results and other documents identified in the report);

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 104 of 181

GST-EST-052146

(c)      transcripts of the plaintiff/decedent's depositions and the depositions of any of their coworkers;

(d)      copies of any affidavit, statement, claim form, or any document submitted to "prove up" or confirm exposure for purposes of obtaining payment or a promise to pay consideration in resolution of such claim.

**RESPONSE:**    Plaintiff objects on the basis that this Request is duplicative of Request for Disclosures, and to the extent that it exceeds the scope of the Texas Rules of Civil Procedure pertaining to settlement agreements. Plaintiff also objects to this Request to the extent it requests confidential information that is not relevant to the pending litigation and not reasonably calculated to lead to the discovery of admissible evidence. *See i.e., Ford Motor Co. v. Leggat,* 904 S.W.2d 643 (Tex.1995). Subject to and without waiving this objection, at the present time, plaintiff is not in possession of any documents responsive to this request. Plaintiff reserves the right to object to production of the non-relevant portions of these documents if and when they become available. In the alternative, plaintiff reserves the right to request an in-camera inspection of any such documents by the Court to preserve his confidentiality.

**REQUEST NO. 47:**

All documents pertaining to, confirming, or reflecting the plaintiff/decedent presence (or, if the plaintiff/decedent is making a household-exposure claim, the presence of the person through whom they contend they were exposed to asbestos) and the presence of any contractor or contractor defendant, at any location or premises at which they contend they worked (or, if they are making a household-exposure claim, the person through whom they contend they were exposed to asbestos worked) and were exposed to asbestos.

**RESPONSE:**    See the Work History Sheet attached as Exhibit "4."

**REQUEST NO. 48:**

All documents regarding specifications, manufacturer's recommendations, directions, or manuals, including but not limited to, any documents relating to or describing the use or inclusion of asbestos or any asbestos-containing product or component part, for each piece of machinery, Heavy Equipment, engine or other equipment or any part of such machinery or equipment, that is alleged to be the source of plaintiff/decedent's claimed asbestos exposure.

**RESPONSE:**    Not applicable.

**REQUEST NO. 49:**

All documents, including but not limited to studies and reports, describing, or relating to, levels of exposure to asbestos fibers resulting from the operation of or work on, with or around equipment, including but not limited to, pumps, vessels, turbines, boilers, furnaces, heat exchangers, tractors, Heavy Equipment, engines or any other mobile or affixed equipment.

**RESPONSE:**    Not applicable.

ANSWERS TO MASTER DISCOVERY                                       Page 40
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 105 of 181

GST-EST-0521447

**REQUEST NO. 50:**

Please complete and sign all authorization forms attached hereto as Exhibits A through J.

| | | |
|---|---|---|
| Exhibit A | - | Medical Authorization (HIPAA) |
| Exhibit B | - | Request for Social Security Earnings Information |
| Exhibit C | - | Authorization for Release of Social Security Records |
| Exhibit D | - | Payroll and Personnel Records Authorization |
| Exhibit E | - | VA Authorization |
| Exhibit F | - | Military Records Authorization |
| Exhibit G | - | Authorization for Workers Compensation Commission Records |
| Exhibit H | - | Two Authorizations to Obtain Income Tax Records |
| Exhibit I | - | Authorization to obtain documents Trust related to Claims |
| Exhibit J | - | Union Records |

**RESPONSE:** Please see attached Exhibits A-J. Defendants are hereby placed on notice that any and all records procured by defendants by using any of these release forms must be furnished to plaintiff at least thirty (30) days before the date of trial.

## DEFENDANT'S MASTER REQUEST FOR DISCLOSURES FOR ALL CASES

Pursuant to Texas Rule of Civil Procedure 194, defendants request that plaintiff disclose all of the information and material described in Rule 194.2 (a) – (I) of the Texas Rules of Civil Procedure.

### REQUEST NO. 194.2(a):

The correct names of the parties to the lawsuit.

**RESPONSE:**   Charles C. White and Barbara J. Lorton.

### REQUEST NO. 194.2(b):

The name, address, and telephone number of any potential parties.

**RESPONSE:**   None known to Plaintiff at this time.

### REQUEST NO. 194.2(c):

The legal theories and, in general, the factual bases of the responding party's claims or defenses (the responding party need not marshal all evidence that may be offered at trial).

**RESPONSE:**   In response to Request for Disclosure please see Plaintiff's Petition, which states the legal theories and the general factual bases of plaintiff's claims. The factual bases will be further supported by testimony confirming exposure to defendants' asbestos-containing products, the use of asbestos-containing products on defendants' equipment or machinery, and/or the use of asbestos-containing products while working on defendants' premises and/or while employed by defendants, as well as the testimony of listed witnesses concerning the propensity of such products and/or activity to cause disease, and the specific causation facts in this case. The factual bases for plaintiffs' claims also include general state-of-the-art knowledge and the medical and scientific literature, which will be provided in testimony form from one or more listed expert witnesses, as well as the corporate documents and deponents of each defendant and other asbestos companies not parties to the case. For more information, please see the most recent general exhibit list, deposition testimony lists and expert witness list filed by Baron & Budd, P.C., In Re: All Asbestos Cases filed or to be filed in Dallas County, Texas, and any additional witness lists, exhibit lists, and lists of deposition testimony filed in this case.

### REQUEST NO. 194.2(d):

The amount and any method of calculating economic damages.

**RESPONSE:**   Plaintiffs will supplement. Charles White and Barbara Lorton will testify to matters regarding lost wages. Medical expenses will calculated by medical bills and/or medical expert testimony.

ANSWERS TO MASTER DISCOVERY                                                                 Page 42
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 107 of 181

GST-EST-0521449

**REQUEST NO. 194.2(e):**

The name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case.

**RESPONSE:** Plaintiff does not know every person who may have "knowledge of facts relevant to this lawsuit," and therefore objects to this request on the grounds that it calls for speculation and is premature. Without waiving these objections, please refer to the co-workers, supervisors and other fact witnesses listed on plaintiff's Work History Sheets which are attached hereto as Exhibit "4," plaintiff's List of Physicians provided as Exhibit "1," plaintiff's medical expert reports, which will be supplemented as soon as they are received, plaintiff's medical records provided as Exhibit "6" and which may be obtained with the authorization being provided, plaintiff's Answer to Interrogatory No. 44 and any Supplemental Answers to these Interrogatories.

See also the Master List of Deposition Testimony filed by Baron & Budd, P.C., on February 12, 1998, In Re: All Asbestos Litigation filed or to be filed in Dallas County, Texas including all supplements and amendments thereto, which is adopted by Plaintiff and incorporated herein by reference.

See also all persons listed in response to part (b) of this interrogatory, in addition to all supplemental and amended responses thereto, as well as the following:

Name:      Charles Conrad White
Address:      ████████
           Hollywood, MD 20636
Telephone:    ████████

Plaintiff, Charles White, will testify, live or by deposition, as to the changes that have occurred in his ████████

████████

Plaintiff will also testify as to his exposure to asbestos-containing products manufactured by some Defendants, as well as his general and specific damages (including, but not limited to medical expenses, physical pain and suffering, and mental anguish) that he has sustained and/or incurred and may sustain and/or incur in the future due to his asbestos-related disease. Plaintiff may provide medical expenses in supplemental discovery responses and discovery deposition. Expert testimony will provide evidence of future medical expenses, if any. Plaintiff's physical pain and suffering and mental anguish damages are intangible and are within the proper province of the jury to determine the amount. Plaintiff will testify as to some of the types and/or brands of asbestos products to which he was exposed, including but not limited to environmental conditions of exposure such as visible dustiness, if any, and lack of respiratory protection. Plaintiff may also testify as to any other matter relevant to this cause of action.

Name:      Barbara Jane Lorton (spouse)
Address:      ████████
           Hollywood, MD 20636
Telephone:    ████████

ANSWERS TO MASTER DISCOVERY           Page 43
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp – White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 108 of 181

GST-EST-0521450

Mrs. Barbara Lorton will testify, live or by deposition, as to the changes that have occurred in her spouse's ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████ She will testify as to the damages, both general and specific (including, but not limited to medical expenses, physical pain and suffering and mental anguish) that her spouse has sustained and/or incurred and may sustain and/or incur in the future due to her spouse's asbestos-related disease. Plaintiff may provide evidence of past medical expenses in supplemental responses. Expert testimony will provide evidence of future medical expenses, if any. Plaintiff's physical pain and suffering, mental anguish and loss of consortium damages are intangible and are within the proper province of the jury to determine the amount. She will testify as to some of the types and/or brands of asbestos products to which he was exposed, including but not limited to environmental conditions of exposure such as visible dustiness, if any, lack of timely and adequate warnings information, and lack of respiratory protection. She may also testify as to any other matter relevant to this cause of action.

Justin C. White
████████████
Pinehurst, NC 28374
910-783-6205

Kerrick King
████████████
Springfield, TN 37172
615-517-0772

Justin White and Kerrick King may testify to the physical and emotional impact they have seen on Charles White and Barbara ████████████

Dr. Charles Bennett
11845 H.G. Truman Rd.
Lusby, MD 20657
(410) 326-6344

M. Blair Marshall
Georgetown University Hospital
3800 Reservoir Rd., NW
Pasquerilla Healthcare Center, 4th Floor
Washington, D,C. 20007
(202) 444-5045

Dr. Shakun Malik
Lombardi Cancer Center
Georgetown University Hospital
3800 Reservoir Rd.
Washington, D.C. 20007
(202) 444-2198

ANSWERS TO MASTER DISCOVERY                                                                                   Page 44
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 109 of 181

GST-EST-0521451

These doctors may testify, live or by deposition, concerning their examination and treatment of Plaintiff and their diagnosis of asbestos-related disease in this case. They may testify concerning asbestos, the effects of asbestos on the body and any other topics related thereto.

████████████████ Additionally, they may testify that Plaintiff's asbestos-related disease was caused by his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. They may testify as to the hazardous nature of asbestos and/or asbestos-containing products and as a result, that such asbestos and/or asbestos-containing products are unreasonably dangerous. They may also testify concerning the role of Plaintiff's asbestos-related disease in causing and/or precipitating Plaintiff's illnesses and/or resulting death. ████████████

████████████████████████████ A copy of these doctors' records, currently in Plaintiff's possession are attached hereto as Exhibit "6" and may also be obtained by Defendants with the medical records authorization provided.

## REQUEST NO. 194.2(f):

For any testifying expert:

(1)     the expert's name, address, and telephone number;

(2)     the subject matter on which the expert will testify;

(3)     the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise, subject to the control of the responding party, documents reflecting such information;

(4)     if the expert is retained by, employed by, or otherwise subject to the control of the responding party:

     (a)     all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

     (b)     the expert's current resume and bibliography.

## RESPONSE:

Dr. Hector Battifora
1752 Wilson Avenue
Arcadia, California 91006
626-836-9147

Dr. Eugene Mark
Massachusetts General Hospital
55 Fruit Street, Warren 244
Boston, Massachusetts 02114
617-726-8891

ANSWERS TO MASTER DISCOVERY                                                                                   Page 45
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 110 of 181

GST-EST-0521452

Dr. Jacques F. Legier
Riverside Regional Medical Center
500 J. Clyde Morris Boulevard
Newport News, Virginia 23601
757-594-2160

Dr. John C. Maddox
Riverside Regional Medical Center
500 J. Clyde Morris Boulevard
Newport News, Virginia 23601
757-594-2160

Dr. Samuel Hammar
Diagnostics Specialties Lab
700 Lebo Boulevard
Bremerton, Washington 98310
360-479-7707

These doctors may testify, live or by deposition, concerning their review of the medical records, pathology and work history of Plaintiff and their diagnosis of asbestos-related disease in this case. These doctors may testify that Plaintiff contracted Mesothelioma as a result of exposure to asbestos. Additionally, these doctors may testify that Plaintiff's asbestos-related disease was caused by his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. These experts may also testify that Plaintiff's diagnosis and symptoms were related to, and caused by, his exposure to asbestos (including minimal amounts of asbestos) and that each and every exposure contributes to asbestos-related disease. They may testify that the effects of exposure to asbestos are cumulative and that each and every exposure substantially contributed to Plaintiff's asbestos related Mesothelioma. Further, these doctors may testify concerning the increased risk of cancer faced by asbestos-exposed workers and the epidemiological link between asbestos and cancer. More specifically, these doctors may testify as to Plaintiff's increased risk of developing an asbestos-related cancer during his lifetime as a result of his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. These doctors may testify as to the hazardous nature of asbestos and/or asbestos-containing products and as a result, that such asbestos and/or asbestos-containing products are unreasonably dangerous. These doctors may testify concerning the reasonable and necessary medical expenses that Plaintiff incurred and/or will incur in the future as a result of his asbestos-related disease. Defense counsel are in possession of numerous transcripts within which these doctors' opinions have been fully explored.

Additionally, these experts will testify about asbestos and the diseases caused by asbestos generally. These experts will testify that smoking is addictive. These experts may testify that based on epidemiological studies, Plaintiff's asbestos-related disease was caused by his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. Additionally, these experts may testify that based on the medical and scientific literature available to Defendants, Defendants knew or should have known that asbestos-containing products could cause disease. These experts may testify as to their review of the medical and scientific literature regarding asbestos and asbestos-related diseases. These experts may testify regarding the availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature. These experts may testify regarding exposure levels of asbestos, at what levels

ANSWERS TO MASTER DISCOVERY
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Page 46

Case 3:14-cv-00116-GCM-DSC    Document 75-1    Filed 01/20/15    Page 111 of 181

GST-EST-0521453

asbestos may cause disease, and as to when this was known in the medical and scientific literature. These experts may also testify as to their review of the documents entered into evidence in this case or reviewed pertaining to Defendants, and as to their conclusions reached therefrom that Defendants were negligent, are strictly liable, and acted with wanton and willful disregard for the rights and safety of Plaintiff. These experts may also testify as to the hazardous nature of asbestos and that asbestos-containing products are unreasonably dangerous. They may also testify that Defendants engaged in negligent and grossly negligent conduct in failing to recall their asbestos-containing products from the market or in failing to warn of the dangers of their products or the use of asbestos-containing products. Further, these experts may testify concerning the increased risk of cancer faced by asbestos-exposed workers and the epidemiological link between asbestos and cancer. More specifically, these experts may testify as to Plaintiff's increased risk of developing an asbestos-related cancer as a result of his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants and that Plaintiff's fear of cancer is a reasonable fear. These experts may testify as to what caused and/or contributed to Plaintiff's exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. These experts may testify concerning fiber types of asbestos generally and that all types of asbestos fibers are capable of causing all asbestos-related diseases and all forms of asbestos-related cancers. These experts may testify regarding the asbestos content of different products and/or pieces of equipment during different periods of time. These experts may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos. They may also testify regarding "bystander" and "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. These experts may testify regarding when it was known that bystander and household exposures were known to cause disease.

These doctors may testify that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames. They may testify regarding the development of knowledge in the medical and scientific community regarding asbestos and asbestos diseases.

These doctors may testify that warnings placed on containers of asbestos-containing products, and/or asbestos equipment, and/or in technical manuals, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

These doctors' opinions will be based upon their review of any and all medical records and available chest x-rays and/or pathology materials, as well as their expertise in the field, including experience and training, and their review of historical and more recent medical articles and journals.

These doctors may testify that pure chrysotile asbestos, in the absence of tremolite, causes mesothelioma. These doctors may further testify that, in their opinion, chrysotile

ANSWERS TO MASTER DISCOVERY                                                        Page 47
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 112 of 181

GST-EST-0521454

asbestos mined in the vicinity of Coalinga, California, including in Union Carbide's calidria mines, causes all of the asbestos disease caused by Canadian chrysotile.

These doctors may testify that chrysotile in asbestos-containing products is contaminated with tremolite asbestos.

Dr. Edwin Holstein
Environmental Health Associates PA
20 Park Plaza, Suite 1028
Boston MA 02116
617-357-4901

Dr. Mark Colella
Allegheny Valley Hospital
1301 Carlisle Street
NatronaHeights, Pennsylvania 15065
724-224-5100, ext. 3063

Barry Horn, M.D.
2450 Ashby Ave.
Berkeley, California 94705

The above listed experts may testify, live or by deposition, concerning their examination of the Plaintiff and/or their review of the Plaintiff's work history, medical records, x-rays, and bills for medical services as well as their diagnosis of asbestos-related disease in this case. These doctors may testify that Plaintiff contracted Mesothelioma as a result of exposure to asbestos. They may testify concerning asbestos, the effects of asbestos on the body and any other topics related thereto. Additionally, they may testify concerning Plaintiff's increased risk of Mesothelioma as a consequence of his exposure to asbestos. They may also testify that Plaintiff's asbestos-related disease was caused by his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. They may also testify that Plaintiff incurred medical expenses as a result of his exposure to asbestos and his development of an asbestos-related disease. The doctors may testify concerning the reasonable and necessary medical expenses that Plaintiff incurred, and may incur in the future, as a result of his asbestos-related disease. They may also testify that asbestos-containing products are unreasonably dangerous due to their propensity to cause development of asbestos-related diseases. Defense counsel are in possession of numerous transcripts of the testimony within which the opinions concerning this subject have been fully explored.

