GARLOCK SEALING TECHNOLOGIES   |
LLC and GARRISON LITIGATION   |
MANAGEMENT GROUP, LTD.,   |      Case No. 3:14-cv-00116
  |
Plaintiffs,   |
  |
v.   |
  |
SIMON GREENSTONE PANATIER   |
BARTLETT, A PROFESSIONAL   |
CORPORATION; JEFFREY B. SIMON;   |
DAVID C. GREENSTONE; ESTATE OF   |
RONALD C. EDDINS; AND JENNIFER L.   |
BARTLETT,   |
  |
Defendants.   |
_____   |

## AMENDED COUNTERCLAIMS[1]

1.      Counterplaintiffs Simon Greenstone Panatier Bartlett, PC, Jeffrey B. Simon,

David C. Greenstone, Estate of Ronald C. Eddins, and Jennifer L. Bartlett (together, "Simon

Greenstone") bring these Counterclaims pursuant to Federal Rule of Civil Procedure 13 against

Garlock Sealing Technologies LLC ("Garlock") and Garrison Litigation Management Group,

Ltd. ( "Garrison") (together, "Counterdefendants") because they, through their employees and

agents, engaged in a criminal enterprise that engaged in a pattern of racketeering acts affecting

---

[1]   Garlock claims in its RICO Lawsuit that answers to discovery and other representations made by litigants in settled state court litigation can be predicate acts by those litigants' trial attorneys for purposes of RICO, which Simon Greenstone denies. Simon Greenstone brings its RICO counterclaims in order to protect its rights against Garlock in the event that it is determined that Garlock's own representations in litigation constitute RICO predicate acts. Simon Greenstone explicitly reserves all of its defenses and objections to the claims asserted against Simon Greenstone by Garlock, including its right to invoke the litigation privileges and immunities granted to Simon Greenstone under state and federal law, and does not waive any such defenses and objections.

interstate commerce, including, but not limited to, a scheme and artifice to obtain property through false or fraudulent pretenses that used the United States mails and other private and commercial interstate common carriers and interstate wire transmissions. Garlock and Garrison made and caused others to make false and fraudulent misrepresentations in asbestos personal injury and wrongful death litigation and knowingly withheld evidence of the dangers of Garlock's products, and Garlock's knowledge of those dangers, in order to depress verdicts and settlements obtained by individuals represented by Simon Greenstone, and in turn Simon Greenstone's contingency fees and ability to recover litigation expenses and costs; fraudulently induced Simon Greenstone into settlement agreements that they had no intention of paying; and knowingly filed a baseless fraud and RICO suit against Simon Greenstone (the "RICO Lawsuit") for improper purposes including the purpose of obtaining money and property under false pretenses. The acts taken in furtherance of this scheme and artifice to defraud constitute violations of and conspiracies to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("RICO"), fraud, fraudulent inducement, and abuse of process.

    2.    Garlock, which manufactured asbestos-containing products from 1900 to 2001, and Garrison, a company that manages Garlock's asbestos personal injury and wrongful death litigation, have for many years sought to deceive personal injury plaintiffs and their attorneys, juries, and the public about the health effects of exposure to Garlock's asbestos-containing gaskets through their reasonably foreseeable use. Garlock and Garrison falsely claimed in asbestos personal injury and wrongful death litigation that Garlock's products were safe and did not pose an unreasonable risk of harm to users, and withheld evidence of the health risks of Garlock's products and their knowledge of those risks. Garlock and Garrison claimed and to this day fraudulently maintain that the asbestos fibers used in Garlock's gaskets were fully

encapsulated and did not become airborne during reasonably foreseeable use, and that the type of asbestos used in Garlock's gaskets was safe. But Garlock and Garrison knew that Garlock's gaskets would have to be removed and replaced and that workers would have to use a scraper, grinder, or wire brush to remove the deteriorated asbestos-containing gaskets, and that doing so would release dangerous disease-causing asbestos fibers.

3.       Garlock has known since no later than 1933 that all forms of asbestos that it incorporated into its products cause disease. Garlock authored a manual about its gaskets in 1980 that warned that "breathing asbestos dust may cause serious bodily harm." And in 1986, Garlock admitted in a Material Safety Data Sheet ("MSDS") that it drafted for its gaskets, under a section entitled "HEALTH HAZARD DATA," that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."

4.       Yet even today, Garlock and Garrison will tell anyone who asks that "there has never been any competent scientific or medical evidence or reason to believe that its asbestos containing products, upon reasonable use, release asbestos fibers in sufficient quantities, if any, to pose a health hazard, potential or otherwise, to persons using such products. Respirators are not required while working with, installing or reworking Garlock products since said products pose no health hazard."

5.       Garlock has a long history of corporate indifference to the hazards of asbestos. Garrison, once it was formed in September 1996 to direct Garlock's asbestos personal injury and wrongful death litigation, together with Garlock continued the deceptive and fraudulent practice of denying that Garlock's products posed any danger in litigation against clients represented by

Simon Greenstone and other personal injury and wrongful death plaintiffs' firms. In written discovery responses served via the interstate wires and/or mails and/or other interstate common carriers, Garlock and Garrison made and caused others to make knowing misrepresentations regarding, and wrongfully concealed evidence of, the hazards of Garlock's products and Garlock's knowledge of those hazards.

6.     In all relevant aspects, Garlock and Garrison acted in concert with each other to further their fraudulent scheme. Beginning not later than September 1996, Garlock and Garrison, through their agents and employees, formed an enterprise as that term is defined in 18 U.S.C. § 1961(4), that has existed for the purpose of achieving, through illegal means, the shared goals of artificially and wrongfully minimizing Garlock's personal injury and wrongful death liability in the tort system and artificially and wrongfully maximizing Garlock's estate in the bankruptcy system (the "Enterprise").

7.     Garlock and Garrison's fraudulent scheme and wrongful conduct continues to this day. Garlock and Garrison, though no longer tort defendants by virtue of the bankruptcy automatic stay, filed the RICO Lawsuit against Simon Greenstone in which Garlock and Garrison falsely, and for the purpose of obtaining money or property by false or fraudulent pretenses, claim that Simon Greenstone withheld evidence of their clients' sources of asbestos exposure other than Garlock's gaskets and, as a result, defrauded Garlock and Garrison into inflated settlements. Garlock and Garrison made and continue to make false and fraudulent claims in the RICO Lawsuit that Garlock's products were safe and, to further and protect the Enterprise and maximize Garlock's bankruptcy estate, have made false and misleading statements that were intended to be heard by the public.

## PARTIES, JURISDICTION, AND VENUE

8.     Counterdefendant Garlock Sealing Technologies LLC is a North Carolina limited liability company with its principal place of business in Charlotte, North Carolina.  Garlock manufactured asbestos-containing products from 1900 through 2001, and as a result has been a defendant in asbestos personal injury and wrongful death litigation across the country since the 1970s.  Garlock filed for Chapter 11 bankruptcy protection on June 5, 2010 (the "Garlock Bankruptcy").  On January 9, 2014, Garlock filed the RICO Lawsuit against Simon Greenstone. At all times pertinent to this Counterclaim, Garlock, individually and through its agents and employees, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or more of the other counterdefendants and co-conspirators in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

9.     Counterdefendant Garrison Litigation Management Group, Ltd. ("Garrison"), is a North Carolina corporation that was formed in September 1996.  Garrison was formed to manage and direct Garlock's asbestos litigation.  Garrison assumed liability arising out of the personal injury and wrongful death cases filed against Garlock in exchange for a $375 million unsecured promissory note, the right to future asbestos insurance recoveries, and the assets and records of Garlock's Asbestos Litigation Department.  Attorneys representing Garlock in asbestos personal injury and wrongful death litigation reported to and took direction from Garrison, and such attorneys acted as Garlock and Garrison's agents.  Garrison is a debtor in Garlock's Bankruptcy and a plaintiff in the RICO Lawsuit.  At all times pertinent to this Counterclaim, Garrison, individually and through its agents and employees, materially participated in the Enterprise, and materially participated, conspired, assisted, encouraged, and otherwise aided and abetted one or

more of the other counterdefendants and co-conspirators in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected interstate commerce in the United States.

10.     Counterplaintiff Simon Greenstone Panatier Bartlett, PC, is a professional corporation organized under the laws of the state of Texas, and is a defendant in the RICO Lawsuit.  Simon Greenstone Panatier Bartlett, PC, is the successor to Simon, Eddins & Greenstone, LLP.  Simon Greenstone acts as counsel to personal injury plaintiffs Charles and Loretta Willis, who are members of the Official Committee of Asbestos Personal Injury Claimants (the "Committee") in the Garlock Bankruptcy.

11.     Counterplaintiff Jeffrey B. Simon is a partner in the law firm Simon Greenstone Panatier Bartlett, PC, is a resident and citizen of the state of Texas, and is a defendant in the RICO Lawsuit.  Simon was previously a partner in the law firm Simon, Eddins & Greenstone, LLP.

12.     Counterplaintiff David C. Greenstone is a partner in the law firm Simon Greenstone Panatier Bartlett, PC, is a resident and citizen of the state of Texas, and is a defendant in the RICO Lawsuit.  Greenstone was previously a partner in the law firm Simons, Eddins & Greenstone, LLP.

13.     Counterplaintiff Jennifer L. Bartlett is a partner in the law firm Simon Greenstone Panatier Bartlett, PC, is a resident and citizen of the state of California, and is a defendant in the RICO Lawsuit.  Bartlett was previously a partner in the law firm Simons, Eddins & Greenstone, LLP.

14.     Counterplaintiff the Estate of Ronald C. Eddins is the estate of Ronald C. Eddins. Ronald C. Eddins was, until September 2011, a partner in the law firm Simon, Eddins &

Greenstone, LLP.  The Estate is a resident and citizen of the state of Texas and is a defendant in the RICO Lawsuit.

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims herein arise under the laws of the United States, and pursuant to 28 U.S.C. § 1332 because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court has subject matter jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims arising under the laws of the United States that they form part of the same case or controversy.  The causes of action alleged herein relate to a case under the Bankruptcy Code.  This is a non-core proceeding under 28 U.S.C. § 157 in which Simon Greenstone requests a jury trial before the District Court.  Simon Greenstone does not consent to the bankruptcy court exercising jurisdiction over these claims.

16.     This Court is a proper venue for this action under 28 U.S.C. § 1391(b)(1) and (2) because all counterdefendants reside in the Western District of North Carolina and because a substantial part of the events giving rise to Simon Greenstone's claims occurred in the Western District of North Carolina.

## THE FACTS

17.     Inhalation of asbestos fibers can cause mesothelioma, lung and other types of cancer, and asbestosis.  There is no established safe lower threshold level of exposure to asbestos.  All forms of asbestos fibers, including chrysotile asbestos, which was the primary (but not exclusive) form of asbestos used in Garlock's gaskets, can cause mesothelioma, other cancers, and asbestosis.

18.     By the1930s, scientific researchers published findings that demonstrated a relationship between asbestos exposure and fatal disease.  An association between asbestos exposure and mesothelioma, once called pleural cancer or cancer of the pleura, an incurable and particularly aggressive cancer, was established by the 1940s.  By the year 1960, there was little doubt that asbestos caused malignant mesothelioma.

19.     Mesothelioma has a long latency period of 20 to 50 years.  Once diagnosed, the average life expectancy is one to two years.  The disease is debilitating, painful, and always fatal.  As a result, mesothelioma personal injury claims are often heard on an expedited docket in the hope that the plaintiff will live long enough to see his day in court.

20.     Garlock's asbestos-containing gaskets were used in high heat applications such as steam lines, pumps, and valves.  In the course of their reasonably anticipated use, Garlock's gaskets would become baked onto the hot surfaces, deteriorate, and crumble.  The seals where Garlock's gaskets were used were also often insulated with friable asbestos insulation pads or blankets.  When replacing Garlock's gaskets, workers would have to remove the insulating material and then use scrapers, grinders, or wire brushes to remove the deteriorated Garlock gaskets.  Through the foreseeable use of Garlock's gaskets, workers were exposed to the asbestos contained in insulation manufactured by others, as well as the asbestos contained in the used gaskets manufactured by Garlock.

21.     Though Garlock purposely and corruptly refrained from doing much of the basic research regarding the effects of the asbestos that it was using in its products, Garlock knew, by no later than the 1940s, that breathing asbestos fibers caused debilitating and sometimes fatal lung disease.  Garlock was well aware of the health hazards posed by exposure to asbestos well before most, if not all, of Simon Greenstone's clients were first exposed to Garlock's asbestos.

Yet despite its superior knowledge that the asbestos in its products was lethal, Garlock continued for decades to sell its asbestos products, with no warning labels, as though asbestos were harmless.

22.     Dr. Richard Lemen, retired Deputy Director and Acting Director of the National Institute of Occupational Safety and Health and retired Assistant Surgeon General in the United States Public Health Service, testified before Congress on July 31, 2001, that an estimated 189,000 to 231,00 deaths had occurred in the United States since 1980 due to workplace exposure to asbestos, and that another 270,000 to 330,000 deaths were expected to occur over the following 30 years.  *See* S. Hrg. 107-269 (July 31, 2001).