These experts may testify based upon their review of Plaintiff's medical records, x-rays, and bills for medical services and that such medical bills for medical services are reasonable and necessary. These experts may testify with regard to Plaintiff's diagnosis of an asbestos-related disease, including Mesothelioma. These experts may also testify with regard to Plaintiff's increased risk of contracting lung cancer or Mesothelioma or other cancers as a result of his asbestos exposure. These experts may also testify that Plaintiff's diagnosis and symptoms were related to, and caused by, his exposure to asbestos (including minimal amounts of asbestos) and that each and every exposure contributes to asbestos-related disease. They may testify that the effects of exposure to

ANSWERS TO MASTER DISCOVERY
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc

Page 48

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 113 of 181

GST-EST-0521455

asbestos are cumulative and that each and every exposure substantially contributed to Plaintiff's asbestos related Mesothelioma. Additionally, these experts may testify that Plaintiff's exposure to asbestos contributed to his asbestos-related disease and/or asbestos-related cancer. These experts may testify that Plaintiff required medical monitoring, treatment and/or hospitalization (and the reasonable medical expenses therefore) as a result of his exposure to asbestos, asbestos-related disease, asbestos-related cancer, the progression and/or recurrence of this cancer and general fear of cancer because of asbestos exposure.

Additionally, these experts will testify about asbestos and the diseases caused by asbestos generally. These experts will testify that smoking is addictive. These experts may testify that based on epidemiological studies, Plaintiff's asbestos-related disease was caused by his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. Additionally, these experts may testify that based on the medical and scientific literature available to Defendants, Defendants knew or should have known that asbestos-containing products could cause disease. These experts may testify as to their review of the medical and scientific literature regarding asbestos and asbestos-related diseases. These experts may testify regarding the availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature. These experts may testify regarding exposure levels of asbestos, at what levels asbestos may cause disease, and as to when this was known in the medical and scientific literature. They may also testify regarding "bystander" and "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. These experts may testify regarding when it was known that bystander and household exposures were known to cause disease. These experts may also testify as to their review of the documents entered into evidence in this case or reviewed pertaining to Defendants, and as to their conclusions reached therefrom that Defendants were negligent, are strictly liable, and acted with wanton and willful disregard for the rights and safety of Plaintiff. These experts may also testify as to the hazardous nature of asbestos and that asbestos-containing products are unreasonably dangerous. They may also testify that Defendants engaged in negligent and grossly negligent conduct in failing to recall their asbestos-containing products from the market or in failing to warn of the dangers of their products or the use of asbestos-containing products. Further, these experts may testify concerning the increased risk of cancer faced by asbestos-exposed workers and the epidemiological link between asbestos and cancer. More specifically, these experts may testify as to Plaintiff's increased risk of developing an asbestos-related cancer as a result of his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants and that Plaintiff's fear of cancer is a reasonable fear. These experts may testify as to what caused and/or contributed to Plaintiff's exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. These experts may testify concerning fiber types of asbestos generally and that all types of asbestos fibers are capable of causing all asbestos-related diseases and all forms of asbestos-related cancers. These experts may testify regarding the asbestos content of different products and/or pieces of equipment during different periods of time.

These experts may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos.

These doctors may testify that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames. They may testify regarding the development of knowledge in the medical and scientific community regarding asbestos and asbestos diseases.

These doctors may testify that warnings placed on containers of asbestos-containing products, and/or asbestos equipment, and/or in technical manuals, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

These doctors' opinions will be based upon their review of any and all medical records and available chest x-rays and/or pathology materials, as well as their expertise in the field, including experience and training, and their review of historical and more recent medical articles and journals.

These doctors may testify that pure chrysotile asbestos, in the absence of tremolite, causes mesothelioma. These doctors will further testify that, in their opinion, chrysotile asbestos mined in the vicinity of Coalinga, California, including in Union Carbide's calidria mines, causes all of the asbestos diseases caused by Canadian chrysotile.

These doctors may testify that chrysotile in asbestos-containing products is contaminated with tremolite asbestos.

Frank M. Parker, III, C.I.H.
Environmental Technologies, Inc
200 Brantley Lane
Magnolia, Texas 77353-0210
281-356-6038

Dr. Edwin Holstein
Environmental Health Associates PA
20 Park Plaza, Suite 1028
Boston MA 02116
617-357-4901

Susan Raterman, C.I.H
The Raterman Group, Ltd
3804 Cloudy Ridge Road
Chicago, Illinois 60601
312-345-0111

Steven S. Paskal, M.S.H., J.D., C.I.H.
Materials Analytical Services, Inc.
107 Ridgely Avenue, Suite 13A
Annapolis, Maryland 21401
410-280-0505

ANSWERS TO MASTER DISCOVERY                                                                     Page 50
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC    Document 75-1    Filed 01/20/15    Page 115 of 181

GST-EST-0521457

Jerry F. Lauderdale, C.I.H.
Lauderdale Environmental Engineering
75 East Wacker Drive, Suite 500
Austin, Texas 78734
512-266-8933

John Templin
Material Alalytical Services, Inc.
3020 Old Ranch Parkway, Suite 300
Seal Beach, California 90740
562-799-5530

The above experts are Certified Industrial Hygienists, Professional Engineers and/or Occupational Medicine Doctors who may testify about industrial hygiene and occupational medicine principles related to the circumstances of Plaintiff's exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants.

These experts may testify regarding Plaintiff's exposures to asbestos at different times and may testify concerning their assessment of the various risks which were associated with such exposures. They may also testify regarding the material and characteristics of Defendants' asbestos products, release of asbestos fibers from Defendants' products, industry and regulatory protocols, constituent analysis with respect to the nature of the materials and the identity of the manufacturer of the materials, product formulae and product identification. They may further testify regarding the availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature. These experts may also testify regarding the asbestos content of different products and/or pieces of equipment during different periods of time.

These experts may further testify concerning the conditions at Plaintiff's asbestos exposure sites based on testimony of the Plaintiff, co-workers, documents, discovery responses and/or conversations with workers. They may testify concerning asbestos hazards resulting from maintenance, repair and construction operations taking place at those sites and Defendants' failure to respond adequately or appropriately to those hazards. They may further testify that Defendants' actions constituted negligence, gross negligence, conscious indifference to others and/or indicate that defendants were aware of the substantial certainty that their actions could or would result in significant illnesses and/or deaths. They may further testify that Defendants were in violation of asbestos regulations promulgated by state governments and the United States government, and that Defendants violated their duties under the Occupational Safety and Health Act and its implementing regulations. They may testify that Defendants' failure to comply with these laws, regulations and standards constitutes negligence and gross negligence, and was a cause of Plaintiff's injuries. They may further testify that Defendants were aware, or should have been aware, of the hazards of asbestos by the time of Plaintiff's exposure to their products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants as a result of medical, scientific and industrial hygiene literature available to all Defendants.

These experts may also testify, based on their experience, training and education, as to the health risks associated with exposure to asbestos. They may testify regarding bystander exposure to asbestos, to asbestos and "fiber drift," and specifically that these are occupational hazards associated with asbestos and that they were significant contributing factors in the Plaintiff's asbestos exposure. They may also testify regarding "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. These experts may testify regarding when it was known that bystander and household exposures were known to cause disease. They may testify that the cumulative dose of asbestos that a person receives is what increases the risk of asbestos related diseases, including mesothelioma. They may testify that all exposures are substantial contributing factors to an individual's disease, and that all of Plaintiff's exposures contributed to the development of Plaintiff's mesothelioma. They may also testify that asbestos products are toxic and unreasonably dangerous, and that they are more dangerous than would be contemplated by the ordinary user with ordinary skills and characteristics common to the community. They may also testify that there are no safe levels of exposure to asbestos dust in that there is no level of exposure to asbestos dust that has been proven too low to cause the disease mesothelioma. They may testify further that all types of asbestos represent occupational hazards and that in the science of industrial hygiene, all types of commercial asbestos and tremolite asbestos are understood to cause all asbestos diseases, including but not limited to, malignant mesothelioma. They may testify that "dose reconstruction" or similar efforts to specifically quantify and model in numeric terms the Plaintiff's total and/or relative asbestos exposure, in the absence of measurements taken at the Plaintiff's exposure sites during the relevant periods of time, are without adequate foundation or generally accepted methodology to be considered reliable.

These experts may testify regarding the general background levels of asbestos release, bystander levels of exposure of the fiber release, and fiber release and contamination on clothing and other personal contamination. They may also testify regarding results of dust studies by analysis of using both particles per cubic foot and fibers per cubic centimeter, as well as current and past techniques used to analyze asbestos content in dust. They may testify that the levels of asbestos dust to which the Plaintiff was exposed during his working career would have likely exceeded established TLVs and PELs in many instances. These experts may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos.

These experts have examined studies of the amount of asbestos fibers released into the breathing zone during ordinary and foreseeable operations of asbestos products. They may testify that during foreseeable uses of Defendants' products that those products released asbestos fibers into the breathing zone of workers, including but not limited to, Plaintiff, in levels that are above background. These asbestos products include dry powders that are mixed with water and sanded, pre-mixed pastes that are sanded, thermal insulation products that are cut, sawed and/or torn out, adhered gaskets that are removed in whole or in part by brushing or sanding, boards or flat sheets or tiles or siding that are cut or scored or abraded, brake linings that are ground, filed or sanded and/or blown out of drums with supplied air, and products scrap that is swept or blown or vacuumed or ripped out. They may testify that impregnated and/or encapsulated products, when disturbed or abraded, can release asbestos fibers into the breathing zone of workers, like Plaintiff, in levels that are above background. They may compare and contrast the findings with other scientific findings. They may offer opinions concerning

ANSWERS TO MASTER DISCOVERY                                                                 Page 52
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 117 of 181

GST-EST-0521459

testing which has been performed on behalf of Defendants or the lack of testing on Defendants' products.

These experts may testify that dust levels measured in testing one Defendants' asbestos product would be similar to the results from another Defendant's similar product with similar ingredients.

It is anticipated, that these experts will testify that asbestos exposure of the Plaintiff arising from Defendants' asbestos products or activities involving the use of asbestos or asbestos products were substantial contributing factors in Plaintiff's overall asbestos exposure and were the result of Defendant's failure to exercise appropriate industrial hygiene controls for suppressing or reducing exposures to asbestos, including but not limited to adequately warning Plaintiff of the dangers associated with asbestos and means to protect himself. They will testify that these failures by Defendants were knowing and/or unreasonable in the time and place in which they occurred given the information that was available to Defendants, medical and scientific literature, statutes, regulations and/or based on the Defendant's actual knowledge. These experts' opinions may be based upon their review of any and all records and materials, published and or expressed opinions of other experts in the field, corporate documents, as well as their expertise in the field, including experience and training, and their review of historical and more recent scientific articles and journals as well as government regulations.

These doctors may testify that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames. They may testify regarding the development of knowledge in the medical and scientific community regarding asbestos and asbestos diseases.

These experts may testify that pure chrysotile asbestos, in the absence of tremolite, represents an industrial hygiene hazard for all asbestos-related diseases that need to be controlled. These doctors may further testify that, in their opinion, chrysotile asbestos mined in the vicinity of Coalinga, California, including in Union Carbide's calidria mines, causes all of the asbestos disease caused by Canadian chrysotile.

These experts may testify that chrysotile in asbestos-containing products is contaminated with tremolite asbestos.

Arnold R. Brody, Ph.D.
Tulane University Medical Center
School of Medicine
Department of Pathology & Laboratory Medicine SL79
1430 Tulane Avenue
New Orleans, Louisiana 70112-2699
504-588-5224

Dr. Brody may testify as to the physiological design and function of the lungs, the effect of asbestos on the lungs and other parts of the body, and on the body's defense mechanisms. He may also testify about the irreversible effects of asbestos-related diseases and the prognosis for an asbestos-exposed individual. He may also testify concerning the scientific and medical literature on the biological and toxicological effects

ANSWERS TO MASTER DISCOVERY                                                                    Page 53
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 118 of 181

GST-EST-0521460

of asbestos written by him and others. He may testify regarding historical literature relating to asbestos related diseases, and when it was known and accepted in the medical and scientific community that asbestos could cause various diseases. He may also testify about the body's biologic responses to brief exposures to asbestos, the pathogenic effects produced by various asbestos fiber types, including chrysotile, and mechanisms of asbestos-induced diseases including fibrosis and carcinogenesis. He may further testify concerning asbestos deposition and migration in and through the lungs and body. He will discuss all types of cancer risks from asbestos exposure, including mesothelioma. He will define what "injury" means and that asbestos-related diseases are injuries. Dr. Brody may further testify as to facts and circumstances regarding the nature of the injuries and damages that are the subject of this action. Dr. Brody may testify that all exposures are substantial contributing factors to an individual's disease. Dr. Brody will testify that products which release asbestos fibers are unreasonably dangerous and that fibers will remain in the lungs until death. Dr. Brody may testify from hypothetical sets of facts and may give opinions regarding whether certain types of exposures would have substantially contributed to cause asbestos related disease, including mesothelioma. Dr. Brody may discuss the dangers of low-level exposure to asbestos and may testify that there is no safe level of exposure to asbestos. He may also testify regarding "bystander" and "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. He may testify regarding when it was known that bystander and household exposures were known to cause disease. He will testify that smoking is addictive. Dr. Brody's testimony is based on his review and knowledge of medical literature, his education and work experience, his research, and the research of others.

Dr. Brody may also testify that it has been known for decades that asbestos can cause asbestos related diseases, including mesothelioma.

Dr. Brody's opinions will be based upon his expertise in the field, including experience and training, and his review of historical and more recent medical and scientific articles and journals.

Dr. Brody may testify that pure chrysotile asbestos, in the absence of tremolite, causes mesothelioma. Dr. Brody may further testify that, in his opinion, chrysotile asbestos mined in the vicinity of Coalinga, California, including in Union Carbide's calidria mines, causes all of the asbestos disease caused by Canadian chrysotile.

Dr. Brody may testify that chrysotile in asbestos-containing products is contaminated with tremolite asbestos.

Dr. Brody will utilize teaching slides during his testimony. These slides have been produced to defendants in asbestos cases on numerous occasions. Additional copies can be made available upon reasonable request.

GST-EST-052146

Dr. Richard A. Lemen
11281 Big Canoe
Jasper, Georgia 30143
706-268-3752

Dr. Lemen will testify as an expert and fact witness about asbestos and the diseases caused by asbestos generally. Dr. Lemen may testify that based on epidemiological studies, Plaintiff's asbestos-related disease was caused by his exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' machinery or equipment, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. Additionally, Dr. Lemen may testify that based on the medical and scientific literature available to Defendants, Defendants knew or should have known that their asbestos-containing products or use of asbestos-containing products could cause disease. Dr. Lemen will testify as to his visits at various asbestos plants and manufacturing plants and about TLVs. Dr. Lemen may testify about TLVs using demonstrative aids. Dr. Lemen may testify as to his review of the literature and the opinions and conclusions contained in that literature. Dr. Lemen will testify that asbestos was known to cause various diseases and cancers before 1950. Dr. Lemen may testify regarding the availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature. Dr. Lemen may testify regarding exposure levels of asbestos, at what levels asbestos may cause disease, and as to when this was known in the medical and scientific literature. Dr. Lemen will testify that each and every exposure to asbestos is a contributing cause to asbestos-related diseases, including mesothelioma. Dr. Lemen will testify as to when end product users, household exposed individuals and bystanders were known to get sick and die from asbestos. Dr. Lemen may also testify as to his review of the documents entered into evidence in this cause or reviewed pertaining to Defendants, and as to his conclusions reached therefrom that Defendants were negligent, are strictly liable, and acted with wanton and willful disregard for the rights and safety of Plaintiff. Dr. Lemen may also testify as to the hazardous nature of asbestos and asbestos-containing products and as a result, that such asbestos and/or asbestos-containing products are unreasonably dangerous. He may also testify that Defendants engaged in negligent and grossly negligent conduct in failing to recall their asbestos-containing products from the market or in failing to adequately and timely warn of the dangers of their products or the use of asbestos-containing products. Further, Dr. Lemen may testify concerning the increased risk of cancer faced by asbestos-exposed workers and the epidemiological link between asbestos and cancer. He will testify that smoking is addictive. Dr. Lemen will specifically testify to activities listed in his curriculum vitae, including his factual knowledge of the conduct of asbestos companies from his work with the United States Government. More specifically, Dr. Lemen may testify as to Plaintiff's increased risk of developing an asbestos-related cancer as a result of his exposure to Defendants' asbestos-containing products and that Plaintiff's fear of cancer is a reasonable fear. Dr. Lemen will discuss the dangers of low-level exposure to asbestos and will testify that there is no safe level of exposure to asbestos. He will testify that all the various types of asbestos fibers are capable of causing death, mesothelioma, asbestosis and all other asbestos-related diseases. Dr. Lemen may also testify that Plaintiff's increased risk of cancer was caused and/or contributed to by Plaintiff's exposure to Defendants' asbestos-containing products, the use of asbestos-containing products on Defendants' equipment or machinery, and/or the use of asbestos-containing products while working on Defendants' premises and/or while employed by Defendants. This doctor may testify concerning the reasonable and

necessary medical expenses that the Plaintiff incurred and/or will incur as a result of his asbestos-related disease. Dr. Lemen may testify concerning fiber types of asbestos generally and that all types of asbestos fibers are capable of causing all asbestos-related diseases and all forms of asbestos-related cancers. Defense counsel are in possession of transcripts within which Dr. Lemen's opinions have been fully explored.