23.     Citing research that concluded that chrysotile asbestos poses increased risks for asbestosis, lung cancer, and mesothelioma in a dose-dependent manner, Dr. Lemen further testified that:

> Asbestos has been responsible for a massive epidemic of disease and death since its commercial exploitation primarily beginning at the turn of this century.  As we enter the new millennium we do not want to promote the myth, as is currently promoted by parties interested in the continued commercial exploration of chrysotile that only one mineral group of asbestos, the amphiboles, were responsible for the disease and death associated with asbestos usage[.]
>
> *        *        *
>
> A review of the lung burden, epidemiologic, toxicologic, and mechanistic studies, lead to the conclusion that chrysotile asbestos exposure carries an increased risk of both lung cancer and mesothelioma.

*See* S. Hrg. 107-269 (July 31, 2001).

24.     Yet over the last 40-plus years that Garlock has been a defendant in tort litigation, Garlock and later Garrison falsely claimed in that litigation and in the RICO Lawsuit that workers would not be exposed to asbestos through the foreseeable use of Garlock's gaskets and

that the asbestos used in Garlock's gaskets does not cause disease.

## GARLOCK'S ASBESTOS LITIGATION HISTORY

25.     Garlock falsely claimed in asbestos personal injury and wrongful death litigation, the RICO Lawsuit, and in public statements that its asbestos-containing products were safe and could not have caused the diseases suffered by a generation of workmen diagnosed with asbestosis, lung cancers, and mesothelioma.  Garlock fraudulently attempts to paint a picture of itself as a company wrongfully under attack by plaintiffs' attorneys and their clients that has been forced to pay damages for injuries that it did not cause.

26.     Nothing could be farther from the truth.  Garlock began manufacturing and selling asbestos-containing products in 1900.  It did not stop manufacturing asbestos-containing products until 2001.  Garlock's trial losses in asbestos personal injury and wrongful death cases were the result of proof that Garlock's asbestos-containing products caused debilitating disease and death.  In some cases, punitive or exemplary damages were assessed against Garlock because Garlock knew by the 1940s at the latest that its products caused disease, but for years continued to market and sell its products to be used by pipefitters, millwrights, machinists, boilermakers, and others, without appropriate warning.  As a result, and to avoid significant damages awards at trial and the incurring of attorneys' fees and defense costs, Garlock and Garrison and their attorneys in the underlying cases undertook a litigation strategy of settling cases early and with limited discovery.

27.     Simon Greenstone took Garlock's corporate deposition in *Wilbur v. Garlock Sealing Technologies, LLC, et al.*, Case. No. CL-04-1127 (City of Portsmouth, VA 2006). Garlock's corporate deponent conceded evidence of Garlock's conscious indifference in continuing to market and sell its asbestos-containing products, despite knowledge that asbestos

caused disease.  In light of this evidence, and recognizing the risks of a high compensatory and punitive damages award at trial, Garlock and Garrison settled the *Wilbur* case.

28.     The evidence of Garlock's conscious indifference to the severe health risks posed by its products includes, but is not limited to, the following.  *See also* Appendix A.

29.     In 1922, Garlock joined the National Safety Council, a nonprofit member organization that promotes health and safety.  In 1933, the National Safety Council informed Garlock that asbestos causes fatal lung disease, and that the most dangerous form of asbestos dust is so small that it is invisible.  In 1942, the National Safety Council informed Garlock that asbestos-containing products also cause fatal lung disease.

30.     But when faced with the business consequences of the health hazards of asbestos, Garlock was in 1944 a founding member of the Asbestos Textile Institute, an organization whose self-described purpose was "to develop a more creative selling by the industry salesmen and to instill among such salesmen an attitude of courageous aggressiveness in combatting attacks upon the industry, its members, and its products."

31.     By 1947, Garlock knew that asbestos caused asbestosis.  That year, the Industrial Hygiene Foundation conducted a study on asbestos in textile plants.  Garlock participated in the study.  The study, conducted by engineer W.C.L. Hemeon, was reported in a document titled "Preliminary Dust Investigation Asbestos Textile Institute."  The object of his investigation was to conduct "a preliminary investigation of the asbestos problem in textile plants of members of the Asbestos Textile Institute with the immediate object of defining the specific nature and the magnitude of the problem in all its phases."  The Hemeon report noted that "The maximum permissible dustiness for asbestos is commonly taken to be 5 million particles per cubic foot. This represents good attainment in the dust control program.  It is emphasized, however, that

dust elimination to this extent does not positively ensure that asbestosis will develop in some workers after a long working life, greater than 20 to 25 years. Scientific evidence is obscure on this point." The report continues that "The information available does not permit a complete assurance that 5 million is thoroughly safe, nor has the information been developed permitting a better estimate of safe dustiness." Garlock received a copy of this report.

32. Garlock also received its first workmen's compensation case stemming from asbestos exposure in 1947, which was brought by an employee who worked in Garlock's asbestos textile department. As a result, Garlock began protecting its own employees from asbestos exposure in its manufacturing plant that year, but still did not warn end users of the dangers of its products.

33. On March 8, 1956, Garlock employee George Houghton and other members of the Asbestos Textile Institute met to discuss how to respond to lawsuits stemming from asbestos-related cancer. During that meeting, they discussed medical studies by Dr. Heuper, who was then the Chief of the Environmental Cancer Section of the National Cancer Institute, National Institute of Health, that concluded that asbestos can cause cancer after only six months of exposure, and that all workers in the industry are susceptible to cancer caused by asbestos. They also discussed "the possibility of more concerted action designed to refute the work of Dr. Heuper."

34. Scientific studies throughout the 1960s continued to identify diseases caused by asbestos, including mesothelioma, which led to greater media attention to asbestos-containing products and resulting disease. An independent study, published in 1965 in *The Biological Effects of Asbestos*, found that more than 50% of insulators had asbestos disease, whether asbestosis, lung cancer, or mesothelioma. A scientific review by Dr. Heuper published in *The*

*Biological Effects of Asbestos* reported that chrysotile asbestos, by far the most common type of asbestos used in the United States, and used in Garlock's sheet packing materials from which gaskets were cut, was the leading cause of mesothelioma.  In addition, Dr. Heuper reported that numerous asbestos products, *including gaskets and packing*, were hazards.

35.     At a February 11, 1966 meeting of the Asbestos Textile Institute, Garlock was told that the number of cases of asbestos disease would increase for the next 30 years.  Garlock was further told that mesothelioma was being diagnosed  increasingly in asbestos victims.  At the same meeting, the Sales Promotion Committee of the Asbestos Textile Institute voted *against* distributing a booklet titled "Method for Determining Asbestos Dust Concentration" to the customers of member companies.  Rather, the member companies would make this booklet available only if and when customers requested information on dust.

36.     At an October 9, 1969 meeting of the Asbestos Textile Institute, which Garlock attended, the members discussed a forthcoming position paper from the U.S. Public Health Service that was expected to report that asbestos hazards can be controlled, with the exception of mesothelioma.  The members discussed how to best "defend" the industry against these findings. The members further discussed that asbestos lawsuits were on the rise.  The members further discussed preparing a position paper on asbestos that "would be for the benefit of customers, and by means of it all companies would be in a position to advise their clients, customers, and the general public, of the many uses of and recommended procedures for the safe handling of asbestos textile products."  The Asbestos Textile Institute deferred further discussion of a booklet until a later meeting.

37.     At a February 4, 1971 meeting of the Asbestos Textile Institute, which Garlock attended, it was reported to the members that Dr. Irving J. Selikoff, Director of the

Environmental and Occupational Health Division of the Mt. Sinai School of Medicine had arranged and presented at a two-day seminar on asbestos where he advised that chrysotile asbestos can cause mesothelioma. The Environmental Health Committee of the Asbestos Textile Industry reported that Dr. Selikoff "is a 'dangerous' man, and the asbestos industry is going to have to learn how to combat his tactics!"

38.     During the same February 4, 1971 meeting, the members considered putting warning labels on their asbestos-containing products in order to better defend against lawsuits. Garlock did not put a caution label on its asbestos-containing gasketing material at that time.

39.     The Asbestos Information Association of North America gave a presentation to the Asbestos Textile Institute, of which Garlock was a member, on June 7, 1973. A Garlock employee attended that meeting. That organization's purpose was to combat governmental and private entities that were investigating the link between asbestos and disease and were imposing or encouraging regulations on asbestos and its uses. During the June 7, 1973 presentation, the Asbestos Information Association of North America presented the "bad news" for the asbestos industry and the "good news." The "bad news" was the large amount of medical data regarding and media coverage of the health hazards of asbestos products. The "good news" was that "very few people have been paying attention" – that is, that workers remained ignorant of the health consequences of working with asbestos – and that sales of asbestos products remained strong.

40.     Garlock joined the Asbestos Information Association of North America the next year, in 1974. At that time, Garlock still did not have any warnings printed on its asbestos-containing products. Garlock did not conduct any testing to determine dust levels or health dangers associated with its products.

41.     It was not until 1977 that Garlock finally placed a warning regarding the hazards of asbestos on its asbestos-containing gaskets.  The 1977 warning on Garlock's products was:

CAUTION
Contains asbestos fibers.  Avoid creating dust.
Breathing asbestos dust may cause serious bodily harm.

42.     Garlock's Products Liability Committee had considered in 1977 – and rejected – a warning that would have identified asbestos as a "cancer hazard."  The committee decided to go with the less specific warning "from a marketing point of view."

43.     In 1986, Garlock admitted in a MSDS that it drafted that its gaskets were comprised of 80 to 90% chrysotile asbestos, and that chrysotile can cause asbestosis, lung cancer, and mesothelioma.  Section V of the MSDS, titled "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix.  Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."

44.     In addition to long failing to label its products with appropriate warnings, Garlock could have developed products that did not contain asbestos, but chose not to do so.  In the late 1980s or early 1990s, Garlock ran an advertisement with the heading "Time is Running Out," that read, "It is time to stop using asbestos and nobody has been more aware of it than Garlock." According to the advertisement, Garlock began developing gaskets that did not contain asbestos in the 1960s.  Also according to the advertisement, Garlock found that gaskets that did not contain asbestos were superior to those that did, because gaskets without asbestos did not harden and thus were easier to remove.  Despite this public pronouncement, Garlock *continued* its

criminal enterprise of manufacturing and selling products containing asbestos through the early 2000s.

45.     In 2001, Garlock was cited by the Occupational Safety and Health Administration (OSHA) for failing to comply with the monitoring provisions of OSHA's asbestos standards. More specifically, Garlock failed to identify and disclose the names, years of employment, and diagnoses for five Garlock employees who had been diagnosed with mesothelioma and asbestosis.

46.     When presented with this evidence of Garlock's conscious and prolonged corporate indifference in continuing to market and sell its dangerous asbestos-containing products without appropriate warning, juries across the country assessed Garlock with significant compensatory and punitive damages awards.

47.     In a 2014 opinion upholding a $874,507 damages award – including $600,000 for punitive damages – against Garlock and in favor of the estate of a plaintiff who died as a result of lung cancer attributed to his occupational exposure to asbestos and his long-term cigarette smoking, the Court of Appeals of Kentucky summarized "just a fraction of the evidence" presented against Garlock:

> At trial, the Estate's theory of the case was premised on Garlock's failure to warn pipefitters like Dayton about the risks of exposure to asbestos in Garlock's gaskets.
>
> *       *       *
>
> The jury heard testimony from Dayton's son, James, who worked alongside his father as a pipefitter on numerous job sites between 1967 and 1986. James recalled that Garlock gaskets were the most prominent gaskets used on the job sites, and the process of removing a gasket from a steam pipe required using a wire brush or grinder to completely remove the deteriorated gasket so a new gasket could be installed. The removal process produced dust that covered the person who was removing the gasket from the pipe.

\*   \*   \*

The jury also heard testimony from Garlock's corporate representative, James Heffron. Heffron's testimony established that Garlock began protecting its own employees from asbestos exposure in its manufacturing plant in 1947. Heffron acknowledged that Garlock representatives attended asbestos-industry meetings where information was provided regarding the link between asbestos exposure and cancer. Heffron admitted that Garlock knew that its gaskets would have to be removed over time and that pipefitters may have to use the grinding method to fully remove the deteriorated gasket.

\*   \*   \*

In sum, sufficient evidence was presented for the jury to conclude that Garlock's failure to warn constituted a wanton or reckless disregard for the health and safety of end-users like Dayton.

*Garlock Sealing Technologies, LLC v. Dexter*, No. 2006-CA-000918, 2014 WL 3795407, at \*2-3 (Ky. Ct. App. Aug. 1, 2014). Garlock was but one of nineteen defendants in that case.

48.     One case involving significant punitive damages against Garlock was *Treggett v. Garlock Industries & Kelly-Moore Paint Co.*, No. BC307058, Los Angeles Co., California, which was tried to a jury in 2004. The plaintiff in that case, Robert Treggett, was represented at trial by Ronald C. Eddins, before he became a founding partner of Simon, Eddins & Greenstone, LLP. David Glaspy, who represented Garlock in asbestos litigation primarily on the West Coast, and who eventually became Garlock's attorney primarily responsible for resolving cases brought by Simon Greenstone, was Garlock's trial counsel.