This doctor may testify that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames. He may testify regarding the development of knowledge in the medical and scientific community regarding asbestos and asbestos diseases.

This doctor may testify that warnings placed on containers of asbestos-containing products, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

Further, Dr. Lemen will testify as to the following specific issues: his background; ethical aspects of corporate responsibility; warnings; and the state of the art of the medical, scientific and/or technical literature regarding asbestos. Dr. Lemen will testify regarding bystander exposure to asbestos, "fiber drift," the fact that asbestos products are "toxic" and unreasonably dangerous, the TLV defense, and the concept that each and every fiber exposure substantially contributed to and was a producing cause of Plaintiff's asbestos-related disease. He may also testify regarding "bystander" and "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. He may testify regarding when it was known that bystander and household exposures were known to cause disease. Further, Dr. Lemen may testify as to the level of asbestos exposure Plaintiff would have received during his employment. Dr. Lemen may testify that there is no "safe level" of exposure to asbestos in terms of causation of asbestos diseases, including mesothelioma.

Dr. Lemen may testify as to the health aspects of asbestos exposure and to his own personal and professional writings, publications and editorials; the amount of asbestos exposure it takes to cause cancer and other asbestos-related diseases; the historical aspects of the development of OSHA/NIOSH and the history of OSHA/NIOSH regulations and other governmental regulations regarding asbestos and asbestos exposure. Dr. Lemen may also testify that Defendants' failure to comply with these regulations constitutes negligence and was a cause of Plaintiff's injuries.

This doctor's opinions will be based upon his review of any and all medical records and available chest x-rays and/or pathology materials, as well as his expertise in the field, including experience and training, and his review of historical and more recent medical articles and journals.

Dr. Lemen may testify that pure chrysotile asbestos, in the absence of tremolite, causes mesothelioma. Dr. Lemen may further testify that, in his opinion, chrysotile asbestos mined in the vicinity of Coalinga, California, including in Union Carbide's calidria mines, causes all of the asbestos disease caused by Canadian chrysotile.

This doctor may testify that chrysotile in asbestos-containing products is contaminated with tremolite asbestos.

ANSWERS TO MASTER DISCOVERY                                                                 Page 56
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 121 of 181

GST-EST-0521463

Captain Francis J. Burger, USNR (ret)
3101 Les Arbres Lane
Ocean Springs, Mississippi 39564

Captain Burger is a retired U.S. Navy Line Officer and Engineer and Engineering Duty Officer, as well as an Engineer/Project Manager in Naval Architecture and Marine Engineering. He is knowledgeable of and may testify to the use of asbestos-containing materials on board ship, work practices regarding the use of insulation and other asbestos-containing products and the types of asbestos products required by various manufacturer specifications and manuals, as well as work performed in naval shipyards. He is familiar with and may testify regarding the types and quantities of materials used in naval construction and repair including insulation, gaskets and packing materials. Captain Burger will testify regarding the use of asbestos in the United States Navy, and aboard vessels. He may testify regarding the use of asbestos in all different kinds of equipment used on Naval ships and other vessels. He may testify that different pieces of equipment used on these ships and vessels were, in fact, asbestos products. He may testify that asbestos was a component of various pieces of equipment and was necessary for the proper operation of the equipment. He may testify that asbestos insulation, asbestos gaskets and asbestos packing were component parts of different pieces of equipment. Captain Burger may further testify that manufacturers of Naval equipment specified and required the use of asbestos on their equipment. He may testify that these manufactures would have known and foreseen that asbestos was a required component of their equipment. He may further testify that these pieces of equipment were not complete products without the asbestos components. Mr. Burger may testify as to U.S. Naval vessel construction, overhaul, repair and maintenance. Mr. Burger is familiar with Navy manuals and specifications for construction and overhaul and repair of U.S. Navy vessels.

Captain Burger will further testify regarding Naval practices and procedures. He may testify that the Navy relied on the expertise of the manufacturers of products and equipment when determining what was used on Naval vessels. He may testify that that manufacturers instructed the Navy on how much asbestos was necessary for their particular equipment and often created drawings and instructions that specified the asbestos insulation and asbestos gaskets and packing requirements for each piece of equipment. He may testify that the manufacturers were also required by the Navy to provide technical manuals with their equipment, and that these manuals were supposed to contain warnings regarding all potential dangers associated with the equipment and its components. He may testify that the manufacturers should have included warnings regarding the dangers of asbestos in these technical manuals. He may testify that equipment manufactures could have always warned about the dangers of asbestos, had they wanted to do so.

Mr. Burger is expected to offer testimony regarding U.S. Navy ship design and engineering, particularly with regard to the use of asbestos containing insulation, gaskets and packing, aboard ship and in various applications in marine engineering operations, including without limitation, boilers, turbines, valves, pumps, distilling plants, steam lines, insulation, and auxiliary systems and equipment. Mr. Burger may also testify as to the authenticity and meaning of records, specifications, and other documents pertaining to naval ship construction and operation. He may offer the opinion that Navy inspection reports, Navy Bureau of Ships documents and other similar records are reliable and authoritative sources of information for establishing the manufacturers of various pieces of equipment aboard a particular U.S. Navy vessel or class of vessels. Mr. Burger may

GST-EST-0521464

also provide general testimony concerning the field of marine engineering and machinery in general as it relates to the subject of the manufacture, design, construction, maintenance, and overhaul of U.S. Navy and commercial vessels, shipyard operations, including major ship construction and overhaul, as well as the use of asbestos and asbestos containing materials during such activities. In addition, Mr. Burger may also offer testimony concerning the level of supervision and control exercised by the U.S. Navy over the design and manufacture of equipment intended for installation on U.S. Navy vessels.

Mr. Burger may also testify regarding the construction and operation of the United States Navy ships, particularly during the time period when Plaintiff was potentially exposed to asbestos while serving and/or working aboard such vessels. Mr. Burger may also testify regarding Plaintiff's Naval service record and the classification, function, purpose and service records of ships identified by Plaintiff.

Mr. Burger may also testify as to the methods, manner and procedures for maintaining and repairing the propulsion plant, boilers, turbines, pumps, distilling plants, valves and other associated and auxiliary equipment aboard Naval vessels, including during shipyard periods as testified to by Plaintiff. Mr. Burger may testify about Plaintiff's actual and potential exposure to asbestos in the Navy and aboard various ships, both military and commercial. Mr. Burger may testify concerning the forseeability to manufacturers of Naval equipment that its equipment would be insulated with asbestos. He may also testify regarding Plaintiff's asbestos exposure to products and equipment attributable to the Defendants named in this case.

Mr. Burger also may testify as to the specifications, including the types and grades, of which insulation, gasket and packing materials were used on naval vessels. Mr. Burger may testify regarding departure reports and ship histories regarding specific ships.

He may testify regarding the working conditions on Naval vessels and the procedures and conditions involved in work on and around equipment. He may testify based on his personal experience that work on different pieces of Naval equipment involved the disturbance of asbestos insulation, and asbestos gaskets and packing. He may testify that disturbance of the asbestos components of these pieces of equipment would release visible dust into the air, and into the breathing zone of workers in the area.

He may testify regarding the Plaintiffs particular job duties and responsibilities and explain how these responsibilities may have involved the disturbance of asbestos components on various different pieces of equipment. He may also testify about the characteristics of Naval vessels in general and the particular vessels that Plaintiff was aboard. He may testify regarding the different pieces of equipment that Plaintiff would have worked on or near.

Captain Burger's testimony will be based upon his experience and training and may also be based on his review of Naval documents and his review of depositions of the Plaintiff, co-workers, or other individuals.

Dr. Barry Castleman
4406 Oxford Street
P.O. Box 188
Garrett Park, Maryland 20896
301-933-9097

Dr. Richard Cohen
19242 Panorama Drive
Saratoga, California 95070-6225
415-424-5156

The above listed doctors may testify about asbestos and the diseases caused by asbestos generally. They may testify that based on the medical and scientific literature available to Defendants, Defendants knew or should have known that their asbestos-containing products or the use of asbestos-containing products, could cause disease. They may testify as to their review of the literature and the opinions and conclusions contained in that literature. They may also testify regarding availability of materials as substitutes for asbestos and when information concerning these substitute materials appeared in the medical and scientific literature. They may also testify as to their review of the documents entered into evidence in this case or reviewed pertaining to Defendants, and as to their conclusions reached there from that Defendants were negligent, are strictly liable, and acted with wanton and willful disregard for the rights and safety of Plaintiff. Additionally, they may testify as to the hazardous nature of all types of asbestos and that all types of asbestos-containing products are unreasonably dangerous. They may also testify that Defendants engaged in negligent and grossly negligent conduct in failing to recall their asbestos-containing products from the market or in failing to warn of the dangers of their products or the use of asbestos-containing products. Further, they may testify that all Defendants conspired to suppress information pertaining to the hazards of asbestos, exposure to asbestos-containing products, and the diseases resulting there from. Consequently, Defendants deprived Plaintiff of the right to make an informed choice concerning his exposure to asbestos-containing products. Defense counsel are in possession of numerous transcripts of these experts' prior testimony within which their opinions concerning these subjects have been fully explored. These doctors may testify concerning the reasonable and necessary medical expenses that the Plaintiff has incurred and will incur in the future, as a result of his asbestos-related disease.

These doctors may testify that medical articles and journals indicated in the 1920s that asbestos could be hazardous and deadly, and in the 1930s and 1940s indicated that asbestos could cause cancer, and that it was known or knowable that asbestos was a hazardous and dangerous substance in those time frames. They may testify regarding the development of knowledge in the medical and scientific community regarding asbestos and asbestos diseases.

These doctors may also testify that warnings placed on asbestos-containing products, if any, may have been inadequate to properly inform users and persons exposed of the significant hazards of asbestos inhalation.

These doctors' opinions will be based upon their review of any and all medical records and available chest x-rays and/or pathology materials, as well as their expertise in the field, including experience and training, and his review of historical and more recent medical articles and journals.

Further, these doctors will testify as to the following specific issues: their background; ethical aspects of corporate responsibility; warnings; and the state of the art of the medical, scientific and/or technical literature regarding asbestos. They will testify regarding bystander exposure to asbestos, "fiber drift," the fact that asbestos products are

"toxic" and unreasonably dangerous, the TLV defense, and the concept that each and every fiber exposure substantially contributed to and was a producing cause of Plaintiff's asbestos-related disease. They may also testify regarding "bystander" and "household exposures" to asbestos and that these types of exposures are known to contribute to cause mesothelioma and other asbestos related diseases. These experts may testify regarding when it was known that bystander and household exposures were known to cause disease. Further, they may testify as to the level of asbestos exposure Plaintiff would have received during his employment.

These doctors may testify as to the health aspects of asbestos exposure and to his own personal and professional writings, publications and editorials; the amount of asbestos exposure it takes to cause cancer and other asbestos-related diseases; the historical aspects of the development of OSHA/NIOSH and the history of OSHA/NIOSH regulations and other governmental regulations regarding asbestos and asbestos exposure. They may also testify that Defendants' failure to comply with these regulations constitutes negligence and was a cause of Plaintiff's injuries.

These doctors may testify that pure chrysotile asbestos, in the absence of tremolite, causes mesothelioma. They may further testify that, in their opinion, chrysotile asbestos mined in the vicinity of Coalinga, California, including in Union Carbide's calidria mines, causes all of the asbestos disease caused by Canadian chrysotile.

These doctors may testify that chrysotile in asbestos-containing products is contaminated with tremolite asbestos.

He is available for deposition upon written request.

**Corporate Witnesses and Other Witnesses:** The following witnesses may offer expert as well as factual testimony

John Crum, dcd
Mr. Crum is a former salesman for Kaiser Gypsum. He will testify by deposition regarding his involvement in the sale of Kaiser Gypsum products, the corporate structure of Kaiser Gypsum , and the sales areas of Kaiser Gypsum products. He will further testify that he sold thousands of bags and containers of Kaiser Gypsum products and never saw any warnings regarding the dangers of the products. He will also testify that Kaiser Gypsum failed to warn him in any way about the dangers of asbestos. Please see his deposition in Crum v. The EJ Bartells Company, et al, NO. 98-2-24915-3 SEA, November 6, 1998.

Brentwood Crosby, dcd.
Mr. Crosby is a former sales manager for Kaiser Gypsum. He will testify by deposition regarding his involvement in the sale of Kaiser Gypsum products, the corporate structure of Kaiser Gypsum , and the sales areas of Kaiser Gypsum products. He will further testify that he sold thousands of bags and containers of Kaiser Gypsum products and never saw any warnings regarding the dangers of the products at any time when the products were sold with asbestos. He will also testify that Kaiser Gypsum failed to warn him in any way about the dangers of asbestos. Please see his deposition in Crum v. The EJ Bartells Company, et al, NO. 98-2-24915-3 SEA, January 19, 1999.

Herb Giffins

c/o Kelly Moore Paint Company

Mr. Giffins is the President of Kelly Moore. He will testify live or by deposition that asbestos joint compounds, including Kelly Moore products, can and do cause mesothelioma. He will testify that Chrysotile asbestos can and does cause mesothelioma. He will testify that brief and low level exposures to chrysotile asbestos can and do cause mesothelioma. He will testify that exposures to joint compounds containing chrysotile asbestos, including Kelly Moore products, can and do cause mesothelioma. He will also testify regarding Kelly Moore's knowledge of the dangers of asbestos. He will testify regarding all matters in his deposition in Nolen v. AW Chesterton Company, et al, No.153-200843-03, Tarrant County, 153rd Judicial District, December 5, 2003.

Julius Nemeth
c/o RPM/Bondex
Julius Nemeth will testify regarding his experience with Bondex and Bondex Products. Please see his deposition in Marfice, et al v. AP Green, et al, 99 CV 206658, March 2, 2000.

Ibrahim Bedros
c/o RPM/Bondex
Mr. Bedros will testify regarding his experience with Bondex and Bondex products. Please see his deposition in Cerniglia v. Armstrong World Industries, et al, NO. 99-L-816, February 22, 2000.

Thomas Sullivan
c/o RPM/Bondex
Mr. Sullivan will testify regarding his experience with Bondex and Bondex products. Please see his deposition in Marfice, et al v. AP Green, et al, 99 CV 206658, March 1, 2000.

John A. Fleming
c/o RPM/Bondex
Mr. Fleming will testify regarding his experience with Bondex and Bondex Products. Please see his depositions in Marfice, et al v. AP Green, et al, 99 CV 206658, March 3, 2000 and January 5, 2000.

Thomas Fipps
c/o RPM/Bondex
Mr. Fipps will testify regarding his experience with Bondex and Bondex Products. Please see his deposition in Cerniglia v. Armstrong World Industries, et al, NO. 99-L-816, February 22, 2000.

James Karman
c/o RPM/Bondex
Mr. Karman will testify regarding his experience with Bondex and Bondex Products. Please see his deposition in Marfice, et al v. AP Green, et al, 99 CV 206658, March 1, 2000.

GST-EST-0521468

Robert Fleming
c/o RPM/Bondex
Robert Fleming will testify regarding his experience with Bondex and Bondex products. Please see his deposition in Marfice, et al v. AP Green, et al, 99 CV 206658, March 2, 2000.

William Lenhert
c/o Georgia Pacific
Mr. Lenhart will testify regarding his experiences with Certainteed, Bestwall and Georgia Pacific and the products of those companies. Please see his prior deposition testimony in the case of Mueller v. The Dow Chemical Company, LASC case number BC 259 907.

Oliver Eugene Burch
c/o Georgia Pacific
Mr. Burch will testify regarding his experiences with Certainteed, Bestwall and Georgia Pacific and the products of those companies. Please see his deposition in Rowan v. Crown Cork and Seal, Et al, November 17,18, 2005, No:02-00973-C.

Rick Rew
c/o Ruco
Mr. Rew will testify regarding his experience with Ruco and Ruco products. Please see his prior depositions, already in the possession of the Defendants.

John Rew
c/o Ruco
Mr. Rew will testify regarding his experience with Ruco and Ruco products. Please see his prior depositions, already in the possession of the Defendants.

Joan Benton
c/o Murco
Ms. Benton will testify regarding her experience with Murco and Murco products. Please see her deposition in Smith et al , v. Elementis et al, No. 200517511, Harris County, Texas, Ocotber 21st, 2005.