49.     Treggett was a former machinist's mate who was exposed to Garlock's gaskets and other asbestos-containing products while serving in the Navy. Treggett testified at trial that, in addition to his work with Garlock gaskets, he was exposed to asbestos-containing insulation during an overhaul of the submarine on which he served. Following a jury trial, Treggett and his wife were awarded in excess of $36 million, including an $18 million punitive damages award.

Garlock was found to be 40% liable for Treggett's damages. According to Garlock's trial counsel, this was the most devastating loss that Garlock ever suffered.

50. It is against this background of trial losses and significant litigation risk that Garlock, Garrison, and their attorneys in the underlying cases decided to settle cases with Simon Greenstone's clients early, often without conducting any discovery, and often in group settlements. During the course of the underlying litigation, Garlock's attorneys were not concerned with bankruptcy trust submissions or thermal insulation exposures, having never even inquired about bankruptcy trust submissions or discussing alternative exposures at all in the context of the settlement negotiations. Instead, they wanted to meet the budget they had allocated for cases handled by Simon Greenstone. They expressed no concern to Simon Greenstone about the completeness of any discovery responses or the veracity of its clients' testimony.

51. Indeed, some of Garlock's attorneys in the underlying litigation boasted of their ability to settle Simon Greenstone's cases early and save Garlock defense costs, as compared to others of Garlock's attorneys who were not as clever and strategic in their approach. In their settlement recommendations to Garlock, Garlock's attorneys in the underlying litigation were concerned with the age of the particular plaintiffs, the seriousness of their injuries, the venue of the lawsuit, the skill of Simon Greenstone's lawyers – and not the existence *vel non* of product identification of other asbestos containing insulation exposure.

52. Garlock's counsel primarily responsible for resolving Simon Greenstone cases made clear that he appreciated how Simon Greenstone's attorneys settled cases with Garlock. In email correspondence settling the *Merrill* and *Pounds* cases – both of which Garlock and Garrison now falsely claim they were defrauded into settling – Garlock's counsel thanked Ron

Eddins for resolving the cases:

> Dear Ron: on behalf of my client, thank you. They do not yet realize that this is a win win, but with time they will. I actually do not like the Segal, Mahoney empire and this will help me under mine [sic.] their influence. They, at my urging, went on record saying that you could not be dealt with in a rational manner. Now I get to shove that up their collective ....
>
> When you have time, it would be help [sic.] if I could get a list of the trial cases from around the country that you want to negotiate. Either annually, quarterly, or whatever time frame you desire and I can then go take the general counsel out golfing and explain how we can cut millions from their legal and expert budget. That would be a win win for me. Golf and vindication, all paid for. I owe you one.

*See* Appendix B, Merrill.

## GARLOCK AND GARRISON'S FRAUD IN ASBESTOS LITIGATION

53.     To further minimize the risk of trial losses, and to wrongfully suppress the value of verdicts and settlements, Garlock and Garrison knowingly and willfully concealed material evidence that they were obligated to disclose in response to discovery requests and knowingly and willfully made false statements in response to interrogatories. They concealed evidence that Garlock's asbestos-containing products cause disease and made false statements in response to interrogatories in order to weaken the asbestos personal injury and wrongful death plaintiffs' cases against Garlock and accordingly to minimize their own financial losses, and the plaintiffs' recovery. By concealing evidence that Garlock's products caused disease, and lying to Simon Greenstone about when Garlock first learned that asbestos causes disease, Garlock and Garrison obtained depressed settlements and verdicts in cases brought by individuals represented by Simon Greenstone and in turn Simon Greenstone's contingency and committed fraud against Simon Greenstone.

54.     Garlock was served with master interrogatories and requests for production for all asbestos-related personal injury cases filed in or to be filed in Harris County, Texas, which included the Simon Garlock case *White v. Buffalo Pumps, Inc., et al.* No. 2006-41943. Garlock and Garrison falsely claim in the RICO Lawsuit that Garlock was defrauded by Simon Greenstone in the *White* case. Garlock served or caused to be served its First Amended Responses to Plaintiffs' Interrogatories and Requests for Production to those requests on Simon Greenstone for the *White* case using the wires on October 5, 2006. *See* Appendix B, White.

55.     In Objection 6 to these discovery requests, and in specific response to Requests for Production 26 and 28, Manufacturers' Request for Production 37, and Manufacturers' Interrogatory 17, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "[t]here has never been any competent scientific or medical evidence or reason to believe that Garlock asbestos-containing products, upon reasonable use, released asbestos fibers in sufficient quantity, if any, to pose a health hazard, potential or otherwise, to persons using such products. Garlock denies that use of, or exposure to, its asbestos-containing products posed any health hazard or any significant possibility of inhalation of asbestos fibers." Garlock had in fact received scientific and medical evidence that Garlock's asbestos-containing products posed health hazards. And Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust.

56.     Interrogatory 1 called for Garlock to describe when and how it learned that inhalation of asbestos fibers can lead to the development of asbestos-related diseases.  In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that Garlock did not learn of the relationship between exposure to asbestos fibers and mesothelioma until the 1970s and that the "source of such knowledge was the asbestos litigation which involved lawsuits alleging a causal relationship between asbestos exposure and mesothelioma."  Garlock had in fact learned that exposure to asbestos fibers caused mesothelioma, at the latest, in a 1966 meeting of the Asbestos Textile Institute, which pre-dated lawsuits filed in the 1970s.   Garlock and Garrison further claimed in furtherance of their scheme to defraud that Garlock did not learn until the "early 1970's" that "excessive exposure to asbestos fibers was viewed by the medical and scientific community as a possible cause or contributor to lung cancer," and that it gained that knowledge through "OSHA regulations and public media reports."  But in truth, Garlock learned no later than March of 1956, at a meeting of the Asbestos Textile Institute, that exposures to asbestos as short as six months cause lung cancer.  In fact, Garlock knew no later than 1956 that the causal relationship between asbestos exposure and lung cancer was strong – so strong that litigation brought by the injured would likely ensue.  The disparity between historical truth and the falsity of Garlock's interrogatory responses in this regard could not be more stark.

57.     Garlock was served with standard interrogatories in the Simon Greenstone case *Lenz v. Allis Chalmers Corp. Prod. Liab. Trust, et al.*, No. 07-CP-40-5106 (Richland Co., SC). Garlock served or caused to be served its Responses to Standard Interrogatories on Simon Greenstone for the *Lenz* case using the wires on March 4, 2008.  *See* Appendix B, Lenz.

58.     In General Objection 5, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "[t]here has never been any competent scientific or medical evidence or reason to believe that Garlock products, upon reasonable use, released asbestos fibers in sufficient quantities, if any, to have posed a health hazard, potential or otherwise, to persons who used said products.  Garlock denies that the use of, or exposure to, its asbestos-containing products posed any health hazard."  Garlock had in fact received scientific and medical evidence that Garlock's asbestos-containing products posed health hazards.  Garlock's own  MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix.  Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."  Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust.

59.     Interrogatory 8 called for Garlock to provide information regarding instructions or warnings concerning the potential health hazards of asbestos exposure to the Lenz's employers.  In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "there has never been any competent scientific or medical evident [sic] or reason to believe that Garlock asbestos-containing products pose a health hazard, potential or otherwise to persons using said products.  Garlock products pose no health hazard, potential or otherwise to persons using such products."  Garlock had in fact received scientific and medical evidence that Garlock's asbestos-containing products posed health hazards.  Garlock's own  MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health

hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust.

60. Interrogatory 9 called for Garlock to provide information regarding instructions or warnings concerning the potential health hazards of asbestos exposure to plaintiffs and workers at various jobsites. In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "there has never been any competent scientific or medical evidence or reason to believe that its asbestos-containing products, upon reasonable use, release asbestos fibers in sufficient quantities, if any, to pose a health hazard, potential or otherwise, to persons using such products. Garlock denies that use of, or exposure to, its asbestos containing products poses any health hazard, or any significant possibility of inhalation of asbestos fibers." Garlock had in fact received scientific and medical evidence that Garlock's asbestos-containing products posed health hazards. Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust. Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation, blankets, or pads containing friable asbestos, and that such

insulation would need to be removed by workers replacing Garlock gaskets.

61.     Interrogatory 11 called for Garlock to indicate whether it provided respirators to Lenz or others at his job sites.  In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "there has never been any competent scientific or medical evidence or reason to believe that its asbestos containing products, upon reasonable use, release asbestos fibers in sufficient quantities, if any, to pose a health hazard, potential or otherwise, to persons using such products.  Respirators are not required while working with, installing or reworking Garlock products since said products pose no health hazard."  In fact, Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust.  Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation, blankets, or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

62.     Interrogatory 5 called for Garlock to describe any investigations or citations by OSHA or any other local, state, or federal agency for any matter related to asbestos or asbestos exposure.  In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that Garlock "has no record, knowledge, or recollection of any such citation relative to any of its asbestos containing products."  Garlock was in fact cited by OSHA in 2001 for failing to comply with the monitoring provisions of OSHA's asbestos standards and failing to identify and disclose the names, years of employment, and diagnoses for five Garlock employees who had been diagnosed with mesothelioma and asbestosis.

63.     Interrogatory 10 called for Garlock to identify its asbestos-containing products. In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "Garlock's flexible and durable gasketing material was handled, installed and removed in all intended applications without releasing meaningful quantities, if any, of asbestos fibers into the air."  In fact, Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust.  Garlock's own  MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix.  Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."  Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation, blankets, or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

64.     Interrogatory 13 to Manufacturers asked Garlock whether it contends that its products can be generally utilized without liberating asbestos fibers into the air.  In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that Garlock's "encapsulated sealing products do not release fibers in sufficient quantities as to pose a health hazard."  Garlock and Garrison in fact knew that when Garlock's asbestos-containing gaskets were removed, workers would have to use a grinding method to remove the deteriorated gasket.  Garlock's own  MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix.

Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."

65.    The *Lenz* case went to trial against the four non-settling defendants, which included Garlock. The jury returned a verdict of zero liability for Garlock. Had Garlock answered the interrogatories propounded honestly and completely, Simon Greenstone would have been better able to present to the jury admissions from Garlock that its products release asbestos fibers in their reasonably foreseeable use and cause disease.

66.    Simon Greenstone served standard interrogatories on Garlock in the cases captioned *Reed v. American Standard, Inc., et al.*, No. BC360536; *Belt v. A.W. Chesterton Co., et al.*, No. BC 360535; *Bercher v. Alfa Laval, Inc., et al.*, No. BC 347728; *Pounds v. Alfa Laval, Inc., et al.*, No. BC 353068; *Howell v. Alfa Laval, Inc., et al.*, No. BC 353761; *Steidel v. AGCO Corp., et al.*, No. BC 369661; and *Lindquist v. Alfa Laval, et al.*, No. BC 382729, all of which were filed in Los Angeles County, California. *See* Appendix B, Reed, Belt, Bercher, Pounds, Howell, Steidel, and Lindquist. Garlock and Garrison claim in the RICO Lawsuit that Garlock was defrauded by Simon Greenstone in these cases.

67.    Garlock and Garrison served Garlock's responses to these interrogatories, using the wires or mails, as follows:

- *Reed v. American Standard, Inc., et al.*, No. BC360536 – Garlock and Garrison served or caused to be served Garlock's verified responses to interrogatories on Simon Greenstone via the wires on January 2, 2007.

- *Belt v. A.W. Chesterton Co., et al.*, No. BC 360535 – Garlock and Garrison served or caused to be served Garlock's verified responses to interrogatories on Simon Greenstone via the mail on January 10, 2007.

- *Bercher v. Alfa Laval, Inc., et al.*, No. BC 347728 – Garlock and Garrison served or caused to be served Garlock's verified responses to interrogatories on Simon Greenstone via facsimile on March 28, 2006.

- *Pounds v. Alfa Laval, Inc., et al.*, No. BC 353068 – Garlock and Garrison served or caused to be served Garlock's verified responses to interrogatories on Simon Greenstone via the mail on July 17, 2006.

- *Howell v. Alfa Laval, Inc., et al.*, No. BC 353761 – Garlock and Garrison served or caused to be served Garlock's responses to interrogatories on Simon Greenstone via the mail on August 8, 2006.

- *Steidel v. AGCO Corp., et al.*, No. BC 369661 – Garlock and Garrison served or caused to be served Garlock's verified responses to interrogatories on Simon Greenstone via the mail on June 21, 2007.

- *Lindquist v. Alfa Laval, et al.*, No. BC 382729 – Garlock and Garrison served or caused to be served Garlock's verified responses to interrogatories on Simon Greenstone via the mail on March 11, 2008.

*See* Appendix B, Reed, Belt, Bercher, Pounds, Howell, Steidel, and Lindquist.

68.    Garlock's interrogatory responses, which were uniform for each case identified in paragraphs 66-67, contained the following false and fraudulent statements made in furtherance of the scheme to defraud:

69.    In Objection 5, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "[t]here has never been any competent scientific or medical evidence or reason to believe that Garlock products, upon reasonable use, release asbestos fibers in sufficient quantities, if any, to pose a health hazard, potential or otherwise, to persons using said products.