Dwight Cohagen
c/o Sherwin Williams
Mr. Cohagen will testify regarding his experience with Sherwin Williams and Sherwin Williams products. Please see his deposition in Clancy v. Flintkote, et al, cause number 6718724801, Tarrant County, TX, 5-22-03.

Theodore Cichocki  (deceased)
35 Woodhollow Drive
Schererville, Indiana 46375

Mr. Cichocki, a pipefitter for forty (40) years that worked regularly with Garlock asbestos-containing gaskets, may testify by deposition taken on July 17, 2001, regarding the matters described in that deposition.  These matters include, but are not limited to, the nature of and frequency of adherence of Garlock asbestos-containing gaskets onto the surfaces of pipe flanges, the methods required or involved in the removal of adhered Garlock asbestos-containing gaskets, the conditions visibly created by the removal of Garlock asbestos-containing gaskets from the flanges of steam pipes, Mr. Cichocki's

physical and emotional condition with pleural mesothelioma proximately caused by exposure to Garlock asbestos-containing gaskets. Mr. Cichocki, through his work with Garlock asbestos-containing gaskets over four decades, has expertise regarding Garlock asbestos-containing gaskets arising through skill, experience, acquired knowledge and training. Counsel for Garlock, Inc. has a copy of this deposition of Mr. Cichocki that it took. Mr. Cichocki will testify that Garlock asbestos-containing gaskets strongly adhere to the surfaces of pipe flanges. He will testify that in working with Garlock asbestos-containing gaskets, use of vigorous wire brushing is necessary to remove adhered Garlock asbestos gaskets. He will testify that studies purporting to show Garlock asbestos-containing gaskets being removed from pipe flanges in one piece (rather than in pieces separated and adhered onto opposite sides of pipe flange surfaces, do not accurately reflect and are not substantially similar to the conditions of Garlock asbestos-containing gaskets after their use in high-temperature industrial applications. He will testify that a videotape conducted by MAS, and described in the deposition, that reflects a pipefitter's use of wire brushing to remove adhered Garlock asbestos-containing gaskets, is an accurate portrayal of the conditions of Garlock asbestos-containing gaskets encountered in the field, the methods necessary for removing them, and visible dust created by the removal of Garlock asbestos-containing gaskets.

William "Bill" Plummer (deceased)
413 East Springdale
Grand Prairie, Texas 75052

Mr. Plummer, a machinist mate for twenty-six (26) years who regularly worked with Garlock asbestos-containing gaskets, may testify by trial testimony give on August 22, 2001, and August 29, 2001, regarding the matters described in the trial transcript. These matters include, but are not limited to, the nature and frequency of adherence of Garlock asbestos-containing gaskets onto the surfaces of pipe flanges, the methods required or involved in the removal of adhered Garlock asbestos-containing gaskets, the conditions visibly created by the removal of Garlock asbestos-containing gaskets from the flanges of low temperature and low pressure pipe lines. Mr. Plummer may also testify as to his physical, mental and emotional condition resulting from pleural mesothelioma caused by his exposure to Garlock asbestos-containing gaskets. Mr. Plummer, through his work with Garlock asbestos-containing gaskets over a twenty-six (26) year period has expertise regarding Garlock asbestos-containing gaskets arising through skill, experience, acquired knowledge and training. He will testify that studies purporting to show Garlock asbestos-containing gaskets being removed from pipe flanges in one piece do not accurately reflect and are not substantially similar to the conditions of Garlock asbestos-containing gaskets after their use in high temperature applications. He will testify that a videotaped simulation conducted by Fred Boelter, viewed by Mr. Plummer during trial, that allegedly reflects the typical procedures to remove adhered Garlock asbestos-containing gaskets, is an inaccurate portrayal of the conditions of Garlock asbestos-containing gaskets encountered in the Navy, the methods necessary for removing the, and visible dust created by the removal of Garlock asbestos-containing gaskets.

William Cunningham
4028 Swarthmore,
Houston, Texas 77005
713-661-6509.

Mr. Cunningham will testify regarding the matters in his deposition taken on May 31, 1989, In Re: All Asbestos Litigation, Master File, No. 86-L-1827 In the Circuit Court for Madison County, Illinois, which is available for inspection and copying upon reasonable request.

The following are **T.H. AGRICULTURE & NUTRITION COMPANY, LLC (THAN)** persons with knowledge of relevant facts, who will appear by **prior written deposition** at any all trials against THAN, some of whom will offer expert testimony and some of whom will offer factual testimony. Many of the witnesses are unavailable for trial, but the most recent contact information would be within the care, custody or control of THAN .They may be contacted by and through the attorney of record who represented them at the deposition:

William Bouldin, 11-8-02, Baker v. Allied Manufacturing Co, et al, IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI AT INDEPENDENCE, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

Marshall Jackson, 11-6-02, Marcek v. The Flintkote Company, et al, Tarrant County, Texas, 352-190894-02, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

Phillip Kizer, 9-11-02, Baker v. Allied Manufacturing Co, et al, IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI AT INDEPENDENCE, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

Max Mason, 10-30-02, Baker v. Allied Manufacturing Co, et al, IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI AT INDEPENDENCE, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

John Sigler, 10-30-02, Baker v. Allied Manufacturing Co, et al, IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI AT INDEPENDENCE, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

Roger Goette, 6-17-05, Steck v. AW Chesterton, et al, IN THE CIRCUIT COURT STATE OF MISSOURI TWENTY-SECOND JUDICIAL CIRCUIT (City of St. Louis), Case No. 032-819, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

Raymond Fitzgerald, 10-23-02, Baker v. Allied Manufacturing Co, et al, IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI AT INDEPENDENCE, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

ANSWERS TO MASTER DISCOVERY                                                      Page 64
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 129 of 181

GST-EST-0521471

Robert Mann, 7-20-05, Bret C. Williams, et al, v, Garlock, INC, et al, In the District Court of Harris County, Texas, 11th Judicial District, Cause number 2004-22789, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

James Robinson, 4-5-06, Line v. Able Supply Company, et al, Harris County Texas, CAUSE NO. 2004-70791, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

James Robinson, 10-29-02, Marcek v. The Flintkote Company, et al, Tarrant County, Texas, 352-190894-02 , designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety

Deposition of **EUGENE K. HERNDON**, taken on November 11, 2002, in <u>Dwight Baker, et al. v. Allied Manufacturing Company, et al.</u>, in the Circuit Court for Jackson County, Missouri at Independence, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Deposition of **JAMES W. SMITH**, taken on October 4, 2000 (V.II), in <u>Edith Adams, et al. v. Allied Manufacturing Company, et al.</u>, in the Circuit Court for Jackson County, Missouri at Independence, No. 99-CV-220517, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Deposition of **JAMES W. SMITH**, taken on August 15, 2000 (V.I), in <u>Edith Adams, et al. v. Allied Manufacturing Company, et al.</u>, in the Circuit Court for Jackson County, Missouri at Independence, No. 99-CV-220517, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Deposition of **JAMES W. SMITH**, taken on April 9, 2001, <u>In Re: Asbestos Products Liability Litigation</u>, in the United States District Court for the District of Kansas, No. 875, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Deposition of **JAMES W. SMITH**, taken on August 24, 2001, in <u>Eugene E. Soule, et al. v. A.P. Green Refractories, Inc., et al.</u>, in the Circuit Court for Jackson County, Missouri at Kansas City, No. 00-CV-227315, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Deposition of **JAMES W. SMITH**, taken on October 25, 2002, in <u>Carollyn J. Marcek v. The Flintkote Company, et al.</u>, in the District Court for Tarrant County, Texas, 352nd Judicial District, No. 352-190894-02, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Deposition of **JOSEPH L. WOLF, JR.**, taken on October 24, 2002 (V.I), in <u>Dwight Baker, et al. v. Allied Manufacturing Company, et al.</u>, in the Circuit Court for Jackson County, Missouri at Independence, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Deposition of **JOSEPH L. WOLF, JR.**, taken on December 18, 2002 (V.II), in <u>Dwight Baker, et al. v. Allied Manufacturing Company, et al.</u>, in the Circuit Court for Jackson

County, Missouri at Independence, No. 022CV202691, designated against **T.H. AGRICULTURE & NUTRITION COMPANY, LLC.**, in its entirety.

Thomas Patrick Norris
c/o Union Carbide Corp
Mr. Norris will testify regarding his experience with Union Carbide. Please see his deposition in Gravitt v. Bondex International, No 48 191131 02, Tarrant County, Texas, August 7, 2002.

The following are Union Carbide persons with knowledge of relevant facts, who will appear by **prior written deposition** at any all trials against Union Carbide, some of whom will offer expert testimony and some of whom will offer factual testimony. Most of the transcripts were provided by Union Carbide counsel of record as witness statements, party opponent admissions or admissions against interest. Many of the witnesses are unavailable for trial, but the most recent contact information would be within the care, custody or control of Union Carbide. They may be contacted by and through the attorney of record who represented them at the deposition:

Siobhan Handley
Orrick, Herrington & Sutcliffe, LLP
666 Fifth Avenue
New York, New York 10103-0001
212-506-5000 (telephone)
212-506-5151 (facsimile)

| | | |
|---|---|---|
| John Meyers | Carl Martino | Robert E. Peele |
| Mark Van Baalen | Howard Stephens | Myron Bennett |
| Newell Bolton | Paul Spoonamore | Edward T. Kleber |
| Ed DeBor | Richard J. Sexton | James Rawlings |
| Carl Durnehl | Gran Townsend | Harrison Rhodes |
| Allen Gibbs | William Paul Woods | Ian Sayers |
| Herb Giffens | Bert K. Barton | William Thurber |
| Thomas Hall | Joseph O. Keeler | John Walsh |
| Edward Ilgren | Roy E. Joyner | Paul W. McDaniel |
| Blair Ingalls | Sam L. Footer | Leonel Trevino |
| Newton Ketchum | William Neal | Douglas Merrill |
| Hilton Lewinsohn | Thomas Norris | Robert E. Byrne |

Anthony Pantaleoni
c/o Crane Co.
Mr. Pantaleoni, corporate representative of Crane Co, will testify regarding his experience with Crane Co., Crane Co. knowledge and conduct, and Crane Co. products. Please see his deposition in Robert Baxter v. Alfa Laval Inc, et al, CA NO – 05-4314, Commonwealth of Massachusetts, Middlesex, SS, June 14, 2006.

Thomas Keenan
c/o Elliot Turbomachinery.
Mr. Keenan, corporate representative of Elliot, will testify regarding his experience with Elliot, Elliot knowledge and conduct, and Elliot products. Please see his deposition in

ANSWERS TO MASTER DISCOVERY                                                                          Page 66
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp - White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 131 of 181

GST-EST-0521473

Robert Baxter v. Alfa Laval Inc, et al, CA NO – 05-4314, Commonwealth of Massachusetts, Middlesex, SS, June 15, 2006.

Alan West
C/O: Yarway Corporation.
Mr. West, corporate representative of Yarway, will testify regarding his experience with Yarway, Yarway knowledge and conduct, and Yarway products. Please see his deposition in Robert Baxter v. Alfa Laval Inc, et al, CA NO – 05-4314, Commonwealth of Massachusetts, Middlesex, SS, June 1, 2006.

Robert Marecek (Librarian & Custodian of Records for the N.S.C.)
National Safety Council Office
1121 Spring Lake Drive
Itasca, Illinois 60143-3201
630-285-1121

Mr. Marecek will testify live or by deposition regarding the storage retention, authenticity and business records and/or ancient nature of National Safety Council (NSC) documents as well as different companies who were members of the National Safety Council. He may also testify regarding the distribution of NSC documents to members of the NSC. Copies of Mr. Marecek's prior deposition testimony in Plaintiff's possession will be made available for inspection upon request. Please see, for example, his deposition in Anderson v. Amoco, et al, cause number 00-10-06613, February 7th, 2003, In the 9th Judicial District, Montgomery County, Texas.

Sally J. Wilke (Custodian of IHF documents)
Industrial Health Foundation
34 Penn Circle West
Pittsburgh, PA 15206

Ms. Wilke will testify live or by deposition regarding the storage, retention, authenticity and business records and/or ancient nature of Industrial Hygiene Foundation (FKA Air Hygiene Foundation, NKA Industrial Health Foundation, collectively referred to here as IHF) documents as well as different companies who were members of the IHF. She may also testify regarding the distribution of IHF documents to members of the IHF. Copies of Ms. Wilke's prior deposition testimony in Plaintiff's possession will be made available for inspection upon request. Please see her depo in King v. Allied Signal, et al, cause number 2424C-03, January 8th, 2000, in the Circuit Court for the City of Newport News, Virginia.

Doris Fagan (Custodian of ATI documents)
c/o Asbestos Textile Institute

Ms. Fagan will testify live or by deposition regarding the storage retention, authenticity and business records and/or ancient nature of Asbestos Textile Institute (ATI) documents as well as different companies who were members of the ATI. She may also testify regarding the distribution of ATI documents to members of the ATI. Copies of Ms. Fagan's prior deposition testimony in Plaintiff's possession will be made available for inspection upon request. Please see her deposition in In Re Asbestos Cases, NO. 76-1206-2-D, District Court, County of Boulder, State of Colorado, May 23, 1979.

Deposition of Bondex, Int'l by and through its corporate representative John A. Flemming
c/o Bondex International

Mr. Flemming will testify live or by deposition regarding various matters related to the shipping and costs of shipping drywall materials and accessory products to various geographic areas of the United States. He may also testify regarding specific Bondex products. Please see his deposition taken in *Perla Filgueira et al. v. Benjamin Moore,* Cause No. 2005-42456; In the District Court, Harris County, Texas, 11th Judicial District, May 18, 2006. Copies of Mr. Flemmings deposition are in plaintiffs' possession and will be made available for inspection upon request.

Deposition of Georgia Pacific by and through its corporate representative Howard Schutte
c/o Georgia Pacific Corporation

Mr. Schutte will testify live or by definition regarding various matters related to Georgia Pacific's knowledge of the hazards of asbestos, Georgia Pacific's actions in response to the hazards of asbestos, the asbestos content and compilation of various Georgia Pacific drywall products, the corporate history of Georgia Pacific and any other matters relevant to this litigation. Please see his deposition taken in *Perla Filgueira et al. v. Benjamin Moore,* Cause No. 2005-42456; In the District Court, Harris County, Texas, 11th Judicial District, April 25, 2006. Copies of Mr. Schutte's deposition are in plaintiffs' possession and will be made available for inspection upon request.

Deposition of Jones-Blair Company by and through their corporate representative Daniel A. Hamblen.
c/o Jones-Blair Company

Mr. Hamblen will testify live or by definition regarding various matters related to Jones-Blair's knowledge of the hazards of asbestos, Jones-Blair's actions in response to the hazards of asbestos, the asbestos content and compilation of various Jones-Blair drywall products, the corporate history of Jones-Blair and any other matters relevant to this litigation. Please see his deposition taken in *Perla Filgueira et al. v. Benjamin Moore,* Cause No. 2005-42456; In the District Court, Harris County, Texas, 11th Judicial District, May 16, 2006. Copies of Mr. Hamblen's deposition are in plaintiffs' possession and will be made available for inspection upon request.

All witnesses listed by all Defendants.

All witnesses listed in Plaintiff's Answers to Interrogatories and any and all supplements and/or amendments thereto.

All witnesses deposed in this case.

All witnesses listed in any deposition taken in this case.

Any physician who has examined and/or treated Plaintiff.

Any and all records custodians, live or by deposition upon written questions.

ANSWERS TO MASTER DISCOVERY                                                                    Page 68
Q:\Asbestos\Dallas Office\Active Cases\WHITE, CHARLES\Discovery\MDL Master Discovery Resp – White.doc
Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 133 of 181

GST-EST-0521475

Any witness necessary for rebuttal.

**REQUEST NO. 194.2(g):**

Any indemnity and insuring agreements described in Rule 192.3(f).

**RESPONSE:**  None

**REQUEST NO. 194.2(h):**

Any settlement agreements described in Rule 192.3(g).

**RESPONSE:**  None

**REQUEST NO. 194.2(i):**

Any witness statements described in Rule 192.3(h).

**RESPONSE:**  None

**REQUEST NO. 194.2(j):**

In a suit alleging physical or mental injury and damages from the occurrence that is the subject of the case, all medical records and bills that are reasonably related to the injuries or damages asserted or, in lieu thereof, an authorization permitting the disclosure of such medical records and bills.

**RESPONSE:**  Please see all medical and billing records in Plaintiff's possession, attached as Exhibit "6". In addition, a medical authorization is attached hereto by which Defendants can obtain these records.

**REQUEST NO. 194.2(k):**

In a suit alleging physical or mental injury and damages from the occurrence that is the subject of the case, all medical records and bills obtained by the responding party by virtue of an authorization furnished by the requesting party.

**RESPONSE:**  See response to Request 194.2(i).

**REQUEST NO. 194.2(l):**

The name, address, and telephone number of any person who may be designated as a responsible third party.