Garlock denies that the use of, or exposure to, its asbestos-containing products pose any health hazard." In fact, Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders or scrapers, which would release hazardous asbestos dust. Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation blankets or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

70.     Interrogatory 15 called for Garlock to answer whether it had engaged in the processing, marketing, and sale of products containing or utilizing asbestos fibers. In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "Garlock's flexible and durable gasketing material is handled, installed and removed in all intended applications without releasing meaningful quantities, if any, of asbestos fibers into the air." In fact, Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust. Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Further, Garlock and Garrison were

aware that the applications where Garlock's gaskets were used would often be insulated with insulation, blankets, or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

71.     Interrogatories 27 and 29 called for Garlock to provide information about warnings regarding the possibility of injury from use of its products.  In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that Garlock's products are "safe."  As set forth herein, Garlock and Garrison knew that Garlock's asbestos-containing products were hazardous.

72.     Interrogatory 30 called for Garlock to identify when Garlock first received notice that any person claimed injury as a result of exposure to asbestos or asbestos-containing products manufactured or sold by Garlock.  In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "[n]o plaintiff has ever presented competent scientific or medical evidence that Garlock's asbestos-containing products, upon reasonable use, emit harmful levels, if any, of asbestos."  As set forth herein, Garlock and Garrison were in fact aware that Garlock asbestos-containing products, upon reasonable use, would emit levels of asbestos sufficient to cause disease.

73.     Interrogatory 71 called for Garlock to indicate whether it heard, from any source, of an alleged association between asbestos exposure and the development of cancer, asbestosis, and pulmonary disease between 1930 and 1978.  Interrogatory 76 called for Garlock to provide information regarding bulletins warning employees of the hazards of inhaling asbestos and coming into contact with Garlock's asbestos-containing products.  In response to both of these interrogatories, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "there has never been any competent scientific or medical evidence that Garlock

products pose a health hazard, potential or otherwise to persons using said products," and knowingly and in furtherance of their scheme to defraud failed to disclose that it learned no later than 1933 that the asbestos utilized in its products causes disease. Garlock was in fact aware of scientific and medical evidence of the health hazards posed by its asbestos-containing products. Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust. Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation, blankets, or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

74. Interrogatory 58 called for Garlock to provide information regarding the use of Garlock's products in a manner to avoid exposing workers to dust exceeding threshold limit values. In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "[n]o specific instructions have been provided on avoidance of dust exceeding threshold limit values and/or permissible exposure limits, as Garlock's encapsulated sealing products have always been below the applicable threshold limit values and/or permissible exposure limits." Garlock had, by 1986 at the latest and as set forth in the MSDS for its gaskets, in fact provided instructions that workers should avoid creating dust when using Garlock's asbestos-containing products due to the health risks posed.

75.     Garlock was served with interrogatories in the case *Thacker v. 3M Company, et al.*, No. BC 384159 (Los Angeles Co., CA).  Garlock and Garrison served or caused to be served Garlock's verified responses on Simon Greenstone using the mail on April 15, 2008.  *See* Appendix B, Thacker.

76.     In Objection 5, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "[t]here has never been any competent scientific or medical evidence or reason to believe that Garlock products, upon reasonable use, release asbestos fibers in sufficient quantities, if any, to pose a health hazard, potential or otherwise, to persons using said products. Garlock denies that the use of, or exposure to, its asbestos-containing products pose any health hazard."  Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders or scrapers, which would release hazardous asbestos dust.  Garlock's own  MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix.  Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."  Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation blankets, or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

77.     Interrogatory 15 called for Garlock to answer whether it had engaged in the processing, marketing, and sale of products containing or utilizing asbestos fibers.  In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "Garlock's flexible and durable gasketing material is handled, installed and removed in all

intended applications without releasing meaningful quantities, if any, of asbestos fibers into the air." In fact, Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust. Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation, blankets, or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

78.     Interrogatory 16 called for Garlock to describe whether its asbestos-containing products had been altered in asbestos content since first being marketed. In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that Garlock discontinued selling asbestos-containing products for "basically economic" reasons "in that the market for the particular product was such that the manufacture and sale was not profitable. Also, as new and better products have been introduced, older products have become obsolete and unprofitable." As set forth in paragraphs 44 and 98-101, Garlock released advertisements indicating that it had developed non-asbestos-containing gaskets that performed better than asbestos-containing gaskets long before it discontinued the sale of asbestos-containing products, and that Garlock was "aware" that it was time to discontinue asbestos-containing products to "clear the air" – that is, to avoid exposing workers to asbestos dust.

79.     Interrogatory 58 called for Garlock to provide information regarding the use of Garlock's products in a manner to avoid exposing workers to dust exceeding threshold limit values.  In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that "[n]o specific instructions have been provided on avoidance of dust exceeding threshold limit values and/or permissible exposure limits, as Garlock's encapsulate sealing products have always been below the applicable threshold limit values and/or permissible exposure limits."  Garlock had, by 1986 at the latest and as set forth in the MSDS for its gaskets, in fact provided instructions that workers should avoid creating dust when using Garlock's asbestos-containing products due to the health risks posed.

80.     Interrogatory 68 called for Garlock to describe any tests or experiments conducted before 1980 to determine whether or not asbestos fibers would become airborne upon applying Garlock's asbestos-containing products.  In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "[t]here has never been any competent scientific or medical evidence or reason to believe that Garlock asbestos-containing products, upon reasonable use, released asbestos fibers in sufficient quantity, if any, to pose a health hazard, potential or otherwise, to persons using such products.  Garlock denies that use of, or exposure to, its asbestos-containing products posed any health hazard or any significant possibility of inhalation of asbestos fibers."  Garlock had in fact received scientific and medical evidence that Garlock's asbestos-containing products posed health hazards, and Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix.  Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."

81.     Garlock was served with interrogatories in the case *Creek v. Alfa-Laval, et al.,* No. BC 348521 (Los Angeles Co., CA, originally filed in Hillsborough Co., FL). Garlock and Garrison served or caused to be served Garlock's verified responses on Simon Greenstone using the wires or mail on or around September 8, 2008. *See* Appendix B, Creek.

82.     Interrogatory 2 called for Garlock to answer whether it had engaged in the marketing and sale of products containing or utilizing asbestos fibers. In response, Garlock and Garrison knowingly and falsely claimed in furtherance of their scheme to defraud that "Garlock's flexible and durable gasketing material is handled, installed and removed in all intended applications without releasing meaningful quantities, if any, of asbestos fibers into the air." In fact, Garlock and Garrison were aware that, at the end of their useful life, Garlock's gaskets would be removed by workers using wire brushes, grinders, or scrapers, which would release hazardous asbestos dust. Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma." Further, Garlock and Garrison were aware that the applications where Garlock's gaskets were used would often be insulated with insulation, blankets, or pads containing friable asbestos, and that such insulation would need to be removed by workers replacing Garlock gaskets.

83.     Interrogatory 5 called for Garlock to provide information about warnings regarding the possibility of injury from use of its products. In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that Garlock's products are "safe." In fact, Garlock knew that its asbestos-containing products were hazardous. As set forth in

Garlock's own MSDS, under the heading "HEALTH HAZARD DATA," indicates that Garlock's products give rise to a health hazard when "subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix. Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma."

84. Interrogatory 6 called for Garlock to describe why it was discontinuing manufacturing and/or selling asbestos-containing products. In response, Garlock and Garrison falsely and in furtherance of their scheme to defraud claimed that Garlock discontinued selling asbestos-containing products for "basically economic" reasons "in that the market for the particular product was such that the manufacture and sale was not profitable. Also, as new and better products have been introduced, older products have become obsolete and unprofitable." As set forth in paragraphs 44 and 98-101, Garlock released advertisements indicating that it had developed non-asbestos-containing gaskets that performed better than asbestos-containing gaskets long before it discontinued the sale of asbestos-containing products, and that Garlock was "aware" that it was time to discontinue asbestos-containing products to "clear the air" – that is, to avoid exposing workers to asbestos dust.

85. Garlock and Garrison made the same or substantially similar misrepresentations in every set of interrogatory responses that it served on Simon Greenstone – that is, Garlock and Garrison knowingly and falsely maintained that Garlock's products were safe, and misrepresented when Garlock learned of the hazards of asbestos, in every case brought by a plaintiff represented by Simon Greenstone and, on information and belief, in every case brought by every plaintiff anywhere in the country.

86.     Additionally, Garlock failed to produce to Simon Greenstone documentary evidence that was responsive to requests for production served in cases brought by Simon Greenstone including, but not limited to, *Belt v. A.W. Chesterton Co., et al.,* No. BC 360535; *White v. Buffalo Pumps, Inc., et al.,* No. 2006-41943; *Thacker v. 3M Company, et al.*, No. BC 384159; and *Creek v. Alfa-Laval, et al.,* No. BC 348521. More specifically, requests for production served in these and other cases called for Garlock to produce documents, *inter alia*, relating to Garlock's decision to stop using asbestos in its products; documents relating to the hazards of Garlock's asbestos-containing products; and documents relating to warnings concerning the presence or use of asbestos or health hazards. *See* Appendix B, Belt, White, Thacker, and Creek.

87.     Simon Greenstone's theory of liability that Garlock had failed to warn of the hazards of its products was based largely on documentary evidence that Garlock knew that its asbestos-containing products caused disease long before Garlock placed warnings on its products. But Garlock failed to produce certain of these documents in response to requests for production, and contested the significance of these documents at trial. Had Garlock produced these documents in response to requests for production pertaining to the hazards of Garlock's asbestos-containing products, the production would have itself been an admission of the significance of the document – that it constituted evidence that Garlock's products did, in fact, contain a hazard.

88.     Garlock and Garrison served Garlock's responses to requests for production, using the wires or mails, as follows:

- *Belt v. A.W. Chesterton Co., et al.*, No. BC 360535 – Garlock and Garrison served or caused to be served Garlock's responses on Simon Greenstone by mail on March 15, 2007.

- *White v. Buffalo Pumps, Inc., et al.*, No. 2006-41943 – Garlock and Garrison served or caused to be served Garlock's responses on Simon Greenstone by wire on October 5, 2006.

- *Thacker v. 3M Company, et al.*, No. BC 384159 – Garlock and Garrison served or caused to be served Garlock's verified responses on Simon Greenstone via the mail on October 31, 2008.

- *Creek v. Alfa-Laval, et al.,* No. BC 348521 – Garlock and Garrison served or caused to be served Garlock's responses on Simon Greenstone via the wires and mail on June 15, 2009.

*See* Appendix B, Belt, White, Thacker, and Creek.

89.     Garlock and Garrison knowingly and intentionally, and in furtherance of their scheme to defraud, failed to produce a 1980 manual titled *Garlock Gasketing Materials* (the "1980 Garlock Gasketing Materials Manual"), a 1986 Material Safety Data Sheet (the "1986 MSDS"), an advertisement from the early 1990s titled *Time is Running Out* (the "Time is Running Out Advertisement"), and another advertisement from the early 1990s titled *Time to Clear the Air* (the "Clear the Air Advertisement").  *See* Appendix C.  Though Simon Greenstone had the 1986 MSDS, the Time is Running Out Advertisement, and the Time to Clear the Air Advertisement, and used them at trial, they were not able to present and argue to the jury that these documents had been *produced by Garlock* in response to requests for production seeking documents relating to the hazards of Garlock's products.

90.     The wrongfully withheld 1980 Garlock Gasketing Materials Manual contains the following warning on the table of contents page:

> **CAUTION:** Some of the products described in this brochure contain asbestos fibers. Avoid creating dust. Breathing asbestos dust may cause serious bodily harm. Many of the products listed are asbestos-free, and are described as such.

*See* Appendix C. Garlock and Garrison knowingly withheld this manual in order to suppress evidence of the health hazards of Garlock's asbestos-containing products and Garlock's knowledge of the health hazards posed by its asbestos-containing products.

91.     Simon Greenstone purchased a copy of the 1980 Garlock Gasketing Materials Manual via eBay in 2012, and did not and could not have discovered that it had been wrongfully withheld from production by Garlock prior to that date.

92.     The wrongfully withheld 1986 MSDS contains the following information under the heading "HEALTH HAZARD DATA" regarding the health hazards of Garlock's asbestos-containing products:

> EFFECTS OF EXPOSURE:
>
> These products do not pose a health hazard under ordinary conditions of use. A hazard would arise only if the products were subjected to mechanical actions that would cause the asbestos fibers to be released from the elastomer compound matrix.
>
> Inhalation of such airborne fibers can cause the well-known long term effects of Asbestosis, lung cancer and mesothelioma.

93.     The MSDS provides the following emergency first aid procedures for inhalation of asbestos fiber:

> Remove victim from contaminated area. Report exposure to medical personnel.

94.    The MSDS provides the following instructions for disposal:

Grinding or machining of the product should be avoided since these, or similar operations may generate asbestos dust. Any such dust should be vacuumed up, sealed in a plastic bag and disposed of in accordance with instructions from a disposal company. The user is responsible for complying with any local, state or federal regulations.

95.    The MSDS provides the following special precautions:

When removing used gaskets, avoid excessive mechanical actions and place the asbestos containing residues in a plastic bag for disposal. As a precaution, a dust mask should be worn by individuals when engaged in removal of used gaskets.

96.    Garlock represented that the MSDS was accurate to the best of its knowledge:

NOTE: The information provided herein is accurate to the best of our knowledge, but no warranty, express or implied, is made.