**RESPONSE:**  Not applicable.

GST-EST-0521476

# CHARLES WHITE
## Doctor List

Dr. Charles Bennett
11845 H.G. Truman Rd.
Lusby, MD 20657
(410) 326-6344

M. Blair Marshall
Georgetown University Hospital
3800 Reservoir Rd., NW
Pasquerilla Healthcare Center, 4th Floor
Washington, D,C. 20007
(202) 444-5045

Dr. Shakun Malik
Lombardi Cancer Center
Georgetown University Hospital
3800 Reservoir Rd.
Washington, D.C. 20007
(202) 444-2198

PLAINTIFF'S EXHIBIT

# CHARLES WHITE
## Hospital List

Georgetown University Hospital
3900 Reservoir Road
Washington, D.C.  20007
(202) 444-2000

PLAINTIFF'S
EXHIBIT
2

NAME:    **CHARLES C. WHITE**

## PLAINTIFF IS A LIFE-LONG NON-SMOKER

DID YOU EVER USE:    CIGARETTES ( ) CHEWING TOBACCO ( ) CIGARS ( ) PIPE ( ) SNUFF ( )

IF YOU SMOKED CIGARS OR CIGARETTES, DID YOU INHALE?

DATES YOU HAVE SMOKED:

HOW MUCH TOBACCO PRODUCT DO YOU USE EACH DAY?

IF YOU HAVE EVER STOPPED SMOKING, PLEASE STATE YOUR REASONS FOR QUITTING:

IF, AFTER QUITTING SMOKING, YOU STARTED SMOKING AGAIN, PLEASE GIVE THE REASON YOU RESTARTED:

NAME ALL BRANDS OF TOBACCO YOU HAVE USED:

HAVE YOU EVER BEEN ADVISED TO QUIT SMOKING?

NAME AND ADDRESS OF PHYSICIAN ADVISING YOU TO QUIT:

DID YOU QUIT?

HAVE YOU BEEN ADVISED THAT CIGARETTE SMOKING IS HARMFUL?

HAVE YOU BEEN ADVISED THAT CIGARETTE SMOKING CAN CAUSE CANCER?

HOW DID YOU LEARN THIS INFORMATION?

ARE YOU AWARE OF THE WARNING BY THE SURGEON GENERAL REGARDING THE DANGERS OF SMOKING?

IF YES, WHEN DID YOU FIRST LEARN?

HAVE YOU EVER READ THE SURGEON GENERAL'S WARNING?

HAVE YOU USED TOBACCO PRODUCTS SINCE READING THE SURGEON GENERAL'S REPORT?

**PLAINTIFF'S EXHIBIT**
3

GST-EST-0521479

NAME: <u>CHARLES WHITE</u>

NICKNAMES: _____

## **WORK HISTORY SHEET**



WORK HISTORY SHEET OF CHARLES WHITE



GST-EST-0521480

## EXHIBIT A

## MATERIALS THAT MAY HAVE CONTAINED ASBESTOS USED ON THESE JOBS:

|  | worked with | worked around |
|---|---|---|
| **GASKETS** | | |
| Cranite | X | X |
| Garlock | X | X |
| John Crane | X | X |
| Sterling | X | X |
| **PACKING** | | |
| Cranite | X | X |
| **PUMPS** | | |
| Buffalo | X | X |
| Carver | X | X |
| Cochrane | X | X |
| Goulds | X | X |
| Ingersoll Rand | X | X |
| Peerless | X | X |
| Warren | X | X |
| Worthington | X | X |
| **STEAM WINCHES:** | X | |
| **VALVES** | | |
| Chapman | X | X |
| Crane | X | X |
| Leslie | X | X |
| Mueller | X | X |

WORK HISTORY SHEET OF CHARLES WHITE

GST-EST-052148

NAME: <u>CHARLES WHITE</u>

NICKNAMES: _____

## **WORK HISTORY SHEET**



WORK HISTORY SHEET OF CHARLES WHITE

GST-EST-0521482

## MATERIALS THAT MAY HAVE CONTAINED ASBESTOS USED ON THESE JOBS:

|  | worked with | worked around |
|---|---|---|
| **ASBESTOS SIDING:** | | |
| CertainTeed | X | |
| **FLOOR TILE:** | | |
| Kentile | X | |
| **JOINT COMPOUND:** | | |
| Georgia Pacific | X | |

WORK HISTORY SHEET OF CHARLES WHITE



GST-EST-0521484

# Authorization for Disclosure of Protected Health Information
## Pursuant to HIPAA 45 C. F. R. 164.512

I authorize the use/disclosure of health information as described below.

1. Person(s) or class of persons authorized to disclose the information:

2. Person(s) or class of persons to whom the information may be disclosed: I understand that this may include information relating to acquired immunodeficiency syndrome (AIDS) or infection with HIV (Human Immunodeficiency Virus), psychiatric care, treatment for alcohol and/or drug abuse, and/or genetic testing.

3. Description of information to be disclosed: Medical records and reports, patient information and history forms, x-rays, x-rays reports, pathology, pathology reports, insurance records, health care providers' reports and consultations, prescriptions, off-work slips, therapy records, lab reports, notes, tests and billing records and statements. From _____ to _____ (dates).

4. The information will be used/disclosed for the following purposes: Use for discovery purposes and as evidence in the lawsuit styled:

_____

(the "Lawsuit").

5. I understand that the health information described above may be redisclosed and no longer protected by federal and state privacy regulations.

6. I understand that my healthcare or payment for healthcare will not be affected if I refuse to sign this authorization.

7. In consideration of the release of information by _____ in accordance with this request, I hereby release _____, its agents, servants, and employees from any and all claims, demands, or liability of any kind, which might arise out of the release of such information and the effects thereof.

I understand that I have the right to revoke this authorization in writing at any time by sending written notice of revocation to: (persons listed in paragraph 1). I understand that my revocation of this authorization will not be effective as to uses and/or disclosures of my health information that the person(s) and/or organizations listed above have already made in reference to this authorization.

This authorization expires 180 days from the date signed.

_____

Signature of patient or personal
representative

If signed by personal representative
state authority (ex. Power of attorney)

_____

Printed name of patient

Date

_____

Date of birth      Social Security No.

Former/alias/maiden name

PLAINTIFF'S EXHIBIT
A

GST-EST-0521485

# REQUEST FOR SOCIAL SECURITY EARNINGS INFORMATION

**1.** From whose record do you need the earnings information?

Print the Name, Social Security Number (SSN), and date of birth below.

| | |
|---|---|
| Name _____ | Social Security Number _____ |
| Other Name(s) Used (Include Maiden Name) _____ | Date of Birth (Mo/Day/Yr) _____ |

**2.** What kind of information do you need?

☐ **Detailed Earnings Information**
(If you check this block, tell us below why you need this information.)

For the period(s)/year(s): _____

_____

☐ **Certified Total Earnings For Each Year.**
(Check this box only if you want the information certified. Otherwise, call 1-800-772-1213 to request Form SSA-7004, Request for Earnings and Benefit Estimate Statement)

For the year(s): _____

**3.** If you owe us a fee for this detailed earnings information, enter the amount due using the chart on page 3 . . . . . . . . . . . . . . . . . . . . . . . . . . **A. $** _____

Do you want us to certify the information?  ☐ Yes  ☐ No

If yes, enter $15.00 · · · · · · · · · · · · · · · · · · · · · · · **B. $** _____

ADD the amounts on lines A and B, and enter the TOTAL amount . . . . . . . . . . . . . . . . . . . . . . . . **C. $** _____

- You can pay by CREDIT CARD by completing and returning the form on page 4, or
- Send your CHECK or MONEY ORDER for the amount on line C with the request and make check or money order payble to "Social Security Administration."
- DO NOT SEND CASH.

**4.** I am the individual to whom the record pertains (or a person who is authorized to sign on behalf of that individual). I understand that any false representation to knowingly and willfully obtain information from Social Security records is punishable by a fine of not more than $5,000 or one year in prison.

SIGN your name here
(Do not print) > _____  Date _____

Daytime Phone Number _____
(Area Code) (Telephone Number)

**5.** Tell us where you want the information sent. (Please print)

Name _____  Address _____

City, State & Zip Code _____

**6.** Mail Completed Form(s) To:

Social Security Administration
Division of Earnings Record Operations
P.O. Box 33003
Baltimore Maryland 21290-3003

**Exception:** If using private contractor (e.g., FedEx) to mail form(s), use:

Social Security Administration
Division of Earnings Record Operations
300 N. Greene St.
Baltimore Maryland 21290-0300

Form SSA-7050-F4 (1-2004) EF (01-2004)  2

PLAINTIFF'S EXHIBIT B

SS-EST-0521486

**Form Approved**
**OMB No. 0960-0566**

# Social Security Administration
## Consent for Release of Information

TO:  Social Security Administration

Name _____ Date of Birth _____ Social Security Number _____

I authorize the Social Security Administration to release information or records about me to:

          NAME                          ADDRESS

I want this information released because:

(There may be a charge for releasing information.)

Please release the following information:

—    Social Security Number
—    Identifying information (includes date and place of birth, parents' names)
—    Monthly Social Security benefit amount
—    Monthly Supplemental Security Income payment amount
—    Information about benefits/payments I received from _____ to _____
—    Information about my Medicare claim/coverage from _____ to _____
      (specify)
—    Medical records
—    Record(s) from my file (specify)

—    Other (specify)

I am the individual to whom the information/record applies or that person's parent (if a minor) or legal guardian. I know that if I make any representation which I know is false to obtain information from Social Security records, I could be punished by a fine or imprisonment or both.

Signature: _____
(Show signatures, names, and addresses of two people if signed by mark.)
Date: _____ Relationship: _____

SSA-3288 Internet (12/98)



GST-EST-0521487

# PAYROLL AND PERSONNEL RECORDS AUTHORIZATION

TO WHOM IT MAY CONCERN:

    I hereby authorize you to provide to:

_____

at this address:

_____

_____

a complete copy of all records pertaining to my employment, including but not limited to

all personnel, payroll, medical or hospital records pertaining to:

Full Name _____

Date of Birth _____ Social Security No. _____

My dates of employment were from _____ to _____

I worked in the following departments:

_____

_____

I was employed at the following office:

_____

SIGNED: _____

DATE: _____

| **EXHIBIT D** |
|---|

PLAINTIFF'S EXHIBIT D

GST-EST-0521488

OMB Number: 2900-0260
Estimated burden: 2 minutes
Expiration Date: 10/31/2003

| (VA) Department of Veterans Affairs | REQUEST FOR AND AUTHORIZATION TO RELEASE MEDICAL RECORDS OR HEALTH INFORMATION |

The Paperwork Reduction Act of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of section 3507 of the Act. We may not conduct or sponsor, and you are not required to respond to, a collection of information unless it displays a valid OMB number. We expect that the time expended by all individuals completing this form will average 2 minutes. This includes the time to read instructions, gather the necessary facts and fill out the form. The purpose of this form is to specifically outline the circumstances under which we may disclose data.

The execution of this form does not authorize the release of information other than that specifically described below. The information requested on this form is solicited under Title 38, U.S.C. The form authorizes release of information in accordance with the Health Insurance Portability and Accountability Act, 45 CFR Parts 160 and 164, 5 U.S.C. 552a, and 38 U.S.C. 5701 and 7332 that you specify. Your disclosure of the information requested on this form is voluntary. However, if the information including Social Security Number (SSN) (the SSN will be used to locate records for release) is not furnished completely and accurately, Department of Veterans Affairs will be unable to comply with the request. The Veterans Health Administration may not condition treatment, payment, enrollment or eligibility on signing the authorization.

**ENTER BELOW THE PATIENT'S NAME AND SOCIAL SECURITY NUMBER IF THE PATIENT DATA CARD IMPRINT IS NOT USED.**

| TO: DEPARTMENT OF VETERANS AFFAIRS (Print or type name and address of health care facility) | PATIENT NAME (Last, First, Middle Initial) |
| | SOCIAL SECURITY NUMBER |

NAME AND ADDRESS OF ORGANIZATION, INDIVIDUAL OR TITLE OF INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

**VETERAN'S REQUEST:** I request and authorize Department of Veterans Affairs to release the information specified below to the organization, or individual named on this request. I understand that the information to be released includes information regarding the following condition(s):

☐ DRUG ABUSE   ☐ ALCOHOLISM OR ALCOHOL ABUSE   ☐ TESTING FOR OR INFECTION WITH HUMAN IMMUNODEFICIENCY VIRUS (HIV)   ☐ SICKLE CELL ANEMIA

**INFORMATION REQUESTED** (Check applicable box(es) and state the extent or nature of the information to be disclosed, giving the dates or approximate dates covered by each)

☐ COPY OF HOSPITAL SUMMARY   ☐ COPY OF OUTPATIENT TREATMENT NOTE(S)   ☐ OTHER (Specify)

PURPOSE(S) OR NEED FOR WHICH THE INFORMATION IS TO BE USED BY INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

**NOTE: ADDITIONAL ITEMS OF INFORMATION DESIRED MAY BE LISTED ON THE BACK OF THIS FORM**

**AUTHORIZATION:** I certify that this request has been made freely, voluntarily and without coercion and that the information given above is accurate and complete to the best of my knowledge. I understand that I will receive a copy of this form after I sign it. I may revoke this authorization, in writing, at any time except to the extent that action has already been taken to comply with it. Written revocation is effective upon receipt by the Release of Information Unit at the facility housing the records. Redisclosure of my medical records by those receiving the above authorized information may be accomplished without my further written authorization and may no longer be protected. Without my express revocation, the authorization will automatically expire: (1) upon satisfaction of the need for disclosure; (2) on _____ (date supplied by patient); or (3) under the following conditions(s):

I understand that the VA health care practitioner's opinions and statements are not official VA decisions regarding whether I will receive other VA benefits or, if I receive VA benefits, their amount. They may, however, be considered with other evidence when these decisions are made at a VA Regional Office that specializes in benefit decisions.

| DATE | SIGNATURE OF PATIENT OR PERSON AUTHORIZED TO SIGN FOR PATIENT (Attach authority to sign, e.g., POA) |

**FOR VA USE ONLY**

| IMPRINT PATIENT DATA CARD (Name, Address, Social Security Number) | TYPE AND EXTENT OF MATERIAL |
| | DATE | RELEASED BY |


PLAINTIFF'S EXHIBIT

# REQUEST PERTAINING TO MILITARY RECORDS

To ensure the best possible service, please thoroughly review the accompanying instructions before filling out this form. Please print clearly or type. If you need more space, use plain paper.

## SECTION I - INFORMATION NEEDED TO LOCATE RECORDS (Furnish as much as possible.)

| 1. NAME USED DURING SERVICE (last, first, and middle) | 2. SOCIAL SECURITY NO. | 3. DATE OF BIRTH | 4. PLACE OF BIRTH |
|---|---|---|---|
| | | | |

**5. SERVICE , PAST AND PRESENT** (For an effective records search, it is important that all service be shown below.)

| BRANCH OF SERVICE | DATES OF SERVICE | | CHECK ONE | | SERVICE NUMBER DURING THIS PERIOD (If unknown, write "unknown") |
|---|---|---|---|---|---|
| | DATE ENTERED | DATE RELEASED | OFFICER | ENLISTED | |
| a. ACTIVE SERVICE | | | | | |
| b. RESERVE SERVICE | | | | | |
| c. NATIONAL GUARD | | | | | |

6. IS THIS PERSON DECEASED? If "YES" enter the date of death.  ☐ NO  ☐ YES _____

7. IS (WAS) THIS PERSON RETIRED FROM MILITARY SERVICE?  ☐ NO  ☐ YES

## SECTION II – INFORMATION AND/OR DOCUMENTS REQUESTED

**1. REPORT OF SEPARATION** (DD Form 214 or equivalent). This contains information normally needed to verify military service. A copy may be sent to the veteran, the deceased veteran's next of kin, or other persons or organizations if authorized in Section III, below. NOTE: If more than one period of service was performed, even in the same branch, there may be more than one Report of Separation. Be sure to show EACH year that a Report of Separation was issued, for which you need a copy.

☐ An UNDELETED Report of Separation is requested for the year(s) _____

This normally will be a copy of the full separation document including such sensitive items as the character of separation, authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and dates of time lost. An undeleted version is ordinarily required to determine eligibility for benefits.

☐ A DELETED Report of Separation is requested for the year(s) _____

The following information will be deleted from the copy sent: authority for separation, reason for separation, reenlistment eligibility code, separation(SPD/SPN) code, and for separations after June 30, 1979, character of separation and dates of time lost.

**2. OTHER INFORMATION AND/OR DOCUMENTS REQUESTED**

**3. PURPOSE** (Optional – An explanation of the purpose of the request is strictly voluntary. Such information may help the agency answering this request to provide the best possible response and will in no way be used to make a decision to deny the request.)

## SECTION III - RETURN ADDRESS AND SIGNATURE

**1. REQUESTER IS:**

☐ Military service member or veteran identified in Section I, above
☐ Next of kin of deceased veteran _____ (relation)
☐ Legal guardian (must submit copy of court appointment)
☐ Other (specify)

**2. SEND INFORMATION/DOCUMENTS TO:**
(Please print or type. See item 3 on accompanying instructions.)

**3. AUTHORIZATION SIGNATURE REQUIRED** (See item 2 on accompanying instructions.) I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the information in this Section III is true and correct.