97.    Garlock and Garrison knowingly and intentionally and in furtherance of their scheme to defraud withheld the 1986 MSDS in order to suppress evidence of the health hazards of Garlock's asbestos-containing products and Garlock's knowledge of the health hazards posed by its asbestos-containing products.

98.    The Time is Running Out Advertisement reads: "IT'S TIME TO STOP USING ASBESTOS. AND NOBODY HAS BEEN MORE AWARE OF IT THAN GARLOCK." The brochure states that Garlock began research and development in the 1960s to develop non-asbestos-containing products. The advertisement touts Garlock's non-asbestos gaskets as less costly and better performing than asbestos gaskets.

99.    Garlock and Garrison knowingly and intentionally and in furtherance of their scheme to defraud withheld the Time is Running Out Advertisement in order to suppress evidence of the health hazards of Garlock's asbestos-containing products and Garlock's knowledge of the health hazards posed by its asbestos-containing products.

100.    The Time to Clear the Air Advertisement reads: "TIME TO CLEAR THE AIR. A TIME FOR REAL ANSWERS."  The advertisement describes the difficulty in removing asbestos-containing gaskets: "Because Garlock asbestos-free gaskets and packing will not harden like asbestos, removal generally is much easier.  Asbestos packing is particularly difficult to remove."

101.    Garlock and Garrison knowingly and intentionally withheld the Time to Clear the Air Advertisement in furtherance of their scheme to defraud and in order to suppress evidence of Garlock's knowledge of the health hazards of Garlock's asbestos-containing products.  Garlock knew that asbestos gaskets and packing harden and are difficult to remove, and, according to their own brochure, Garlock was aware of these facts  25 years *before* EPA regulations forbade the use of asbestos-sealing products sealing products "that [were] not merely substitutes for asbestos," but were rather "appreciably superior to asbestos in every aspect of performance."

## GARLOCK FRAUDULENTLY INDUCES SETTLEMENTS ON THE EVE OF FILING FOR BANKRUPTCY

102.    Garlock filed for Chapter 11 bankruptcy protection on June 5, 2010.

103.    At the time it filed for bankruptcy protection, more than 4,000 mesothelioma lawsuits were pending against Garlock.  The company had $2.4 million in outstanding settlement agreements for claims it had already resolved with mesothelioma plaintiffs represented by Simon Greenstone.  Now that Garlock has filed for bankruptcy protection, the survivors of these terminally-ill plaintiffs will be paid only pennies on the dollar.

104.    On information and belief, at the time Garlock entered into settlement agreements with Simon Greenstone clients in the last months of 2009 and in the first six months of 2010, it had no intention of ever paying those settlements.  Simon Greenstone regularly contacted Garlock's asbestos trial counsel via the wires about the status of settlements that were past due.

Garlock and Garrison, through counsel, as late as May 26, 2010, corruptly assured Simon Greenstone via the wires that the money had been sent to Garlock by its insurer; that the funds would be forthcoming; and that Simon Greenstone did not need to file motions to compel payment. Garlock and Garrison, through counsel, claimed that the delay in payments was due to slow payment by the insurance carriers. On information and belief, Garlock did not pay these settlements because it had already decided to file for Chapter 11 bankruptcy protection, and had in fact made the decision to file for Chapter 11 bankruptcy protection before it entered into these settlements, and made these representations to Simon Greenstone in furtherance of its fraudulent scheme and for the purpose of obtaining money and property by false and fraudulent pretenses by inducing Simon Greenstone to refrain from judicially enforcing the settlement agreements until it was too late – when the bankruptcy automatic stay took effect.

105. Further, in late May 2010 – before Garlock filed for bankruptcy protection – Garlock, through counsel, scheduled via the wires a meeting to take place on June 11, 2010, with attorneys from the five plaintiffs firms whose clients received the most in aggregate payments from Garlock on an annual basis, which included Simon Greenstone. Garlock described the meeting as an opportunity to discuss a possible resolution of Garlock's present and future asbestos liabilities. On information and belief, this meeting was scheduled with the knowledge that Garlock would file for bankruptcy protection before the meeting occurred. Garlock described the purpose of the meeting as to discuss the decreasing pool of insurance money available for Garlock to fund settlements going forward, and assured Simon Greenstone that the meeting would not have any effect on the settlements already entered with Simon Greenstone's clients. On information and belief, this meeting was scheduled in furtherance of Garlock and Garrison's fraudulent scheme for the purpose of obtaining money and property by false and

fraudulent pretenses by fraudulently inducing Simon Greenstone to not file motions to compel payment of overdue settlements because Garlock had already decided to file for Chapter 11 bankruptcy protection.

## GARLOCK AND GARRISON'S FRAUDULENT RICO LAWSUIT

106.    The June 11, 2010 meeting between Garlock and Garrison, through their counsel, and attorneys from the five plaintiffs firms whose clients received the most in aggregate payments from Garlock on an annual basis, took place at the Omni Berkshire hotel in New York. Jeffrey Simon attended on behalf of Simon Greenstone.

107.    During the meeting, Garlock and Garrison floated their new theory that Garlock had been defrauded into entering into settlements with Simon Greenstone and other plaintiff firms' clients. Garlock and Garrison proposed paying only $12,000 per mesothelioma claim out of an aggregate fund of $165 million as part of Garlock's bankruptcy reorganization. Garlock and Garrison attempted to leverage their fraud allegations to pressure plaintiffs' attorneys into committing their dying clients (and deceased clients' survivors) to accept Garlock and Garrison's proposal to pay what amounted to only a small fraction of the values of what Garlock had paid to mesothelioma victims in the past, threatening to "come after you" (the plaintiffs' lawyers) and "blow the lid off" of what Garlock and Garrison claimed was fraud if the plaintiffs' lawyers did not coerce  their clients to agree to Garlock's demands.

108.    When Simon Greenstone and other plaintiffs' attorneys refused to commit their clients to accept $12,000, Garlock and Garrison went forward with their fraudulent scheme to paint Garlock as a victim of fraud in the underlying asbestos personal injury and wrongful death cases rather than the sophisticated litigant that it was.

109.     Garlock and Garrison filed the RICO Lawsuit against Simon Greenstone on January 9, 2014, the day before the bankruptcy court's estimation order was scheduled to be released.  Garlock and Garrison have not filed suit against the estates of any individual plaintiff represented by Simon Greenstone whom Garlock and Garrison contend perjured themselves.

110.     In the RICO Lawsuit, Garlock and Garrison knowingly and falsely and in furtherance of their scheme to defraud claimed that Simon Greenstone and their clients withheld evidence of exposure to asbestos thermal insulation products and fraudulently induced Garlock into settlements.

111.     Garlock and Garrison's allegations against Simon Greenstone form a clear and familiar pattern. In the cases described in Garlock and Garrison's RICO Lawsuit, Garlock and Garrison claim that plaintiffs dying of mesothelioma, at their lawyers' urging, concealed the existence of plaintiff's historical exposure to asbestos-containing thermal insulation. Yet, in *each* case, there is clear testimony from the plaintiff of his exposure to thermal insulation that Garlock and Garrison simply ignore for the purpose of contriving fraudulent claims against Simon Greenstone.  It is Garlock and Garrison, not Simon Greenstone, that have engaged in a startling pattern of misrepresentation.

112.     Garlock and Garrison's ulterior purpose in bringing the RICO Lawsuit against Simon Greenstone was to gain improper leverage against Simon Greenstone in the Garlock Bankruptcy by putting Simon Greenstone at financial risk with threats of economic harm through the damages pled in the RICO Lawsuit and by damaging Simon Greenstone's reputation.

113.     Simon Greenstone's clients – men who served in the armed forces and merchant marine of the United States and who worked as pipefitters, millwrights, machinists, boilermakers, and laborers, and who had regular exposure to Garlock's gaskets and the insulation

surrounding those gaskets – disclosed those sources of asbestos exposure of which they were

aware, as well as their work history, in their interrogatory responses and depositions. Indeed,

one of Simon Greenstone's theories of liability against Garlock was that Garlock was responsible

for failing to warn about foreseeable exposures to thermal insulation in connection with

maintenance and repair of Garlock's gaskets. Additionally, plaintiffs represented by Simon

Greenstone often had claims against equipment defendants who were responsible for exposing

the injured plaintiffs to the amphibole containing thermal insulation on that equipment. Thus, far

from trying to hide plaintiffs' exposure to asbestos thermal insulation products, Simon

Greenstone developed and pursued that evidence where it was available.

114.    It is not surprising that many of Simon Greenstone's clients recalled the name

brands of only those materials with which they worked regularly, and that their knowledge of the

universe of potential sources of exposure was more limited than Garlock's, given that Garrison

developed a comprehensive database of claims filed against Garlock, and that Garlock and

Garrison utilized a database maintained by Bates White, an environmental and products liability

consulting firm. The Bates White database provides information as to which specific asbestos

products were used at each jobsite, and by job description, across the country. That is, even if a

mesothelioma plaintiff did not know of all of his potential sources of exposure, Garlock had easy

access to the universe of other potential defendants by virtue of the Bates White database.

115.    Additionally, Garlock and Garrison had in their possession, or their attorneys in

the underlying litigation had in their possession, depositions, trial testimony, expert testimony,

and expert reports as a result of Garlock's more than 40 years' experience as a defendant in

asbestos personal injury and wrongful death cases. Garlock and Garrison knew from this

evidence what other products were likely to have been at the work sites of future plaintiffs, and

who manufactured those other products.

116.     But Garlock and Garrison chose not to develop that evidence in its tort litigation – tort litigation that Garlock and Garrison claimed was infected with fraud in well-publicized submissions, testimony, and arguments in the Garlock Bankruptcy.  Garlock's motivation for not developing that evidence was at least three-fold.  First, Garlock's national coordinating counsel represented other manufacturers and employers in asbestos litigation, and thus had a conflict of interest that prevented them and Garlock's trial counsel from advancing a theory that those other manufacturers and employers were responsible.  Garlock and Garrison were aware of this conflict and, on information and belief, signed conflict waivers.  Second, Garlock made the strategic decision not to "point the finger" at other manufacturers to avoid a litigation  scenario where defendants attacked each other to all defendants' detriment, and to the plaintiffs' benefit, in the form of likely higher damages awards.  And third, Garlock made the decision to settle many cases early, often before discovery had commenced in earnest, to dramatically limit cost of defense expenditures.

117.     Simon Greenstone obtained settlement values from Garlock that were comparatively high because they were highly skilled attorneys who represented primarily mesothelioma victims and were prepared to work cases up to trial.  Simon Greenstone has been described by Garlock's asbestos personal injury lawyer responsible for resolving Simon Greenstone cases as "in the top tier" of personal injury firms and as some of "the best trial lawyers in the country."

118.     In sum, Garlock and Garrison  made the strategic decision to settle Simon Greenstone's clients' claims early and purposely forego the opportunity to litigate before a jury its defense that it was other manufacturers' asbestos-containing products that caused the

plaintiffs' disease.

119.    Garlock and Garrison relied primarily on one attorney to resolve asbestos claims brought by Simon Greenstone counsel.   That attorney undertook a conscious, well-informed, and deliberate litigation strategy of settling cases with Simon Greenstone plaintiffs extremely early in litigation, often without conducting discovery.  Garlock, Garrison, and their counsel's case valuation was based not on the detailed facts of each case, but on the jurisdiction and venue in which the claim was filed, the nature of the plaintiff's disease, the plaintiff's evidence of exposure to Garlock gaskets (without regard to what other potential sources of exposure there may have been at that plaintiff's jobsites), and the potential damages based on the plaintiff's age, likely economic damages, and likely jury appeal of the plaintiff.

120.    Garlock's national coordinating counsel also represented equipment defendants, including Foster Wheeler, Fairbanks Morse, Cummins Diesel, and Weil-McLain, numerous premises defendants, and some insulation contractors.  This conflict of interest was known to Garlock and Garrison.  Plaintiffs' liability theory against several of these defendants was that those defendants were responsible for the thermal insulation products that Garlock falsely claims Simon Greenstone was trying to conceal.   Garlock's lawyers in the underlying cases had no interest in developing evidence of thermal insulation exposures to the detriment of their other clients.

121.    Garlock and Garrison's asbestos litigation counsel in the underlying cases prepared major expense authorizations ("MEAs") for asbestos litigation settlements.  The MEAs for settlements with Simon Greenstone clients reflect that the settlement considerations were the plaintiffs' ages, job titles, where they worked and the strength of Garlock identification at those worksites, the jurisdiction in which the cases were filed, and Simon Greenstone's history of trial

success.

122.    In the MEA authorizing settlement of eight Simon Greenstone cases set for trial in
Los Angeles in 2008 – including the *Reed* case, which Garlock and Garrison claim in the RICO
Lawsuit they were defrauded into settling – Garlock's lawyers in the underlying cases justify the
settlement figures with the following:

> The deal, although rich, is favorable and advisable.  First, the per
> case average is down from what we have recently paid on
> mesothelioma claims handled by Simon, Eddins & Greenstone in
> not only California, but in other jurisdictions as well.  In the recent
> past, we have paid Simons, Eddins & Greenstone $300,000 and
> above on various mesothelioma claims.
>
> Second, the deal provides certainty relative to very high risk cases,
> in an extremely bad jurisdiction, being handled by so if [sic.] the
> best trial lawyers in the country.  More specifically, and by way of
> history, Simmons, Eddins & Greenstone is a split-off of the Waters
> & Kraus firm.  Ron Eddins, then a partner of Waters & Kraus, was
> the trial attorney that obtained the large verdict and punitive
> damages award against Garlock in the Treggett case.  As to the
> cases themselves, all of them involve alleged exposures at sites
> where Garlock has been heavily identified in the past, including
> the U.S. Navy.  All of them have very high verdict potential.
>
> Overall, this settlement is worth consummating given the nature of
> the risk presented by the facts of these cases and the potential
> volatility of Los Angeles juries.