Signature of requester (Please do not print.)

Name _____

Street _____ Apt. _____

City _____ State _____ Zip Code _____

Date of this request _____ Daytime phone ( ) _____

Email address _____

PLAINTIFF'S EXHIBIT

GST-EST-0521490

# LOCATION OF MILITARY RECORDS

The various categories of military service records are described in the chart below. For each category there is a code number which indicates the address at the bottom of the page to which this request should be sent. Please refer to the Instruction and Information Sheet accompanying this form as needed.

| BRANCH | CURRENT STATUS OF SERVICE MEMBER | ADDRESS CODE | |
| --- | --- | --- | --- |
| | | Personnel Record | Health Record |
| AIR FORCE | Discharged, deceased, or retired before 5/1/1994 | 14 | 14 |
| | Discharged, deceased, or retired on or after 5/1/1994 | 14 | 11 |
| | Active (including National Guard on active duty in the Air Force), TDRL, or general officers retired with pay | 1 | |
| | Reserve, retired reserve in nonpay status, current National Guard officers not on active duty in the Air Force, or National Guard released from active duty in the Air Force | 2 | |
| | Current National Guard enlisted not on active duty in the Air Force | 13 | |
| COAST GUARD | Discharge, deceased, or retired before 1/1/1898 | 6 | |
| | Discharged, deceased, or retired 1/1/1898 – 3/31/1998 | 14 | 14 |
| | Discharged, deceased, or retired on or after 4/1/1998 | 14 | 11 |
| | Active, reserve, or TDRL | 3 | |
| MARINE CORPS | Discharged, deceased, or retired before 1/1/1905 | 6 | |
| | Discharged, deceased, or retired 1/1/1905 – 4/30/1994 | 14 | 14 |
| | Discharged, deceased, or retired on or after 5/1/1994 | 14 | 11 |
| | Individual Ready Reserve or Fleet Marine Corps Reserve | 5 | |
| | Active, Selected Marine Corps Reserve, TDRL | 4 | |
| ARMY | Discharged, deceased, or retired before 11/1/1912 (enlisted) or before 7/1/1917 (officer) | 6 | |
| | Discharged, deceased, or retired 11/1/1912 – 10/15/1992 (enlisted) or 7/1/1917 – 10/15/1992 (officer) | 14 | 14 |
| | Discharged, deceased, or retired on or after 10/16/1992 | 14 | 11 |
| | Reserve; or active duty records of current National Guard members who performed service in the U.S. Army before 7/1/1972 | 7 | |
| | Active enlisted (including National Guard on active duty in the U.S. Army) or TDRL enlisted | 9 | |
| | Active officers (including National Guard on active duty in the U.S. Army) or TDRL officers | 8 | |
| | Current National Guard enlisted not on active duty in Army (including records of Army active duty performed after 6/30/1972) | 13 | |
| | Current National Guard officers not on active duty in Army (including records of Army active duty performed after 6/30/1972) | 12 | |
| NAVY | Discharged, deceased, or retired before 1/1/1886 (enlisted) or before 1/1/1903 (officer) | 6 | |
| | Discharged, deceased, or retired 1/1/1886 – 1/30/1994 (enlisted) or 1/1/1903 – 1/30/1994 (officer) | 14 | 14 |
| | Discharged, deceased, or retired 1/31/1994 – 12/31/1994 | 14 | 11 |
| | Discharged, deceased, or retired on or after 1/1/1995 | 10 | |
| | Active, reserve, or TDRL | 10 | |
| PUBLIC HEALTH SERVICE | Commissioned Corps -- active, inactive, terminated, retired | 15 | |

## ADDRESS LIST OF CUSTODIANS (BY CODE NUMBERS SHOWN ABOVE) -- Where to write/send this form

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| 1 | Air Force Personnel Center HQ AFPC/DPSRP 550 C Street West, Suite 19 Randolph AFB, TX 78150-4721 | 6 | National Archives & Records Administration Old Military and Civil Records (NWCTB-Military) Textual Services Division 700 Pennsylvania Ave., N.W. Washington, DC 20408-0001 | 11 | Department of Veterans Affairs Records Management Center P.O. Box 5020 St. Louis, MO 63115-5020 |
| 2 | Air Reserve Personnel Center /DSMR HQ ARPC/DPSSA/B 6760 E. Irvington Place, Suite 4600 Denver, CO 80280-4600 | 7 | Commander U.S. Army Reserve Personnel Command ATTN: ARPC-ZCC-B 1 Reserve Way St. Louis, MO 63132-5200 | 12 | Army National Guard Readiness Center NGB-ARP 111 S. George Mason Dr. Arlington, VA 22204-1382 |
| 3 | Commander, CGPC-adm-3 USCG Personnel Command 4200 Wilson Blvd., Suite 1100 Arlington, VA 22203-1804 | 8 | U.S. Total Army Personnel Command ATTN: TAPC-MSR-S 200 Stovall Street Alexandria, VA 22332-0444 | 13 | The Adjutant General (of the appropriate state, DC, or Puerto Rico) |
| 4 | Headquarters U.S. Marine Corps Personnel Management Support Branch (MMSB-10) 2008 Elliot Road Quantico, VA 22134-5030 | 9 | Commander USAEREC ATTN: PCRE-F 8899 E. 56th St. Indianapolis, IN 46249-5301 | 14 | National Personnel Records Center (Military Personnel Records) 9700 Page Ave. St. Louis, MO 63132-5100 |
| 5 | Marine Corps Reserve Support Command (Code MMI) 15303 Andrews Road Kansas City, MO 64147-1207 | 10 | Navy Personnel Command (PERS-313C1) 5720 Integrity Drive Millington, TN 38055-3130 | 15 | Division of Commissioned Personnel ATTN: Records Officer 5600 Fishers Lane, Room 4-36 Rockville, MD 20857-0001 |

GST-EST-0521491



Send To:
TEXAS WORKERS' COMPENSATION COMMISSION
7551 Metro Center Drive, Suite 100, MS-92B
Austin, TX 78744

# REQUEST FOR COPIES OF
# CONFIDENTIAL CLAIMANT INFORMATION

SUBMIT A SEPARATE TWCC-153
FOR EACH TWCC OR IAB #

Please carefully read the information on both sides of this form and the accompanying instructions. INCORRECTLY COMPLETED FORMS WILL BE RETURNED TO REQUESTOR WITHOUT ACTION. Use this form to request the confidential information listed below. This form must be signed by a party eligible to receive the information requested. The signature must be notarized.

**(Please type or print)**

## I. CLAIM FILE IDENTIFICATION. Provide the following information to identify the requested claim file.

| TWCC or IAB Number | | | Employee's Social Security Number | | | – | | – | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Employee's Name | | | Employee's Date of Injury | | | | | | | |
| Last | First | MI | | m m | | d d | | | y y | |

## II. REQUESTOR INFORMATION. Provide the following information pertaining to the requestor.

| Name | TWCC/Representative Box No. (If Applicable): |
|---|---|
| Address | Prepaid Account No. (If Applicable): |
| City, State | ZIP | Telephone No. ( ) | ☐ Authorized Legal Representative Statement on File |

## III. INFORMATION REQUESTED. Please indicate the information and services requested.
Copy Fees: $1.00/first page - $0.30/each additional page    Certification Fee: $1.00

☐ **CLAIM FILE INFORMATION - TWCC REPROGRAPHICS DEPARTMENT - (512) 804-4990**
Provides paper copies of claim information maintained by the Commission in the original claim file and/or electronic data stored on TWCC computer.

☐ Certified    ☐ Uncertified
☐ Expedited Handling Request ($25.00 Additional Charge)
☐ Claim File (Complete)
☐ Specific document in file:_____    ☐ Dispute Resolution Contact Data (Electronic)
☐ Other (Specify) _____

A FEE STATEMENT WILL BE SENT TO REQUESTOR. COPIES WILL BE AVAILABLE UPON RECEIPT OF PAYMENT.

☐ **MEDICAL RECORDS INFORMATION - TWCC MEDICAL REVIEW DIVISION - (512) 804-4812**
Provides paper copies of claim information maintained in specific TWCC Medical Division records.

Tracking No: _____
☐ Expedited Handling Request ($25.00 Additional Charge)
☐ Spinal Surgery File (Complete)    ☐ Medical Dispute File (Complete)
☐ Specific File Document
☐ Medical Dispute Resolution Contact Data (Electronic)

A FEE STATEMENT WILL BE SENT TO REQUESTOR. COPIES WILL BE AVAILABLE UPON RECEIPT OF PAYMENT.

☐ **HEARINGS RECORD - TWCC HEARINGS DIVISION - (512) 804-4060**
Provides information received at TWCC hearings pertaining to disputes between the health care provider, the carrier, the employee, the employer and/or TWCC. (Applies to claims with date of injury after January 1, 1991 only.)
☐ Certified    ☐ Uncertified    TWCC Docket No: _____
☐ Expedited Handling Requested ($25.00 Additional Charge)
☐ Complete Hearings Record
☐ Specific document in record: _____ (example: transcript, original petition, etc.)
☐ Video Tape (if available) $5.72    ☐ Audio Tape $3.60 each

REQUESTOR WILL BE ADVISED OF CHARGES. COPIES WILL BE AVAILABLE UPON RECEIPT OF PAYMENT.
DEPOSIT REQUIRED FOR TAPE TRANSCRIPTION:  $350.00/hour (estimate).

**COMPLETE**                    **BOTH**                    **SIDES**

TWCC-153 (Rev. 07/04) Page 1                    TEXAS WORKERS' COMPENSATION COMMISSION

PLAINTIFF'S EXHIBIT G

GST-EST-0521492

**IMPORTANT:** BY EXECUTING THIS FORM, REQUESTOR REPRESENTS THAT HE OR SHE IS ENTITLED TO THE INFORMATION REQUESTED AND THAT HE OR SHE HAS FULL AUTHORITY TO ACT AS A REQUESTOR. REQUESTOR ALSO ACKNOWLEDGES HIS OR HER LIABILITY FOR PAYMENT OF ALL AMOUNTS OWED FOR SERVICES PROVIDED AS A RESULT OF THIS REQUEST.

**IV. REQUESTOR ELIGIBILITY AND NOTARIZATION. (PLEASE CHECK ONE BOX ONLY)**

The Texas Workers' Compensation Act, Texas Labor Code, Title 5, Section 402.084, limits the release of confidential information in or derived from a claim file to the categories of persons listed below. Indicate the category of eligibility, which qualifies you to receive the information requested. Sign and complete the notarization prior to sending the request to TWCC. Eligibility will be verified.

☐ The employee or the employee's legal beneficiary

☐ The employee or the legal beneficiary's representative (attach letter of representation)

☐ The employer at the time of injury. Requestor must provide injured employee's period of employment:

_____ to _____
mo./yr.      mo./yr.

☐ The Texas Certified Self-Insurer Guaranty Association Established under Subchapter G, Chapter 407, if that association has assumed the obligations of an impaired employer

☐ Health Care Provider who is a party to a Medical Dispute. (Section 413.031 of the Act.)

☐ The workers' compensation insurance carrier. Requestor must provide injured employee's date of injury or current claim: _____
mo./dy./yr.

☐ The Texas Property and Casualty Insurance Guaranty Association, if that association has assumed the obligations of an impaired insurance company

☐ A third party litigant in a lawsuit, in which the cause of action arises from the incident that gave rise to the injury. (COPY OF PETITION AND ANSWER MUST BE ATTACHED). Requestor must provide injured employee's date of injury _____
mo/yr

I have read and understood this form and the accompanying instructions. I am entitled to receive the confidential employee information being requested as indicated above. I understand that it is a Class A misdemeanor to unlawfully receive, publish, disclose, or distribute confidential information in or derived from an employee's claim file. [Texas Labor Code, Sections 402.064; 402.081; 402.083 - .084; 402.086 and 402.091]

Name of Requestor: _____
(Please Print)

Position/Title: _____

Firm Name: _____
(If applicable)

Federal Tax I.D.#: _____

Signature: _____
                                    Date

State of _____
County of _____

Before me on the above date personally appeared_____, who after first being sworn, said that the statements contained in this request are true.

Signed _____

Notary Public, State of_____

My Commission Expires_____

TEXAS WORKERS' COMPENSATION COMMISSION

GST-EST-0521493

Form **4506**
(Rev. January 2004)

Department of the Treasury
Internal Revenue Service

## Request for Copy of Tax Return

▶ **Do not sign this form unless all applicable parts have been completed.**
Read the instructions on page 2.
▶ Request may be rejected if the form is incomplete, illegible, or any required
part was blank at the time of signature.

OMB No. 1545-0429

**TIP:** You may be able to get your tax return or return information from other sources. If you had your tax return completed by a paid preparer, they should be able to provide you a copy of the return. The IRS can provide a **Tax Return Transcript** for many returns free of charge. The transcript provides most of the line entries from the tax return and usually contains the information that a third party (such as a mortgage company) requires. See new Form 4506-T, Request for Transcript of Tax Return, to order a transcript or you can call 1-800-829-1040 to order a transcript.

| | |
|---|---|
| 1a Name shown on tax return. If a joint return, enter the name shown first. | 1b First social security number on tax return or employer identification number (see instructions) |
| 2a If a joint return, enter spouse's name shown on tax return | 2b Second social security number if joint tax return |

**3** Current name, address (including apt., room, or suite no.), city, state, and ZIP code

**4** Address, (including apt., room, or suite no.), city, state, and ZIP code shown on the last return filed if different from line 3

**5** If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number. The IRS has no control over what the third party does with the tax return.

**CAUTION:** Lines 6 and 7 must be completed if the third party requires you to complete Form 4506. Do not sign Form 4506 if the third party requests that you sign Form 4506 and lines 6 and 7 are blank.

**6** Tax return requested (Form 1040, 1120, 941, etc.) and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶ _____

**Note:** If the copies must be certified for court or administrative proceedings, check here. . . . . . . . . . . . . . ☐

**7** Year or period requested. Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than four years or periods, you must attach another Form 4506.

___/___/___     ___/___/___     ___/___/___     ___/___/___

**8** Fee. There is a $39 fee for each return requested. Full payment must be included with your request or it will be rejected. Make your check or money order payable to "United States Treasury." Enter your SSN or EIN and "Form 4506 request" on your check or money order.

| | | |
|---|---|---|
| a Cost for each return . . . . . . . . . . . . . . . . . . . . . . . | $ | 39.00 |
| b Number of returns requested on line 7 . . . . . . . . . . . . . . . | | |
| c Total cost. Multiply line 8a by line 8b . . . . . . . . . . . . . . . | $ | |

**9** If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . ☐

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer.

**Sign Here**

Signature (see instructions)     Date

Telephone number of taxpayer on line 1a or 2a
( )

Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature     Date

For Privacy Act and Paperwork Reduction Act Notice, see page 2.     Cat. No. 41721E     Form **4506** (Rev. 1-2004)

**PLAINTIFF'S EXHIBIT**
4

SST-EST-0521494

## AUTHORIZATION FOR RELEASE OF RECORDS OF BANKRUPTCY TRUSTS AND CLAIMS RESOLUTION FACILITIES

**TO WHOM IT MAY CONCERN:**

This Authorization specifically allows the law firm of _____ _____, or any of its representatives to obtain all information requested from _____ ("the Trust"), including claim submissions, correspondence, and any information regarding exposure to asbestos or other hazardous substances, trace and occupation information, earnings, and any documents submitted by plaintiff/decedent seeking compensation through "the Trust."

In addition, this Authorization shall extend to any and all reports pertaining to medical screening, annual physical examinations, including X-rays, medical examination reports, and plaintiff/decedent waives any privilege which plaintiff/decedent may have regarding such reports, records and information for the purposes of this lawsuit.

A copy of this Authorization bearing my signature shall be as valid as the original.

Plaintiff/Decedent: _____

Social Security No: _____

Date of Birth: _____

Signature: _____

Name of Representative, if applicable: _____

Date: _____



GST-EST-0521495

## AUTHORIZATION FOR UNION RECORDS

TO WHOM IT MAY CONCERN:

This authorization specifically allows the law firm of _____
_____, or any of its representatives
to obtain all information requested from the unions of which plaintiff/decedent, _____
_____, was a member, including but not limited to, payroll
records and information, worker's compensation claim records, if any, health and dental
records, and any and all reports pertaining to medical screening, annual physical
examinations, including X-rays, medical examination reports, and plaintiff/decedent
waives any privilege which plaintiff/decedent may have regarding such reports, records
and information for the purposes of this lawsuit.

A copy of this authorization bearing my signature shall be as valid as the original.