There is no mention whatsoever of the presence, strength, or absence of evidence of other
sources of exposure, which were of no consequence to Garlock at the time.  *See* Appendix B,
Reed.

123.    Likewise, in trial evaluation forms ("TEF") prepared by trial counsel to assess
upcoming cases, Garlock took into consideration the demand amount, the plaintiff's occupation,
exposure to Garlock's products, age, disease and date of diagnosis, whether the plaintiff smoked
cigarettes, whether the plaintiff had wage loss, any medical examinations, plaintiff's experts,
evidence of identification of Garlock's products, trial date, and skill of the plaintiff's attorney.  In

the TEF that contained the evaluations of the *Reed* and *Ornstein* cases (which Garlock and Garrison claim in the RICO Lawsuit they were defrauded into settling), there is no mention whatsoever of the presence, strength, or absence of evidence of other sources of exposure. *See* Appendix B, Reed, Ornstein.

124.    Garlock and Garrison deliberately and in furtherance of their scheme to defraud omitted from their recitation of facts in the RICO Lawsuit those portions of the depositions of Simon Greenstone's clients that refute the false and fraudulent claims that Garlock and Garrison make in the RICO Lawsuit.

125.    Garlock and Garrison claim in the RICO Lawsuit that false discovery responses were given in the case *White v. Buffalo Pumps, Inc., et al.*, No. 2006-41943 (Harris Co., TX, filed May 2006), and allege that "[a]lthough White and Defendants had actual knowledge that White was in fact exposed to amphibole insulating products (including pipe insulation) and other highly friable asbestos-containing products, White and Defendants failed to describe or identify exposures to those products in discovery in the *White* tort action."

126.    Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

127.    In White's answer to interrogatory 6, White disclosed that he "repaired equipment that was brought from the ships to the machine shop. . . . Plaintiff . . . was exposed to . . . the external insulation of those products." *See* Appendix B, White.

128.    White testified throughout his deposition that he removed asbestos insulation from valves, gaskets, and piping, and that he was then responsible for sweeping up the debris to dispose of it.  Counsel for Garlock attended White's deposition.  When describing maintenance work on pumps, White testified during his direct examination that "the majority of times that you

work in the shop, it's going to have asbestos attached to it" as insulation. When asked what happened after he removed asbestos insulation and gaskets from pumps, White testified during his direct examination:

> Well, I picture it. In other words, it might take a couple of day period, but I'm the helper handy man. So number one, I've got it removed, and now it's in a pile on the floor. And about the third day on along the line, somebody's going to say, gosh, we need to get rid of that. Well, that's also my job. I'm not a first class machinist. I'm the guy that sweeps it up, puts it in a bag, and puts it out in the trash.

During cross examination, White was asked, "So you removed the asbestos insulation not just from the valve itself in those instances, but also from the pertinent piping?" White's clear and direct answer, admitting exposure to asbestos insulation, was "Yes, sure." *See* Appendix B, White.

129. Dr. Holstein, an expert witness *retained by Simon Greenstone* in the *White* case, testified that White had significant exposure to friable amosite-containing products in his work history, and that that exposure was sufficient to cause mesothelioma. Garlock's counsel attended Holstein's deposition by telephone. *See* Appendix B, White. Steve Hays, another expert witness in the *White* case, testified that White's most significant exposure that increased his risk of developing mesothelioma was removal of external insulation, followed by sweeping up the external insulation debris, followed by removing asbestos-containing gaskets. Garlock's counsel attended Hays' deposition by telephone. *See* Appendix B, White.

130. Garlock and Garrison further claim in the RICO Lawsuit that they were defrauded into settling the *White* case.

131. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in the furtherance of their scheme to defraud. On information and belief, Garlock and Garrison settled the *White* case on the advice of their attorneys following a choice-of-law

decision finding that Virginia law applied to that case. Under Virginia law, joint and several liability applied. That made *White* a very dangerous case for Garlock because it could not blame White's thermal insulation exposure for his mesothelioma on a comparative fault basis. If the jury found that Garlock was *any* legal cause of White's mesothelioma, Garlock would be jointly and severally liable for the entire verdict, regardless of the testimony of White's own expert witness that White's exposure to friable amosite-containing products posed a greater risk than his exposure to Garlock's gaskets. Further, the Virginia Supreme Court had in 2005 upheld under federal maritime principles a $276,000 judgment returned after trial against Garlock as the sole remaining defendant where the plaintiff had pursued a theory that Garlock was liable because it had failed to warn of the dangers of insulation on its gaskets that had to be disturbed to perform maintenance on or replace Garlock's asbestos gaskets.

132. Garlock and Garrison claim in the RICO Lawsuit that false discovery responses were given in the case *Ornstein v. Alfa Laval, Inc., et al.*, No. BC38810 (Los Angeles Co., CA, filed April 2008), and allege that "[a]lthough Ornstein and Defendants had actual knowledge that Ornstein was exposed to amphibole insulating products (including pipe insulation) and other highly friable asbestos-containing products, Ornstein and Defendants failed to describe or identify exposures to those products in discovery in the *Ornstein* tort action."

133. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud. In Ornstein's response to interrogatory 59, Ornstein disclosed that "Pumps and valves were insulated with asbestos and contained asbestos gaskets, all of which were removed in Plaintiff's presence that created respirable asbestos dust." *See* Appendix B, Ornstein.

134. Ornstein sat for a five-day deposition and testified extensively to asbestos exposure from many different sources, including thermal insulation, over his 40-year career. Ornstein recalled seeing insulated pipes where he worked on his Navy ship, that he had to clean insulated valves and insulated pipes, and that insulation work on the ship was done in his presence. During his direct examination, Ornstein testified that there was insulation on the valves that he cleaned. The insulation "was like a blanket with – the valve would be wrapped in a blanket, like a whitish blanket that would cover the valve," and that "[w]hen the insulation was taken off, there were fibers on it." *See* Appendix B, Ornstein.

135. Garlock attended the five-day deposition only by *telephone*, and although Garlock examined Ornstein on two occasions, it did not ask Ornstein a single question about exposures to thermal insulation. If Garlock and Garrison had been genuinely interested in developing evidence of Ornstein's thermal insulation exposure, their attorneys would have asked Ornstein about it. They chose not to. But lawyers representing other parties and apparently pursuing other strategies asked Ornstein about thermal insulation exposures, and Ornstein testified that insulation work was done in his presence:

> Q. During that time period, there was also people that were doing insulation work on the ship; correct? They were re[-]covering pipes and things?
>
> A. Yes.
>
> Q. And that work would have been done in your presence?
>
> A. Some of it. Some of it was work done, you know, while I was doing – when I was doing the cleaning in the compartment, I usually – I had it sealed off where no one can get through. Especially if I was doing the deck on it, I would have it sealed off.
>
> Q. Right. The work that I'm talking about now is just during the yard period.
>
> A. In the yard period.

Case 3:14-cv-00116-GCM-DSC   Document 103   Filed 12/07/15   Page 51 of 75

> Q.     Right.
>
> A.     Yeah.  In the yard period, they could have done it when I
> was doing the, you know, the watches and whatnot.

*See* Appendix B, Ornstein.

136.    To the extent Garlock and Garrison in the RICO Lawsuit identify what they

characterize as conflicting testimony by Ornstein, an elderly man who was dying of

mesothelioma, such a conflict presented a contested issue of fact, not fraud.  Like most civil

litigants in the state courts of the United States, Garlock and Garrison resolved the contested fact

issue by making an informed business decision and upon advice of counsel in 2008 to settle

Ornstein's case rather than litigate.

137.    Dr. Holstein, an expert witness *retained by Simon Greenstone*, testified that

Ornstein was "exposed to asbestos in two basic ways.  One way he was exposed to asbestos was

by his cleaning duties and other related duties which brought him into contact with a lot of

asbestos-insulated equipment, and then in addition to that he had exposures to asbestos related to

standing watch during which others were carrying out repair work in close – and overhaul work

in close proximity to where he stood."  Dr. Holstein gave the opinion that Ornstein was exposed

to amphibole asbestos while he was in the Navy.  *See* Appendix B, Ornstein.  Steve Paskal, an

expert industrial hygienist *retained by Simon Greenstone*, testified that Ornstein was exposed to

amphiboles as a result of thermal pipe insulation during Ornstein's service in the Navy.  *See*

Appendix B, Ornstein.  Garlock's counsel did not attend the Holstein or Paskal depositions but,

on information and belief, had the transcripts of these depositions, and certainly had access to

these transcripts as a party to the litigation.

138.    Garlock and Garrison further claim in the RICO Lawsuit that they were defrauded

into settling the *Ornstein* case because they were not aware that Ornstein had been exposed to

thermal insulation products while in the Navy.

139. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud. Garlock and Garrison knew that Garlock would use its low-dose, alternative-exposure defense early in the *Ornstein* litigation. On May 16, 2008, *two days after it answered Ornstein's Complaint*, Garlock filed its Expert Witness Disclosure, certifying that Garlock had retained two experts prepared to testify about the equipment used on Navy ships. Roger B. Horne, a retired Navy Admiral, planned to testify about "naval shipbuilding, conversions, repair and maintenance in general, the materials used in ship construction and repair, [and] Shipboard and shipyard practices during construction and repair." *See* Appendix B, Ornstein. Additionally, Charles Wasson, a retired Navy Captain, intended to offer testimony regarding U.S. Navy ship design, particularly "the specifications for and use of asbestos-containing insulation," the use of asbestos-containing materials, including amosite asbestos by the Navy or on specific U.S. Navy ships, and the repair and overhaul work performed to Navy ships. Garlock anticipated that Captain Wasson would rely on "Qualified Products Lists, Approved Materials Lists, Military Specifications and Federal Specifications, specific ship records, personnel records and other official documents" to support his testimony concerning all of the other sources of asbestos exposure at the shipyard. *See* Appendix B, Ornstein. As evidenced by these disclosures, Garlock had access to all of the evidence required to independently show that Ornstein was exposed to asbestos from insulation products.

140. Further, fifteen years before *Ornstein* was filed, Garlock was a co-defendant at a trial during which Charlie Ay, a former insulator at the Long Beach Naval Shipyard – where Ornstein served fire watch and messenger duty on the *U.S.S. Estes* while it underwent overhaul – testified that the Long Beach Naval Shipyard used Kaylo, Pabco, and Armstrong insulation,

Eagle-Picher pipe covering, and H.K. Porter asbestos cloth during ship overhauls. Garlock and Garrison, therefore, had institutional knowledge and a factual basis for challenging plaintiffs' discovery responses if they believed there were different or more numerous asbestos exposures than disclosed.

141. Garlock and Garrison, through counsel, contacted Simon Greenstone via email about settling the *Ornstein* case as part of a nineteen-case settlement. Garlock and Garrison's attorney agreed to a settlement figure on a Saturday afternoon *42 minutes* after his initial email seeking to settle the case. *See* Appendix B, Ornstein. Garlock agreed to that settlement figure knowing that Ornstein had been exposed to amphibole insulating products, as disclosed in Ornstein's deposition and the depositions of Ornstein's expert witnesses, and as evidenced by Garlock's expert witness disclosures.

142. Garlock and Garrison claim in the RICO Lawsuit that false discovery responses were given in the case *Reed v. American Standard, Inc., et al.*, No. BC360536 (Los Angeles Co., CA, filed October 2006), and allege that "[a]lthough Reed and Defendants had actual knowledge that Reed was exposed to amphibole insulating products (including pipe insulation) and other highly friable asbestos-containing products, Reed and Defendants failed to describe or identify exposures to those products in discovery in the *Reed* tort action."

143. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud. In response to interrogatory 59, Reed disclosed that "Plaintiff believes, and therefore alleges that he was exposed to various asbestos-containing products and/or equipment consisting of, but not limited to . . . insulation . . ." *See* Appendix B, Reed.

144.	Reed testified during his deposition that he was present when insulation was put onto pipes and when insulation was removed from pipes and boilers, that the insulation usually crumbled when it was removed, that the removal of insulation was a dusty process, and that he inhaled the dust from the removal of insulation.  Counsel for Garlock attended Reed's deposition.  Thorpe Insulation was a named defendant and counsel for Thorpe Insulation attended Reed's deposition.  Reed testified during both his direct and cross examination that he was present when insulation work was done:

> Q.	Were you present when they were putting insulation on the pipes?
>
> A.	Yes.
>
> *	*	*
>
> Q.	Were you in the vicinity of Bill as he applied this insulation?
>
> A.	Oh, sure.
>
> *	*	*
>
> Q.	Okay.  Did you ever see Bill remove that insulation?
>
> A.	Oh, several times, yes.
>
> Q.	Did you ever see that insulation crumble?
>
> A.	Well, it did usually, yes.
>
> Q.	And when he removed it or when it crumbled, was that a dusty process?
>
> A.	Oh, yes.
>
> Q.	Did you inhale that dust?
>
> A.	Oh, yes.  If you was there, you were going to inhale it.