Name of Union: _____
Address of Union: _____
_____
Dates of Union Membership: _____

Plaintiff/Decedent: _____
Social Security No: _____
Date of Birth: _____
Signature: _____
Name of Representative, if applicable: _____
Date: _____

PLAINTIFF'S
EXHIBIT
J

GST-EST-0521496




JEFFREY B. SIMON (NY, TX)
RON C. EDDINS (CA, TX)
DAVID C. GREENSTONE (CA, NY, TX)

ASSOCIATES
JENNIFER L. BARTLETT (CA)
CLAY B. CARROLL (TX)

SIMON, EDDINS & GREENSTONE, LLP

JES...
ROBE...
H.W. TF...
SAAR...
CHARLES W. BRANHAM (CA)
JAMIE A. NEWBOLD (CA)

PLEASE RESPOND TO THE TEXAS OFFICE

August 3, 2006

## VIA LEXISNEXIS
## TO ALL COUNSEL OF RECORD:

Re: *Charles White, et al v. Buffalo Pumps, Inc., et al;* Cause No. 2006-41943; In the 11th Judicial District Court of Harris County, Texas

*TRANSFERRED FROM*

*Charles White, et al v. Buffalo Pumps, Inc., et al;* Cause No. 06-06970-E; In the County Court at Law No. 5 in Dallas County, Texas.

Dear Counsel:

Attached please find Plaintiffs Charles White and Barbara Lorton's *Supplemental Answers to Master Discovery Requests* to all Defendants in all Asbestos-Related Personal Injury and Death Cases Filed in Harris County, including *Exhibit "5."*

If you have any questions, do not hesitate to call.

Sincerely,

*Chapman*

Christi Chapman
*Legal Assistant*

CWB/cfc
Attachments

**cc: All Counsel of Record via Lexis Nexis (See attached counsel list)**

TEXAS OFFICE:
3232 MCKINNEY AVENUE, SUITE 610
DALLAS, TEXAS 75204
TEL: 214.276.7680
FAX: 214.276.7699

ATTORNEYS & COUNSELORS AT LAW
www.seglaw.com

CALIFORNIA OFFICE:
211 E. OCEAN BLVD., SUITE 200
LONG BEACH, CALIF. 90802
TEL: 562.590.3400
FAX: 562.590.3411

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 155 of 181

GST-EST-0181690

| Counsel Name | Firm Name | Address | Phone | Fax | Party(s) Represented | E-mail |
|---|---|---|---|---|---|---|
| James H. Powers | Powers & Frost | 2400 One Houston Center, 1221 McKinney St., Houston, TX 77010 | 713-767-1555 | 713-767-1799 | Buffalo Pumps, Inc. | jpowers@powersfrost.com |
| Nathan Bosio | Dogan & Wilkinson | 734 Delmas Ave., Pascagoula, MS 39568 | 228-762-2272 | 228-762-3223 | Carver Pump Co. | nbosio@doganwilkinson.com |
| Michael J. Ramirez | Kirkpatrick & Lockhart Nicholson Graham, LLP | 2828 N. Harwood St., Ste. 1800, Dallas, TX 75201 | 214-939-4900 | 214-939-4949 | Crane Co. | mramirez@klng.com |
| Susan Ashmore | DeHay & Elliston | 901 Main St., Ste. 3500, Dallas, TX 75202 | 214-210-2400 | 214-210-2500 | Certainteed, Inc. Union Carbide Corp. | sashmore@dehay.com |
| Raymond Harris | Schachter Harris, LLP | 2300 Plaza of the Americas, 600 N. Pearl, LB 133, Dallas, TX 75201 | 214-999-5700 | 214-999-5747 | Garlock Sealing Tech. | rharris@schachterharris.com |
| John D. Carlos | Prichard Hawkins McFarland & Young | 10101 Reunion Pl., Ste. 600, San Antonio, TX 78216 | 210-477-7400 | 210-477-7450 | General Motors Corp. | jcarlos@phmy.com |
| L. Hayes Fuller, III | Naman Howell Smith & Lee | 900 Washington, 7th Floor, P.O. Box 1470, Waco, TX 76703 | 254-755-4100 | 254-754-3172 | Goulds Pumps, Inc. Goulds Pumps (NY), Inc. | fuller@namanhowell.com |
| Robert Wilkinson William Farrell | Dogan & Wilkinson | 734 Delmas Ave., Pascagoula, MS 39568 | 228-762-2272 | 228-762-3223 | Guard-Line, Inc. | rwilkinson@doganwilkinson.com |
| J. Michael Jordan | Gardere Wynne Sewell | 1000 Louisiana, Ste. 3400, Houston, TX 77002 | 713-276-5569 | 713-276-6569 | IMO Industries, Inc. | mjordan@gardere.com |
| Laura Frase | Forman Perry Watkins Krutz & Tardy | 2001 Bryan St., Ste. 1300, Dallas, TX 75201 | 214-678-5541 | 214-905-5976 | Ingersoll Rand Co. | lafrase@fpwk.com |
| Laura Kugler | Bailey Crowe & Kugler | 6550 Bank of America Plaza, 901 Main St., Ste. 4600, Dallas, TX 75202 | 214-231-0555 | 214-231-0556 | John Crane, Inc. | lkugler@bcklaw.com |
| Billy D. Anderson | Kent, Good, Anderson & Bush | Woodgate 1, Ste. 200, 1121 ESE Loop 323, Tyler, TX 75701 | 903-579-7500 | 903-581-3701 | Leslie Controls, Inc. | billya@tyler.net |

GST-EST-018169

| Counsel Name | Firm Name | Address | Phone | Fax | Party(s) Represented | E-mail |
|---|---|---|---|---|---|---|
| Ken Rhodes | Kacal, Adams & Law | One Riverway Ste. 1200 Houston, TX 77056 | 713-529-3992 | 713-621-4072 | Met Life Insurance Co. | kdrhodes@kalbc.com |
| Brian S. Clary | The Clary Firm | 408 Staitt Humble, TX 77338 | 281-548-1100 | 281-548-1126 | Mueller, Co. | bclary@claryfirm.com |
| Laurie B. Easter | McGinnis Lochridge & Kilgore, LLP | One Houston Center, Ste. 3200, 1221 McKinney St. Houston, TX 77010 | 713-651-8524 | 713-328-1824 | Mueller Steam Specialty PCC Flow Technologies Holdings, Inc. | leaster@mcginnislaw.com |
| Jillian J. Reisburg | DeHay & Elliston | 3500 Bank of America Plaza, 901 Main St. Dallas, TX 75202 | 214-210-2400 | 214-210-2500 | Sterling Fluid Sysesms (Peerless Pump Company) | jvr@dehay.com |
| Ken Royer | Beason Willingham | 808 Travis St., Ste. 1608 Houston, TX 77002 | 713-333-7600 | 713-333-7601 | Standco Industries, Inc. | kenr@beasonwillingham.com |
| Todd Ogden | Forman Perry Watkins Krutz & Tardy | 2001 Bryan St., Ste. 1300 Dallas, TX 75201 | 214-678-5546 | 214-905-3976 | Uniroyal Holdings, Inc. | tdogden@fpwk.com |
| Robert Thackston | Hawkins Parnell & Thackston | 4514 Cole Ave., Ste. 550 Dallas, TX 75205 | 214-780-5100 | 214-780-5200 | Warren Pumps, Inc. | rthackston@hnplegal.com |
| Alan Moore | Fanning Harper & Martinson | Two Energy Square 4849 Greenville Ave., Ste. 1300 Dallas, TX 75206 | 214-369-1300 | 214-987-9649 | Yarway Corporation | amoore@fhmlaw.com |

| | | |
|---|---|---|
| CHARLES WHITE and spouse BARBARA LORTON, | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | HARRIS COUNTY, TEXAS |
| BUFFALO PUMPS, INC., ET AL | § § | 11TH JUDICIAL DISTRICT |

---

## TRANSFERRED FROM

---

CAUSE NO. 06-06970-E

| | | |
|---|---|---|
| CHARLES WHITE and spouse BARBARA LORTON, | § § § | IN THE COUNTY COURT |
| VS. | § § | AT LAW NO. 5 |
| BUFFALO PUMPS, INC., ET AL | § § | DALLAS COUNTY, TEXAS |

---

### PLAINTIFF'S SUPPLEMENTAL ANSWERS TO MASTER DISCOVERY REQUESTS TO ALL DEFENDANTS IN ALL ASBESTOS-RELATED PERSONAL INJURY AND DEATH CASES FILED IN HARRIS COUNTY

TO: ALL DEFENDANTS, by and through their counsel of record.

COME NOW Plaintiffs, CHARLES WHITE and spouse BARBARA LORTON, Plaintiffs herein and by and through their counsel of record, file this their Supplemental Answers to Master Discovery Requests propounded by all defendants and also in response and supplemental response to written discovery previously propounded by the defendants to the plaintiff and responses to any and all defendants' Rule 194 Requests for Disclosure pursuant to the Texas Rules of Civil Procedure.

Respectfully submitted,
**SIMON, EDDINS & GREENSTONE, LLP**

DAVID C. GREENSTONE
State Bar No. 24007271
JESSICA M. DEAN
State Bar No. 24040777

3232 McKinney Avenue   Suite 610
Dallas, Texas 75204
214-276-7680
214-276-7699 Fax

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Instrument was sent via Lexis Nexis to all counsel of record on the 3rd day of August, 2006 .

JESSICA M. DEAN

GST-EST-018169

**INTERROGATORY NO. 6:**

Using extreme diligence, provide detailed work and asbestos exposure history of the plaintiff/decedent (or if exposure is claimed through another person, of that other person) to include the following information (provide answers to each subpart):

(a)    the location and name of the owner/occupier of each premises, the specific unit or area of the premises where exposure to asbestos is alleged to have occurred;

(b)    the manufacturer, description, model name and number, serial number, and location at the time of plaintiff/decedent's alleged exposure, of any and all equipment, including but not limited to Heavy Equipment, pumps, vessels, boilers, turbines, furnaces, tractors, engines, mobile or affixed equipment containing or utilizing asbestos or asbestos-containing products or component part(s) to which the plaintiff/decedent claims, or has claimed, exposure;

(c)    the identity of each Contractor that the plaintiff/decedent claims, or has claimed, caused them to be exposed to asbestos and for each Contractor, each act or omission of that Contractor that caused exposure, including the premises, location and date of each such claimed exposure;

(d)    each product, to include manufacturer, supplier or distributor and brand name (regardless of whether the manufacturer is a party), that the plaintiff/decedent claims, or has claimed, to have caused his/her asbestos exposure. The plaintiff must state if the name of the manufacturer is not known by the plaintiff;

(e)    a specific description of each alleged exposure, including the specific time period, the work or task being performed, the length of time in hours, days, or months, as appropriate, and the specific nature of the exposure alleged;

(f)    the plaintiff/decedent's employer and occupation or craft at the time of each exposure identified;

(g)    if any exposure in question is the result of ship-board exposure in the navy or otherwise, the work history must identify the name of any ship on which the plaintiff claims exposure occurred and, if known, the hull number, the owner/operator of the ship, the dates of service on the ship and any berths or yards where the ship was located when not at sea or in operation; and

(h)    whether any exposure in question is claimed to have occurred on United States government property, and if so, the complete name and location of the site, relevant dates of alleged exposure, and describe the nature of the exposure and the asbestos-containing products to which plaintiff was exposed at that time.

**ANSWER:**

(a)



GST-EST-018169



(b) Plaintiff objects to this Interrogatory to the extent it is overly broad and unreasonably burdensome. In addition, the information requested herein is equally or moreso available to the Defendants in this action. Subject to, and without waiving this objection, please see Plaintiffs' Work History Sheet, previously provided as Exhibit "4." Discovery is ongoing and Plaintiff reserves the right to supplement this answer as discovery continues.

(c) Not applicable.

(d) Please see Plaintiff's Work History Sheet previously provided as Exhibit "4". Mr. White was exposed to products, including but not limited to, gaskets and packing manufactured and sold by Crane; gaskets manufactured and sold by Garlock, John Crane and Standco, Industries; pumps manufactured and sold by Buffalo Pumps, Carver Pumps, Cochrane, Goulds Pumps, Ingersoll Rand, Peerless Pump Co., Warren Steam Pumps and Worthingon; valves manufactured and sold by Chapman, Crane Co., Leslie Controls, Inc., and Mueller Co; asbestos siding manufactured and sold by Certainteed; floor tile manufactured and sold by Kentile; and joint compound manufactured and sold by Georgia-Pacific. Plaintiff's counsel will make Mr. White available, if he is able, for deposition for cross-examination on the specific issues.

(e)

(f)

(g)

(h) N/A.

# REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**A.**    **"FAST-TRACK" REQUESTS FOR PRODUCTION TO BE ANSWERED AT LEAST SEVEN (7) DAYS BEFORE EXIGENT PLAINTIFF DEPOSITIONS (Pursuant to Section III.A.1.(c) of the Case Management Order)**

**REQUEST NO. 1:**

To the extent available, using extreme diligence, detailed Social Security earnings records, as supplied by the Social Security Administration, with any annotations concerning exposure the plaintiff or plaintiff's counsel chooses to make on the report.

**RESPONSE:**    Please see Plaintiff's Social Security Records attached hereto as Exhibit "5." Additionally, please find the attached authorization allowing defendants to order these records.

GST-EST-0181697

# SOCIAL SECURITY ADMINISTRATION

Baltimore, Maryland 21235

## CERTIFICATION OF EXTRACT FROM RECORDS

Pursuant to the provisions of Title 42, United States Code, Section 904, and the authority vested in me by 42 United States Code 902. I hereby certify that I have legal custody of certain records, documents, and other information established and maintained by the Social Security Administration, pursuant to Title 42, United States Code, Section 405, and that the annexed is a true extract from such records in my custody as aforesaid.

I further certify that all signatures of Social Security Administration annexed document(s) are genuine and made to the signers' official capacity.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Social Security Administration to be affixed this 27th day of July , 2006.

Steven Donnell
Division Director
Division of Earnings Record Operations
Office of Central Operations

Form SSA-473 (3-96)
Destroy Prior Edition



PLAINTIFF'S
EXHIBIT
5

GST-EST-0181698

SSA-1826                      ITEMIZED STATEMENT OF EARNINGS              JOB:
VERSION 1984.002 * * *        FOR SSN [ ]-5981        * * *

FROM:    SOCIAL SECURITY ADMINISTRATION
         OFFICE OF CENTRAL OPERATIONS
         300 N. GREENE STREET
         BALTIMORE, MARYLAND  21290-0300

WRITTEN DEPOSITION SERVICE LP            NUMBER HOLDER NAME:
                                         CHARLES    WHITE
1750 VALLEY VIEW LN
SUITE 210

DALLAS                    TX  75234

PERIOD REQUESTED    JANUARY 1957   THRU  DECEMBER 2005

YEAR   JAN - MARCH  APRIL -JUNE  JULY - SEPT     OCT - DEC      TOTAL



PAGE 001

000001

GST-EST-0181699



A-1826                    ITEMIZED STATEMENT OF EARNINGS        JOB:
VERSION 1984.002 * * *       FOR SSN    -5981        * * *

YEAR   JAN - MARCH   APRIL -JUNE   JULY - SEPT   OCT - DEC   TOTAL

PAGE 002

000002

GST-EST-0181700

-1826
VERSION 1984.002 * * *  ITEMIZED STATEMENT OF EARNINGS  JOB:
                        FOR SSN ▮▮▮-5981        * * *

YEAR   JAN - MARCH   APRIL - JUNE   JULY - SEPT   OCT - DEC   TOTAL



PAGE 003

**000003**

GST-EST-018170



1826
VERSION 1984.002 * * *   ITEMIZED STATEMENT OF EARNINGS   JOB:
                          FOR SSN ████-5981     * * *

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|

PAGE 004

000004

GST-EST-0181702

ITEMIZED STATEMENT OF EARNINGS      JOB:
ON 1984.002 * * *      FOR SSN █████ -5981      * * *

| YEAR | JAN - MARCH | APRIL -JUNE | JULY - SEPT | OCT - DEC | TOTAL |
|------|-------------|-------------|-------------|-----------|-------|



PAGE 005

000005

GST-EST-018170



826
RSION 1984.002 * * *   ITEMIZED STATEMENT OF EARNINGS   JOB:
                        FOR SSN ████ -5981   * * *

YEAR   JAN - MARCH  APRIL -JUNE  JULY - SEPT   OCT - DEC   TOTAL

PAGE 006

**000006**

GST-EST-0181704



A-1826
VERSION 1984.002 * * *    ITEMIZED STATEMENT OF EARNINGS    JOB:
                              FOR SSN ▓▓▓-5981       * * *

YEAR   JAN - MARCH  APRIL -JUNE  JULY - SEPT   OCT - DEC    TOTAL

PAGE 007 END

000007

GST-EST-0181705

JEFFREY B. SIMON (NY, TX)
RON C. EDDINS (CA, TX)
DAVID C. GREENSTONE (CA, NY, TX)

ASSOCIATES
JENNIFER L. BARTLETT (CA)
CLAY B. CARROLL (TX)





JES
ROBE 11998706
H.W. TR
SAAR

CHARLES W. BRAMHAM (TX, CO)
JAMIE A. NEWGOLD (CA)

PLEASE RESPOND TO THE TEXAS OFFICE

August 7, 2006

**VIA LEXISNEXIS**
**TO ALL COUNSEL OF RECORD:**

Re:   *Charles White, et al v. Buffalo Pumps, Inc., et al;* Cause No. 2006-41943; In the
      11th Judicial District Court of Harris County, Texas
                        ***TRANSFERRED FROM***
      *Charles White, et al v. Buffalo Pumps, Inc., et al;* Cause No. 06-06970-E; In the
      County Court at Law No. 5 in Dallas County, Texas.