*See* Appendix B, Reed.

145.    Dr. Holstein, an expert witness retained by Simon Greenstone, testified that the gaskets to which Reed was exposed almost certainly contained chrysotile asbestos, while the insulation to which Reed was exposed probably contained amosite asbestos, and that amosite asbestos has a three- to fivefold greater risk of causing asbestos than does chrysotile asbestos. *See* Appendix B, Reed.

146.    Garlock and Garrison further claim in RICO Lawsuit that they were defrauded into settling the *Reed* case.

147.    Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud. Reed and the expert witnesses had provided Garlock with evidence that Reed was exposed to insulation containing amosite asbestos. Garlock and Garrison's counsel contacted Simon Greenstone to propose settling the case before Garlock and Garrison "wasted much on experts and lawyers." During settlement negotiations, Garlock and Garrison's counsel characterized *Reed* as "another old (86) wrongful death case with little damages. Bystander exposure at best." *See* Appendix B, Reed. Despite Garlock's counsel's view that *Reed* did not have a strong case against Garlock, Garlock's initial settlement offer to Simon Greenstone was $100,000, and Garlock and Garrison ultimately settled *Reed* for $400,000 as part of a group of pending California cases brought by Simon Greenstone clients. In correspondence regarding the settlement, Garlock and Garrison's counsel indicated that he had gotten authority to settle the cases but was "supposed to negotiate and get them for less. So we did negotiate some more and I didn't." *See* Appendix B, Reed. Thus, if Garlock and Garrison believe that Garlock should have paid less to resolve Reed's case, they should look to their lawyer, who they directed to continue negotiating for a lesser number, but who chose not to do so.

148.    Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, in the case *Belt v. A.W. Chesterton Co., et al.*, No. BC 360535 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Belt* case.

149.    Garlock and Garrison's statements, transmitted via the wires and/or mail,  are false and were made in furtherance of their scheme to defraud.  In Garlock's answers to special interrogatories in the *Belt* case that sought information regarding other potential sources of asbestos exposure, Garlock represented that Belt "has testified to numerous other defendants whose products plaintiff was exposed to."  Garlock objected to producing writings that documented such other sources of exposure on the grounds that the interrogatory "seeks to invade those documents identified by experts" – apparently meaning that Garlock's experts had identified other sources of potential exposure through the course of Garlock's preparation of its defense.  *See* Appendix B, Belt.

150.    Belt worked as a boilertender/boilermaker while serving in the U.S. Navy.  Belt was deposed for five days.  Counsel for Garlock attended Belt's deposition.  Belt  testified that he was exposed to asbestos by other products, including asbestos insulation, in addition to Garlock's gaskets.  Belt testified during his deposition that his work on pumps, valves, turbines, boilers, and steam traps "always" involved the installation or removal or insulation and that the insulation "was always asbestos.  Everything was insulated with asbestos."  He testified that his work included making "mud out of asbestos" and smearing that mud in cracks on main steam lines and on valves to seal them.  He testified that he worked regularly with asbestos insulating pads.  He testified that he had to knock insulation off of pumps and that "[i]t was always dusty and dirty," and that he breathed in the dust that resulted from his removal of insulation from

pumps. *See* Appendix B, Belt. Garlock was of course aware of this testimony at the time it settled the *Belt* case.

151. Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, in *Bercher v. Alfa Laval, Inc., et al.*, No. BC 347728 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Bercher* case.

152. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

153. Bercher worked as a fireman and machinist while serving in the U.S. Navy and as a machinist while working for Ford Motor Company and Shell Oil. During his nine-day deposition, Bercher testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Bercher's deposition. Bercher testified that, in the course of his work, he put on and removed asbestos insulation from various pieces of equipment, which created asbestos dust that he breathed in. Bercher testified that he removed asbestos insulation off of equipment, which created dust, in order to access gaskets that needed to be replaced, and that he would use a wire brush to scrape the gaskets, which also created dust. He testified that "most everything around steam was insulated, all the piping and the valves and anything, to – to keep people from touching it or to hold the heat in" and that he learned during his Navy training that "they always used asbestos insulation." *See* Appendix B, Bercher. Garlock was of course aware of this testimony at the time it settled the *Bercher* case.

154. Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, *Merrill v. Alfa Laval, Inc., et al.*, No. BC 352170 (Los Angeles Co., CA), and that as a result

they were defrauded into settling the *Merrill* case.

155. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

156. Merrill worked as a machinist mate during his service in the U.S. Navy and retired from the U.S. Navy as a Senior Chief. During his eleven-day deposition, Merrill testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Merrill's deposition. The Thorpe Insulation Company was a named defendant, and counsel for the Thorpe Insulation Company attended Merrill's deposition. Merrill testified that "everything that was hot was insulated, and some things that were cold were insulated," that hot things were insulated with asbestos, and that most of his work was with insulation pads. Throughout, he testified that any time he had to do work on hot equipment, he would have to remove asbestos insulation. *See* Appendix B, Merrill. Garlock was of course aware of this testimony at the time it settled the *Merrill* case.

157. Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, *Pounds v. Alfa Laval, Inc., et al.*, No. BC 353068 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Pounds* case.

158. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

159. Pounds worked as a boiler tender during his service in the U.S. Navy. During his five-day deposition, Pounds testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Pounds' deposition. The Thorpe Insulation Company was a named defendant, and counsel for the Thorpe Insulation Company

attended Pounds' deposition. Pounds testified that "[j]ust about everything [he] worked on" while in the Navy was insulated with asbestos. Throughout his testimony, Pounds said that he would have to remove insulation to work on hot equipment. *See* Appendix B, Pounds. Garlock was of course aware of this testimony at the time it settled the *Pounds* case.

160. Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, *Howell v. Alfa Laval, Inc., et al.*, No. BC 353761 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Howell* case.

161. Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

162. Howell worked as a boilerman during his service in the U.S. Navy. During his four-day deposition, Howell testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Belt's deposition. The Thorpe Insulation Company was a named defendant, and counsel for the Thorpe Insulation Company attended Howell's deposition. Howell testified that he was exposed to asbestos-containing insulation, gaskets, packing, valves, flanges, and pumps. He testified that the insulation, which he called lagging or a blanket, was around the pieces of equipment that he worked on. Howell testified that, to insulate a piece of equipment or pipe, he would wrap asbestos insulation around it and then thread wire through the blankets' eyelets to keep it in place. *See* Appendix B, Howell. Garlock was of course aware of this testimony at the time it settled the *Howell* case.

163. Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, *Steidel v. AGCO Corp., et al.*, No. BC 369661 (Los Angeles Co., CA), and that as a result they

were defrauded into settling the *Steidel* case.

164.    Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

165.    Steidel worked as a machinist mate in engine rooms during his service in the U.S. Navy.  During his five-day deposition, Steidel testified to extensive alternate sources of exposure to asbestos, including thermal insulation.  Counsel for Garlock attended Steidel's deposition by phone. The Plant Insulation Company was a named defendant, and counsel for the Plant Insulation Company attended Steidel's deposition.  Steidel testified that he worked near workers installing and removing asbestos insulation.  *See* Appendix B, Steidel.  Garlock was of course aware of this testimony at the time it settled the *Steidel* case.

166.    Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, *Creek v. Alfa-Laval, et al.*, No. BC 348521 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Creek* case.

167.    Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

168.    Creek worked in supply and store rooms during his service in the U.S. Navy.  He enlisted in 1942 and retired as a Lieutenant in 1967.  During his seven-day deposition, Creek testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Creek's deposition.  Garlock's counsel also represented Foster Wheeler, an equipment defendant, in the *Creek* case.  The Thorpe Insulation Company was a named defendant, and counsel for the Thorpe Insulation Company attended Creek's deposition. Creek testified that all of the equipment within the ships was insulated and that he stored spare

parts and insulation for the ship. Creek testified that he would have to go to different parts of the ship where asbestos insulation was used. Creek further testified that he inhaled dust from blocks of Foster Wheeler insulation. *See* Appendix B, Creek. Garlock was of course aware of this testimony at the time it settled the *Creek* case.

169.     Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, in *Lindquist v. Alfa Laval, et al.*, No. BC 382729 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Lindquist* case.

170.     Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

171.     Lindquist worked as a machinist mate during his service in the U.S. Navy. During his twelve-day deposition, Lindquist testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Lindquist's deposition by telephone. Garlock's counsel also represented The Scotts Company, a turf builder whose products contained amphibole asbestos fibers, in the *Lindquist* case. Lindquist testified that he was exposed to insulation on the hot parts of the equipment on which he worked, and that he had to remove the insulation to get to the equipment. *See* Appendix B, Lindquist. Garlock was of course aware of this testimony at the time it settled the *Lindquist* case.

172.     Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, in *Thacker v. 3M Company, et al.*, No. BC 384159 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Thacker* case.

173.     Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

174.     Thacker worked as a laborer and a metallurgist at a steel mill in Indiana and later as a pipefitter at industrial and commercial jobsites in California while earning his law degree from Western State School of Law. During his thirteen-day deposition, Thacker testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Thacker's deposition. Garlock's counsel also represented Weil-McLain, an equipment defendant, in the *Thacker* case. Thacker testified that he removed insulation from boilers, including Weil-McLain boilers, and other equipment and that "any time you would remove insulation, you're going to have a lot of dust," and that the "environment . . . is always going to be filthy when removing the insulation. It's always going to be filthy when you're removing the gasket material." *See* Appendix B, Thacker. Garlock was of course aware of this testimony at the time it settled the *Thacker* case.

175.     Garlock and Garrison claim in the RICO Lawsuit that Simon Greenstone concealed the plaintiff's exposures to asbestos products, including friable amphibole insulation, in *Lange v. Alfa Laval, et al.*, No. BC 396922 (Los Angeles Co., CA), and that as a result they were defrauded into settling the *Lange* case.

176.     Garlock and Garrison's statements, transmitted via the wires and/or mail, are false and were made in furtherance of their scheme to defraud.

177.     Lange worked as a machinist mate during his service in the U.S. Navy and eventually obtained his Ph.D. from Oxford Graduate School. During his three-day deposition, Lange testified to extensive alternate sources of exposure to asbestos, including thermal insulation. Counsel for Garlock attended Lange's deposition by telephone. Lange recalled

"lugging a lot of" insulation when cleaning up and testified that lagging insulation was wrapped around valves and other equipment. *See* Appendix B, Lange. Garlock was of course aware of this testimony at the time it settled the *Lange* case.

178.    Garlock and Garrison deliberately and in furtherance of their scheme to defraud mischaracterize in the RICO Lawsuit the trust distribution procedures of those trusts against which Simon Greenstone's clients submitted claims as requiring claims based on the clients' personal knowledge rather than approved jobsite lists, falsely claiming that Simon Greenstone's clients who filed claims based on site list presumptions without having, much less admitting, personal knowledge of exposure to the bankrupt's products committed fraud.

179.    As Garlock and Garrison were aware at the time they filed the RICO Lawsuit, many trusts accept a sworn statement that a claimant worked at a particular jobsite, and sometimes further required that the claimant have worked under a particular job title, as sufficient to presume that the claimant was likely exposed to the products of the bankrupt, and to support a payout from the trust. The trusts themselves assembled the list of approved jobsites and job titles which are publicly available.

180.    Garlock and Garrison deliberately and in furtherance of their scheme to defraud falsely claim in the RICO Lawsuit that trust claims constitute "exposure evidence." But Garlock and Garrison knew at the time it made this false and fraudulent statement that a claimant need certify only that he worked at a particular jobsite, and sometimes in a particular position, to make a claim against these trusts. Bates White, which assisted Garlock and Garrison in the Garlock Bankruptcy, provided a report in the case *Burns v. Hajoca Corp.*, No. 004317 (Philadelphia Co., PA) that describes trust distribution procedures based on site list exposures:

> As an alternative to sworn statements of product or operations
> exposure allegations, some trusts will accept evidence of presumed

exposures at a qualifying Approved Site. Each such trust will compile a list of Approved Sites based on credible information that the former defendant's products or operations were present at a given location for a specified period of time. These Approved Site lists are often compiled through historical corporate records and prior plaintiff testimony, to which the trust has determined, establishes enough evidence to presume that any individual in the direct proximity was likely exposed to the former defendant's products or operations . . . . In addition to Approved Site Lists, certain Trusts also provide an Approved Industry/Occupation list of approved occupations and/or industries where the formerly bankrupt defendant's products or operations were presumed to be present.

181.    On information and belief, Bates White provided the same advice to Garlock and Garrison regarding the function of jobsite list trust distribution procedures before Garlock and Garrison filed the RICO Lawsuit.

182.    In each of the Simon Greenstone asbestos tort cases identified in the RICO Lawsuit, Garlock requested and received in discovery the plaintiff's work history sheet. Had Garlock wished to develop *evidence* of a particular plaintiff's possible other sources of exposure beyond those that the plaintiff recalled (as compared with the non-evidentiary presumption of exposure represented by a trust claim based on the same jobsite list), Garlock could have done so by questioning the plaintiff during his deposition about the other products used at his jobsites and by presenting the testimony of jobsite witnesses to testify about other products that may have been used. Garlock did not do so.