Dear Counsel:

   Attached please find Plaintiffs Charles White and Barbara Lorton's *Second Supplemental*
*Answers to Master Discovery Requests* to all Defendants in all Asbestos-Related Personal Injury
and Death Cases Filed in Harris County, including *Exhibit "8."*

   If you have any questions, do not hesitate to call.

                                        Sincerely,

                                        *Chapman*

                                        Christi Chapman
                                        *Legal Assistant*

CWB/cfc
Attachments

**cc: All Counsel of Record via Lexis Nexis (See attached counsel list)**

TEXAS OFFICE:
3232 MCKINNEY AVENUE, SUITE 610
DALLAS, TEXAS 75204
TEL: 214.276.7680
FAX: 214.276.7699

ATTORNEYS & COUNSELORS AT LAW
www.seglaw.com

CALIFORNIA OFFICE:
211 E. OCEAN BLVD., SUITE 200
LONG BEACH, CALIF. 90802
TEL: 562.590.3400
FAX: 562.590.3411

Case 3:14-cv-00116-GCM-DSC   Document 75-1   Filed 01/20/15   Page 171 of 181

GST-EST-0181706

# CLIENT CHECKLIST – WHITE, CHARLES MDL CN#2006-41943

| Counsel Name | Firm Name | Address | Phone | Fax | Party(s) Represented | E-mail |
|---|---|---|---|---|---|---|
| James H. Powers | Powers & Frost | 2400 One Houston Center<br>1221 McKinney St.<br>Houston, TX 77010 | 713-767-1555 | 713-767-1799 | Buffalo Pumps, Inc. | jpowers@powersfrost.com |
| Nathan Bosio | Dogan & Wilkinson | 734 Delmas Ave.<br>Pascagoula, MS 39568 | 228-762-2272 | 228-762-3223 | Carver Pump Co. | nbosio@doganwilkinson.com |
| Michael J. Ramirez | Kirkpatrick & Lockhart Nicholson Graham, LLP | 2828 N. Harwood St., Ste. 1800<br>Dallas, TX 75201 | 214-939-4900 | 214-939-4949 | Crane Co. | mramirez@klng.com |
| Susan Ashmore | DeHay & Elliston | 901 Main St., Ste. 3500<br>Dallas, TX 75202 | 214-210-2400 | 214-210-2500 | Certainteed, Inc.<br>Union Carbide Corp. | sashmore@dehay.com |
| Raymond Harris | Schachter Harris, LLP | 2300 Plaza of the Americas,<br>600 N. Pearl, LB 133<br>Dallas, TX 75201 | 214-999-5700 | 214-999-5747 | Garlock Sealing Tech. | rharris@schachterharris.com |
| John D. Carlos | Prichard Hawkins McFarland & Young | 10101 Reunion Pl., Ste. 600<br>San Antonio, TX 78216 | 210-477-7400 | 210-477-7450 | General Motors Corp. | jcarlos@phmy.com |
| L. Hayes Fuller, III | Naman Howell Smith & Lee | 900 Washington, 7th Floor<br>P.O. Box 1470<br>Waco, TX 76703 | 254-755-4100 | 254-754-3172 | Goulds Pumps, Inc.<br>Goulds Pumps (NY), Inc. | fuller@namanhowell.com |
| Robert Wilkinson<br>William Farrell | Dogan & Wilkinson | 734 Delmas Ave.<br>Pascagoula, MS 39568 | 228-762-2272 | 228-762-3223 | Guard-Line, Inc. | rwilkinson@doganwilkinson.com |
| J. Michael Jordan | Gardere Wynne Sewell | 1000 Louisiana, Ste. 3400<br>Houston, TX 77002 | 713-276-5569 | 713-276-6569 | IMO Industries, Inc. | mjordan@gardere.com |
| Laura Frase | Forman Perry Watkins Krutz & Tardy | 2001 Bryan St., Ste. 1300<br>Dallas, TX 75201 | 214-678-5541 | 214-905-3976 | Ingersoll Rand Co. | lafrase@fpwk.com |
| Laura Kugler | Bailey Crowe & Kugler | 6550 Bank of America Plaza,<br>901 Main St., Ste. 4600<br>Dallas, TX 75202 | 214-231-0555 | 214-231-0556 | John Crane, Inc. | lkugler@bcklaw.com |
| Billy D. Anderson | Kent, Good, Anderson & Bush | Woodgate I, Ste. 200<br>1121 ESE Loop 323<br>Tyler, TX 75701 | 903-579-7500 | 903-581-3701 | Leslie Controls, Inc. | billya@tyler.net |

GST-EST-0181707

| Counsel Name | Firm Name | Address | Phone | Fax | Party(s) Represented | E-mail |
|---|---|---|---|---|---|---|
| Ken Rhodes | Kacal, Adams & Law | One Riverway Ste. 1200 Houston, TX 77056 | 713-529-3992 | 713-621-4072 | Met Life Insurance Co. | kdrhodes@kalpc.com |
| Brian S. Clary | The Clary Firm | 408 Staiti Humble, TX 77338 | 281-548-1100 | 281-548-1126 | Mueller, Co. | bclary@claryfirm.com |
| Laurie B. Easter | McGinnis Lockridge & Kilgore, LLP | One Houston Center, Ste. 3200, 1221 McKinney St. Houston, TX 77010 | 713-651-8524 | 713-328-1824 | Mueller Steam Specialty PCC Flow Technologies Holdings, Inc. | leaster@mcginnislaw.com |
| Jillian J. Rensburg | DeHay & Elliston | 3500 Bank of America Plaza, 901 Main St. Dallas, TX 75202 | 214-210-2400 | 214-210-2500 | Sterling Fluid Sysesms (Peerless Pump Company) | jvr@dehay.com |
| Ken Royer | Beason Willingham | 808 Travis St., Ste. 1608 Houston, TX 77002 | 713-333-7600 | 713-333-7601 | Standco Industries, Inc. | kenr@beasonwillingham.com |
| Todd Ogden | Forman Perry Watkins Krutz & Tardy | 2001 Bryan St., Ste. 1300 Dallas, TX 75201 | 214-678-5546 | 214-905-3976 | Uniroyal Holdings, Inc. | tdogden@fpwk.com |
| Robert Thackston | Hawkins Parnell & Thackston | 4514 Cole Ave., Ste. 550 Dallas, TX 75205 | 214-780-5100 | 214-780-5200 | Warren Pumps, Inc. | rthackston@hplegal.com |
| Alan Moore | Fanning Harper & Martinson | Two Energy Square 4849 Greenville Ave., Ste. 1300 Dallas, TX 75206 | 214-369-1300 | 214-987-9649 | Yarway Corporation | amoore@fhmlaw.com |

GST-EST-0181708

| | | |
|---|---|---|
| CHARLES WHITE and spouse BARBARA LORTON, | § § § | IN THE DISTRICT COURT OF |
| VS. | § § | HARRIS COUNTY, TEXAS |
| BUFFALO PUMPS, INC., ET AL | § § | 11TH JUDICIAL DISTRICT |

**TRANSFERRED FROM**

CAUSE NO. 06-06970-E

| | | |
|---|---|---|
| CHARLES WHITE and spouse BARBARA LORTON, | § § § | IN THE COUNTY COURT |
| VS. | § § | AT LAW NO. 5 |
| BUFFALO PUMPS, INC., ET AL | § § | DALLAS COUNTY, TEXAS |

**PLAINTIFF'S SECOND SUPPLEMENTAL ANSWERS TO MASTER DISCOVERY REQUESTS TO ALL DEFENDANTS IN ALL ASBESTOS-RELATED PERSONAL INJURY AND DEATH CASES FILED IN HARRIS COUNTY**

TO: ALL DEFENDANTS, by and through their counsel of record.

COME NOW Plaintiffs, CHARLES WHITE and spouse BARBARA LORTON, Plaintiffs herein and by and through their counsel of record, file this their Second Supplemental Answers to Master Discovery Requests .

Respectfully submitted,
**SIMON, EDDINS & GREENSTONE, LLP**

DAVID C. GREENSTONE
State Bar No. 24007271
JESSICA M. DEAN
State Bar No. 24040777
3232 McKinney Avenue   Suite 610
Dallas, Texas 75204
214-276-7680
214-276-7699 Fax

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the above and foregoing Instrument was sent via Lexis Nexis to all counsel of record on the 7th day of August, 2006 .

JESSICA M. DEAN

GST-EST-0181710

**INTERROGATORY NO. 6:**

Using extreme diligence, provide detailed work and asbestos exposure history of the plaintiff/decedent (or if exposure is claimed through another person, of that other person) to include the following information (provide answers to each subpart):

    (a)    the location and name of the owner/occupier of each premises, the specific unit or area of the premises where exposure to asbestos is alleged to have occurred;

    (b)    the manufacturer, description, model name and number, serial number, and location at the time of plaintiff/decedent's alleged exposure, of any and all equipment, including but not limited to Heavy Equipment, pumps, vessels, boilers, turbines, furnaces, tractors, engines, mobile or affixed equipment containing or utilizing asbestos or asbestos-containing products or component part(s) to which the plaintiff/decedent claims, or has claimed, exposure;

    (c)    the identity of each Contractor that the plaintiff/decedent claims, or has claimed, caused them to be exposed to asbestos and for each Contractor, each act or omission of that Contractor that caused exposure, including the premises, location and date of each such claimed exposure;

    (d)    each product, to include manufacturer, supplier or distributor and brand name (regardless of whether the manufacturer is a party), that the plaintiff/decedent claims, or has claimed, to have caused his/her asbestos exposure. The plaintiff must state if the name of the manufacturer is not known by the plaintiff;

    (e)    a specific description of each alleged exposure, including the specific time period, the work or task being performed, the length of time in hours, days, or months, as appropriate, and the specific nature of the exposure alleged;

    (f)    the plaintiff/decedent's employer and occupation or craft at the time of each exposure identified;

    (g)    if any exposure in question is the result of ship-board exposure in the navy or otherwise, the work history must identify the name of any ship on which the plaintiff claims exposure occurred and, if known, the hull number, the owner/operator of the ship, the dates of service on the ship and any berths or yards where the ship was located when not at sea or in operation; and

    (h)    whether any exposure in question is claimed to have occurred on United States government property, and if so, the complete name and location of the site, relevant dates of alleged exposure, and describe the nature of the exposure and the asbestos-containing products to which plaintiff was exposed at that time.

**SUPPLEMENTAL ANSWER:**

    (a)



(b)    Plaintiff objects to this Interrogatory to the extent it is overly broad and unreasonably burdensome. In addition, the information requested herein is equally or moreso available to the Defendants in this action. Subject to, and without waiving this objection, please see Plaintiffs' Work History Sheet, previously provided as Exhibit "4." Discovery is ongoing and Plaintiff reserves the right to supplement this answer as discovery continues.

(c)    Not applicable.

(d)    Please see Plaintiff's Work History Sheet, previously provided as Exhibit "4". Mr. White was exposed to products, including but not limited to, gaskets and packing manufactured and sold by Crane; gaskets manufactured and sold by Garlock, John Crane and Standco, Industries; pumps manufactured and sold by Buffalo Pumps, Carver Pumps, Cochrane, Goulds Pumps, Ingersoll Rand, Peerless Pump Co., Warren Steam Pumps and Worthingon; valves manufactured and sold by Chapman, Crane Co., Leslie Controls, Inc., and Mueller Co; asbestos siding manufactured and sold by Certainteed; floor tile manufactured and sold by Kentile; and joint compound manufactured and sold by Georgia-Pacific. Please also see Plaintiff's Affidavit attached hereto as Exhibit "8." Additionally, Plaintiff's counsel have scheduled Mr. White for deposition, and for cross-examination on the specific issues, for Friday, August 11, 2006.

(e)

(f)

(g)



GST-EST-018171

(h)  N/A.

**INTERROGATORY NO. 43:**

Please provide the following information for each Retailer product that the plaintiff/decedent claims caused or contributed to cause their injuries.

     (a)     Identify the type of product, including manufacturer and brand name.

     (b)     Identify who purchased the product and when and the location where was it purchased.

     (c)     State specifically how the plaintiff/decedent was exposed to dust created by the product. If the plaintiff/decedent worked with the product, provide a detailed description of what work they did; where and when they did the work; how long it took; how this work created dust; and what tools they used to manipulate, install or remove the product, if any.  If the plaintiff/decedent is making a bystander claim, please describe in detail when and where they were around the product; identify who was working with the product; their proximity to the product; how the product was being used; how long they were around the product; how this work created dust; and, what tools were used to manipulate, install or remove the product, if any.

     (d)     Identify the plaintiff/decedent's employer and  supervisor at the time they performed or were around the work described in subsection (c) above.

     (e)     Identify the plaintiff/decedent's supervisors and co-workers at the time they performed or were around the work described in subsection (c) or (d), above.

     (f)     State whether the plaintiff/decedent believes the product contained asbestos, then give all reasons for such belief.

**SUPPLEMENTAL ANSWER:**

     (a)     See Work History Sheet, previously provided as Exhibit "4."

     (b)     Plaintiff, in certain instances purchased the various asbestos-containing products around which he worked and with which he worked.  Additionally, members of his family or unidentified third parties may have purchased certain asbestos-containing products around which he worked and with which he worked.  See also Exhibit "4," previously provided.

     (c)     Breathing asbestos dust from close proximity to the cutting of asbestos siding, from the installation and removal of asbestos floor tiles and from the mixing of asbestos joint compound which he used in the renovation work he performed on his house.  See Affidavit of Charles White, attached hereto as Exhibit "8."

     (d)     Plaintiff performed this work himself.

     (e)     See response to (d) above.

(f)  Yes. Sworn interrogatory responses of defendant companies, coupled with general inaction by defendant companies to vigorously substitute asbestos until likelihood of Consumer Products Ban was announced in the late 1970's.

GST-EST-018171

## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**REQUEST NO. 18:**

A verbatim copy of every statement in the plaintiff/decedent's possession, custody or control made by the plaintiff/decedent and/or any individual identified in their answer to Request for Disclosure 194.2(e) or 194.2(l). This request includes written statements and recorded statements (both audio and video), and all witness statements (as described in Rule 192.3(h) of the Texas Rules of Civil Procedure) and affidavits given or made by the plaintiff/decedent in any lawsuit involving any allegations of asbestos exposure or asbestos-related injury or disease, regardless of whether they were a party or were giving or making the statements or affidavits as a nonparty witness.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects on the basis that this Request is duplicative of Request for Disclosures, and is therefore unduly burdensome and harassing. To the extent that this Request exceeds the scope of witness statements as contemplated by Requests for Disclosures, then it exceeds the scope of the Texas Rules of Civil Procedure. Subject to and without waiver of the foregoing objection, please see the Affidavit of Charles White, attached hereto as Exhibit "8." In addition, Plaintiff will supplement Requests for Disclosures with any discoverable witness statements as necessary and in accordance with the Texas Rules of Civil Procedure.

**REQUEST NO. 19:**

All documents evidencing or supporting the plaintiff/decedent's contention that the plaintiff/decedent, or, if they are making a household-exposure claim, the person through whom they contend they were exposed to asbestos, was exposed to each asbestos-containing product to which the plaintiff/decedent alleges exposure.

**SUPPLEMENTAL RESPONSE:** Plaintiff objects to this Request as vague, overly broad and unduly burdensome. Without waiving this objection, see the Work History Sheet, previously provided as Exhibit "4," and the Affidavit of Charles White, attached hereto as Exhibit "8."

GST-EST-0181715

# AFFIDAVIT

**STATE OF MARYLAND**     §
            §
**COUNTY OF ST. MARY'S**    §

  **BEFORE ME**, the undersigned authority, on this day personally appeared Charles White, who, upon his oath, did state, swear, and affirm:

  I am over 18 years of age, am competent to testify, have never been convicted of a crime, and have personal knowledge of the facts stated herein.

  I have been diagnosed with malignant mesothelioma. My doctors have confirmed to me that my cancer was caused by asbestos exposure. In addition to asbestos exposure in the ▇▇▇ I was exposed to asbestos while doing home renovation work. For example, in the late 1960's and early 1970's, I recall using Georgia Pacific Joint Compound in the dry powder form. I recall repeatedly mixing, sanding, and sweeping Georgia Pacific joint compound. All of these activities created a visible dust that I breathed.

_____
Charles White

  **SUBSCRIBED AND SWORN TO BEFORE ME** on this _28_ day of _June_, 2008.

_____
Notary Public

PLAINTIFF'S
EXHIBIT
8

GST-EST-0181716