**GARLOCK AND GARRISON'S FALSE STATEMENTS TO THE PUBLIC**

183.    Garlock and Garrison's false and fraudulent statements have not been limited to those made in asbestos litigation and the RICO Lawsuit. Rather, Garlock and Garrison have engaged in a smear campaign that makes clear that Garlock's ulterior purpose in bringing the RICO Lawsuit against Simon Greenstone is to gain unfair and fraudulent leverage against Simon Greenstone in the Garlock Bankruptcy by putting Simon Greenstone at financial risk through the

damages pled in the RICO Lawsuit and by damaging Simon Greenstone's reputation. Garlock and Garrison engaged in a pressure campaign by, on information and belief of causing or encouraging articles to be published in Texas calling Simon Greenstone "swindlers" and "con men" and accusing them of "criminality," and articles to be published online comparing Simon Greenstone to mafia characters from *The Godfather*.

## COUNT 1: RICO

184.    Simon Greenstone incorporates by reference the allegations contained in paragraphs 1 to 183.

185.    Garlock and Garrison are each a "person" within the meaning of 18 U.S.C. § 1961(3).  Beginning not later than September 1996, and continuing up to and including the date of the filing of their complaint, Garlock and Garrison, through their agents and employees, formed an enterprise as that term is defined in 18 U.S.C. § 1961(4), engaged in or the activities of which affect interstate commerce, that exists for the purpose of achieving, through illegal means, the shared goals of minimizing Garlock's personal injury and wrongful death liability in the tort system and maximizing Garlock's estate in the bankruptcy system though a pattern of racketeering activity.

186.    Garlock and Garrison, directly and through their agents and employees, conducted and participated in the business and affairs of the Enterprise through a pattern of racketeering for purposes of 18 U.S.C. § 1962(c).

187.    The Enterprise came into formation no later than September 1996, when Garrison was formed for the purpose of managing and directing Garlock's asbestos personal injury and wrongful death litigation, and when Garrison agreed to continue Garlock's fraudulent practices of wrongfully withholding evidence of, and making false and misleading statements regarding,

the dangers of Garlock's products, and Garlock's knowledge of those dangers, in asbestos personal injury and wrongful death litigation.

188.    At all relevant times, the Enterprise has existed separate and apart from Garlock and Garrison's racketeering acts and their conspiracy to commit such acts.  The Enterprise has an ascertainable structure and purpose beyond the scope and commission of the counterdefendants' predicate acts.  The Enterprise is used to coordinate strategy, manipulate evidence, suppress the truth about the dangers of Garlock's products, assert false and fraudulent claims about Simon Greenstone's litigation conduct, exert improper and fraudulent pressure on Simon Greenstone in the Garlock Bankruptcy, and otherwise further Garlock and Garrison's fraudulent scheme of wrongfully minimizing Garlock's liability for asbestos personal injury and wrongful death cases and maximizing the bankruptcy estate.  The Enterprise is an ongoing organization.

189.    Garlock and Garrison, having devised a scheme or artifice to defraud, used the mails and interstate wires for the purpose of executing, or attempting to execute, the scheme. More specifically, Garlock and Garrison served false responses to discovery on Simon Greenstone in order to wrongfully suppress litigation and settlement values for Simon Greenstone's clients, and in turn Simon Greenstone's contingency fees, and to limit Simon Greenstone's ability to recover costs expended in bringing claims on behalf of clients, and thereby obtain money or property through false or fraudulent pretenses.  These acts constitute violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) and are therefore predicate acts of racketeering activity under 18 U.S.C. § 1961(1)(B).

190.    Garlock and Garrison, having devised a scheme or artifice to defraud, used the mails and wires for the purpose of executing, or attempting to execute, the scheme.  More specifically, Garlock and Garrison filed the RICO Lawsuit on January 9, 2014 and served the

RICO Lawsuit on Simon Greenstone, using the wires and mails. Garlock and Garrison knowingly made false and fraudulent claims in the RICO Lawsuit in furtherance of their scheme to obtain money or property by false or fraudulent pretenses by praying for damages against Simon Greenstone based on allegations that Garlock and Garrison know are false, and by using the RICO Lawsuit to exert pressure on Simon Greenstone and members of the Committee in the Garlock Bankruptcy for the purpose of wrongfully limiting the funds available to pay personal injury and wrongful death claims brought by current and future Simon Greenstone clients, and in turn Simon Greenstone's contingency fees. These acts constitute violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) and are therefore predicate acts of racketeering activity under 18 U.S.C. § 1961(1)(B).

191.    These predicate acts are related in that they share the same or similar purposes, results, participants, methods of commission, and were otherwise interrelated and not isolated. The predicate acts were not isolated events, but rather were regular, continuous, and integral steps in furtherance of Counterdefendants' scheme to defraud. Accordingly, the Counterdefendants' predicate acts constitute a pattern of racketeering for purposes of 18 U.S.C. §§ 1961(5) and 1962(c).

192.    By reason of Counterdefendants' violations of 18 U.S.C. § 1962(c), Counterdefendants suppressed the settlement and trial verdict value of claims brought against Garlock by Simon Greenstone's clients, and in turn Simon Greenstone's contingency fees; limited the funds that will be available to satisfy claims by present and future clients represented by Simon Greenstone, and in turn Simon Greenstone's contingency fees; caused Simon Greenstone to expend substantial money and resources to defend against the false claims brought by Counterdefendants in the RICO Lawsuit against Simon Greenstone; and damaged Simon

Greenstone's reputation. Simon Greenstone is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest thereon from the date of loss and attorney's fees.

## COUNT 2: CONSPIRACY TO VIOLATE RICO

193.    Simon Greenstone incorporates by reference the allegations contained in paragraphs 1 to 192.

194.    From at least September 1996 up to and including the date of the filing of this Counterclaim, Garrison and Garlock, directly and through their agents and employees, and others, being persons associated with the Enterprise, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree together and with each other, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, which was engaged in, and the activities of which affected, interstate commerce, through a pattern of racketeering activity consisting of multiple acts indictable under 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

195.    Each Counterdefendant and co-conspirator agreed that at least two acts of racketeering activity would be committed by a member of the conspiracy in furtherance of the conduct of the Enterprise. It was part of the conspiracy that Garlock and Garrison and others, through their agents and employees, would commit numerous acts of racketeering activity in the conduct of the affairs of the Enterprise, including but not limited to the acts of racketeering set forth in this Counterclaim.

196.    The pattern of racketeering activity began from at least as early as September 1996 and is continuing through the filing of this Counterclaim. Garlock and Garrison and others known and unknown did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and obtain money and property from, Simon Greenstone by withholding

evidence of the dangers of Garlock's products and knowledge of that danger in asbestos personal injury and wrongful death litigation, by making false and misleading statements in discovery responses in asbestos personal injury and wrongful death litigation, and by making false and fraudulent allegations in the RICO Lawsuit and in articles that Garlock and Garrison caused or encouraged to be published.

197.    For the purpose of executing and attempting to execute the scheme and artifice described herein, Garlock and Garrison and others, through their agents and employees, would and did knowingly place and cause to be placed in any post office or authorized depository for mail, matter, matters, and things to be sent and delivered by the United States Postal Service and other common carriers, and knowingly caused to be delivered by mail according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in violation of 18 U.S.C. § 1341 including, but not limited to, the instances of racketeering acts set forth in this Counterclaim.

198.    For the purpose of executing and attempting to execute the scheme and artifice described herein, Garlock and Garrison and others, through their agents and employees, would and did knowingly transmit and caused to be transmit in interstate commerce by means of wire, matters in violation of 18 U.S.C. § 1343 including, but not limited to, the instances of racketeering acts set forth in this Counterclaim.

199.    These predicate acts are related in that they shared the same or similar purposes, results, participants, methods of commission, and were otherwise interrelated and not isolated. The predicate acts were not isolated events, but rather were regular, continuous, and integral steps in furtherance of Garlock and Garrison's scheme to defraud.  Accordingly, Garlock and Garrison's predicate acts constitute a pattern of racketeering for purposes of 18 U.S.C. §§

1961(5) and 1962(c).

200.    By reason of Garlock and Garrison and others' violations of 18 U.S.C. § 1962(d), Garlock and Garrison suppressed the settlement and trial verdict value of claims brought against Garlock by Simon Greenstone's clients, and in turn Simon Greenstone's contingency fees; limited the funds that will be available to satisfy claims by present and future clients represented by Simon Greenstone, and in turn Simon Greenstone's contingency fees; caused Simon Greenstone to expend substantial money and resources to defend against the false claims brought by Garlock and Garrison in the RICO Lawsuit against Simon Greenstone; and damaged Simon Greenstone's reputation.  Simon Greenstone is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest thereon from the date of loss and attorney's fees.

## COUNT 3: FRAUDULENT INDUCEMENT

201.    Simon Greenstone incorporates by reference the allegations contained in paragraphs 1 to 200.

202.    Garlock and Garrison knowingly made false representations to Simon Greenstone that they would make payment under settlement agreements with Simon Greenstone's clients while knowing full well that Garlock would be seeking bankruptcy protection and that these settlements would be paid only pennies on the dollar.

203.    Garlock and Garrison intended to deceive Simon Greenstone and intended that Simon Greenstone rely on their false representations.

204.    Simon Greenstone justifiably relied on those misrepresentations and, as a result, suffered compensatory and punitive damages in an amount to be proven at trial that exceeds $75,000, exclusive of interest and costs.

## COUNT 4: ABUSE OF PROCESS

205.     Simon Greenstone incorporates by reference the allegations contained in paragraphs 1 to 204.

206.     Garlock and Garrison initiated the RICO Lawsuit against Simon Greenstone for an ulterior purpose not warranted by the civil litigation process.  Specifically, Garlock and Garrison initiated the RICO Lawsuit against Simon Greenstone in an attempt to pressure Simon Greenstone and others representing their clients on the Committee to agree to Garlock's proposed valuation of all future mesothelioma claims at $12,000 per claimant.  Garlock and Garrison further initiated the RICO Lawsuit against Simon Greenstone in an attempt to gain leverage and an unfair advantage over the Asbestos Personal Injury Creditors and Simon Greenstone's present and future clients in the litigation of the Garlock Bankruptcy.  Garlock and Garrison further initiated the RICO Lawsuit against Simon Greenstone for the purpose of harming Simon Greenstone's reputation and in general to oppress Simon Greenstone.

207.     As a result of Garlock and Garrison's abuse of process, Simon Greenstone suffered compensatory and punitive damages in an amount to be proven at trial that exceeds $75,000, exclusive of interest and costs.

## COUNT 5: PUNITIVE AND EXEMPLARY DAMAGES

208.     Simon Greenstone incorporates by reference the allegations contained in paragraphs 1 to 207.

209.     Garlock and Garrison acted with outrageous, malicious, or otherwise morally culpable conduct, and committed fraud.  In order to punish Garlock and Garrison and to deter such actions and/or omissions in the future, Simon Greenstone seeks recovery from Garlock and

Garrison for punitive and exemplary damages.

**JURY TRIAL DEMAND**

210.    Simon Greenstone demands a jury trial on all issues so triable.

WHEREFORE, having brought its counterclaims, Simon Greenstone prays as follows:

1.    All issues of fact be tried to a jury;

2.    Simon Greenstone recover RICO treble damages of Garlock and Garrison;

3.    Simon Greenstone recover compensatory, exemplary, and punitive damages of Garlock and Garrison;

4.    Simon Greenstone recover their attorneys' fees to the full extent permitted by law;

5.    The cost of this action be taxed to Garlock and Garrison;

6.    The Court enter such other and further relief as may be just and proper.

Respectfully submitted,

/s/  Michael W. Magner
MICHAEL W. MAGNER (La. Bar. No. 1206)
(admitted pro hac vice)
MARK A. CUNNINGHAM (La. Bar No. 24063)
(admitted pro hac vice)
AVERY B. PARDEE (La. Bar No. 31280)
(admitted pro hac vice)
JONES WALKER LLP
201 St. Charles Avenue, Suite 5100
New Orleans, Louisiana 70170
Phone:  (504) 582-8316
Fax:  (504) 589-8316
mmagner@joneswalker.com
mcunningham@joneswalker.com
*Attorneys for Simon Greenstone Panatier Bartlett,*
*PC, Jeffrey B. Simon, David C. Greenstone, the*
*Estate of Ronald C. Eddins and Jennifer L. Bartlett*

- and -

SARA W. HIGGINS (N.C. Bar No. 22111)
RAYMOND E. OWENS, JR. (N.C. Bar No. 8439)
HIGGINS & OWENS, PLLC
5925 Carnegie Blvd., Suite 530
Charlotte, North Carolina 28209
Phone: (704) 366-4607
Fax: (704) 749-9451
shiggins@higginsowens.com
rowens@higginsowens.com

## CERTIFICATE OF SERVICE

In accordance with Local Rule 5.3(C), I hereby certify that a copy of this document was served on all counsel of record via ECF and NEF, this 7th day of December, 2015.

*/s/ Michael W. Magner*